**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| BUSINESS LEADERS IN CHRIST, an unincorporated association, | Civ. Action No.: _____ |
| *Plaintiff,* | |
| v. | **COMPLAINT** |
| THE UNIVERSITY OF IOWA; LYN REDINGTON, in her official capacity as Dean of Students and in her individual capacity; THOMAS R. BAKER, in his official capacity as Assistant Dean of Students and in his individual capacity; and WILLIAM R. NELSON, in his official capacity as Executive Director, Iowa Memorial Union, and in his individual capacity, | |
| *Defendants.* | |

Matt M. Dummermuth
Hagenow & Gustoff, LLP
600 Oakland Rd. NE
Cedar Rapids, IA 52402
(319) 849-8390 phone
(888) 689-1995 fax
*mdummermuth@whgllp.com*

Eric S. Baxter*
*Lead Counsel*
Daniel H. Blomberg*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC, 20036
(202) 955-0095 phone
(202) 955-0090 fax
*ebaxter@becketlaw.org*
*dblomberg@becketlaw.org*

*Counsel for Plaintiff*

*\*Admission pro hac vice pending*

1.   This dispute arises from discrimination by the University of Iowa and the Defendant Officers (collectively, "the University") against a small Christian student group on campus because the group requires its student leaders to embrace and follow its religious beliefs.

2.   The group, Business Leaders in Christ, or "BLinC," was founded three years ago at the University's Tippie College of Business.



3.   Its "primary mission is to create a community of followers of Christ . . . to share and gain wisdom on how to practice business that is both Biblical and founded on God's truth." *See Business Leaders in Christ*, https://orgsync.com/93906/chapter.

4.   BLinC encourages its members to follow the Apostle Paul's admonition to view all their activities—including their careers—as part of their Christian discipleship.



5.   BLinC pursues its mission "by reading scripture together through devotions, hosting Christian businessmen and women from the community, serving [the] community together, and spending time with one another." *See id.*

6.   To guide its work, BLinC has adopted a Statement of Faith describing what it means to be a disciple of Christ. *See* Exhibit A (current BLinC Constitution with Statement of Faith attached as Exhibit A1).

7.   The Statement of Faith embraces traditional Christian doctrines, including those concerning the supremacy of the Bible, the Unity of the Trinity, and the availability of salvation through Jesus Christ.

8.   It sets forth religious teachings on how members should conduct their careers without the greed, racism, sexual immorality, and selfishness that all too often arise in business, political, and cultural institutions.

9.   The Statement of Faith also calls on members to use their financial resources and personal talents to serve the community by providing for the orphaned, the needy, the abused, the aged, the helpless, and the sick.

10.   To preserve and fully express its religious mission, BLinC requires all of its leaders (but not members) to affirm that they will embrace and follow the Statement of Faith.

11.   In 2016, a student member of BLinC claimed that he was denied a leadership position because he is "openly gay." Exhibit B (Student Complaint).

12.   The charge was false. BLinC declined the student's request because he expressly stated that he rejected BLinC's religious beliefs and would not follow them.

13.   Yet the University went on to de-register BLinC as a student organization.

14.   Without registered status, BLinC cannot participate in on-campus recruitment fairs, access University facilities, or receive the funding and other benefits that are available to all other student groups.

15.   In rendering its decision, the University singled out BLinC's Christian beliefs about sexual morality, finding that these beliefs, on their face, were discriminatory and impermissible.

16.   The University concluded that if BLinC wants to be re-registered, it will have to amend its Statement of Faith and submit an "acceptable plan" for selecting its leaders.

17.   The University is targeting BLinC because it dislikes BLinC's religious beliefs.

18.   The University's attempt to tell BLinC how to define its faith and select its leaders constitutes religious animus and discrimination and violates clearly established federal and state law.

19.   The U.S. Supreme Court has recently and unanimously affirmed over a century of precedent protecting the right of religious groups to manage their own internal religious affairs, including determining their own religious beliefs and selecting their own religious leaders.

20.   Moreover, the Court has insisted that only the most compelling reasons could justify censoring a private group's expression, or punishing a private association for exercising its right to assemble with those who share its mission and beliefs. The University offers no such compelling reason here.

21.   The University knows that what it is doing to BLinC is unfair, illegal, and unconstitutional. It allows other student groups to define their own mission and limit both leadership *and membership* to those who embrace that mission. And in the past, the University has conceded that it must allow other religious student to select their own leaders. But BLinC is being targeted because the University has animosity towards its religious beliefs.

22.   The University's decision thus is not only illegal and unconstitutional, but contrary to the University's own policies and practices.

23.   For all these reasons, the University's discrimination against BLinC must be enjoined.

## JURISDICTION AND VENUE

24.   This action arises under the Constitution and laws of the United States. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

25.   The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

26.   Venue lies in this district under 28 U.S.C. § 1391(b)(1) and (2).

## IDENTIFICATION OF PARTIES

27.   Plaintiff BLinC was founded in 2014 and is a student group at the Tippie College of Business at the University of Iowa.

28.   Defendant The University of Iowa is a public university. Defendant Lyn Redington is the Dean of Students at the University of Iowa and is sued in her official and individual capacities.

29.   Defendant Thomas R, Baker is the Associate Dean of Students at the University of Iowa and is sued in his official and individual capacities.

30.   Defendant William R. Nelson is the Executive Director of the Iowa Memorial Union at the University of Iowa and is sued in his official and individual capacities.

31.   All Defendants are persons acting under color of state law within the meaning of 42 U.S.C. § 1983.

## FACTUAL ALLEGATIONS

BLinC's Mission and Activities

32.   BLinC was founded in the Spring of 2014 by a small group of students at the Tippie College of Business at the University of Iowa.

4

33.  BLinC was recognized by the University as an on-campus student organization in Fall of 2014.

34.  The founding students sought to create opportunity to fellowship, strengthen each other's faith, develop character, and learn how to live their faith in the business world.

35.  They believe that part of their calling as Christians is to conduct all aspects of their lives—including their careers—as disciples of Jesus Christ.

36.  This belief includes recognizing the Bible as BLinC's ultimate authority on how Christians should live their lives, and that Christians should confess and repent of any conduct that fails to live up to the Bible's standards.

37.  In accordance with that belief, the founding students adopted Colossians 3:23 from the New Testament to help define their purpose: "Whatever you do, work at it with all your heart, as working for the Lord, not for human masters." The Holy Bible: New International Version, Colossians 3:23.

38.  Since its founding, BLinC has held itself out as a religious organization. Article I of its founding constitution stated that BLinC's "purpose" was to gather "seekers of Christ" and "help students learn about how to continually keep Christ first in the fast-paced business world." *See* Exhibit C (original constitution).

39.  BLinC seeks to accomplish this religious mission by "[u]sing the Bible as a guide," engaging in religious "fellowship and small group discussion," and inviting business leaders "who walk with Christ on a day-to-day basis" to speak to and mentor students. *Id.*

40.  Likewise, BLinC's public campus webpage states that its "primary mission is to create a community of followers of Christ within the Tippie College of [B]usiness in order to share and gain wisdom on how to practice business that is both Biblical and founded on God's truth." *See*

*Business Leaders in Christ*, https://orgsync.com/93906/chapter; *see also* Tippie College of Business, *Business Leaders in Christ*, https://tippie.uiowa.edu/student-organizations/business-leaders-christ (BLinC is "on a mission to create a community of followers of Christ within Tippie," which it accomplishes in part by "reading scripture together").

41.   BLinC's social media is also clear about its religious identity. Its Facebook page—which features Colossians 3:23 superimposed on a New York City skyline—is facebook.com/TippieBelievers, and past leaders have used #TippieBelievers as BLinC's Twitter handle.

42.   During BLinC's weekly meetings, its leaders—typically the president or vice president—lead the members in prayer, Bible study, and spiritual reflection.

43.   The leaders are also responsible for selecting Iowa business leaders to speak to students about how they integrate their faith and careers. Speakers have come from institutions like Thrivent Financial, Rockwell Collins, and from the University itself.

44.   Leaders also organize regular service projects on and around campus, such as providing childcare at a local Saturday-school program and partnering with a local non-profit's after-school mentoring program for at-risk youth.

45.   The leaders have also organized events within the business school, such as Tippie Gives Thanks, an event at which BLinC offered students and faculty a place to write down and reflect on things they are thankful for.

46.   Because BLinC's leaders are responsible to carry out BlinC's religious mission and to provide religious ministry to BLinC's members, BLinC takes great care in selecting the leaders in each successive year.

47.   Members may nominate themselves or others for leadership positions.

48.   The leadership then meets with the nominated individuals to discuss their commitment to BLinC's mission.

49.   Members have a final vote on the slate of candidates approved by the current leadership.

50.   This is a matter of basic institutional integrity. To remain in existence and to carry out its mission—to be "Business Leaders *in Christ*"—BLinC must have leaders who themselves embrace and follow BLinC's mission. BLinC's Bible studies, prayers, worship, and religious service would be hollow, inauthentic, and ultimately short-lived if it did not require its leaders to share its basic organizational mission and guiding purpose.

51.   It is also a matter of personal integrity, both for potential leaders and members. BLinC cannot and will not ask leaders who do not share its beliefs to lead members in prayer or to convey those beliefs. Nor can BLinC ask its members to participate in insincere worship.

The Complaint against BLinC

52.   In March 2016, a BLinC member approached Hannah Thompson, BLinC's president at the time, to inquire about serving as BLinC's vice president.

53.   Ms. Thompson met with the student in April 2016 to determine if he could provide spiritual leadership to BLinC. She brought her Bible to the meeting and asked him questions about his faith and his relationship with Jesus Christ.

54.   On his own initiative, the member disclosed to Ms. Thompson that he thought he was gay and was struggling with how that related to his Christian faith. Ms. Thompson opened her Bible and they studied what the Bible teaches about sexual conduct. They prayed together.

55.   Ms. Thompson explained that the member was welcome to participate in BLinC and that she would need to discuss his leadership candidacy with other members of the executive team.

56.   Through prayer and discussion of the Bible's teachings, the executive board agreed that the most important qualities for BLinC's leaders were to accept Jesus Christ as their Savior and to believe in the Bible as the ultimate authority on how to live their lives.

57.   The board members further agreed that where leaders engaged in conduct that the Bible identified as sinful, they had a Christian duty to admit that the conduct was sinful (known as "confession") and choose to turn from the conduct and strive to live in a manner that was worthy of Christ's sacrifice (known as "repentance").

58.   The executive board was concerned that the member did not share BLinC's view of the Bible's guiding authority and its teaching on sexual conduct, and did not seem willing to confess and repent of what the Bible taught is sinful conduct. The board thus came to the consensus that the student appeared to be in fundamental disagreement with BLinC's faith, and thus could not lead BLinC in a manner that would reliably interpret and apply the Bible's teachings.

59.   When she next met with the student, Ms. Thompson asked the member if he planned to follow BLinC's Christian beliefs on sexual moral conduct. The member said he did not and that he intended to pursue same-sex relationships.

60.   Ms. Thompson expressed to the member that she wanted to continue to walk closely with him as a friend and fellow Christian, and would love for him to continue to be a member of BLinC, but that he would not be eligible for a leadership position because his decision to enter into same-sex relationships was inconsistent with BLinC's religious beliefs.

61.   Ms. Thompson emphasized to the member that her decision was not because he was gay, but because he did not agree with BLinC's biblically based views on sexual conduct.

62.   At the beginning of the next school year, BLinC's leadership team held a "Vision Meeting" to more clearly state their leadership standards.

63.   At the meeting, the leaders adopted the statement of faith used by the Christian Business Fellowship, with the addition of the following standard for its leaders:

> As I hold an Executive position with Business Leaders in Christ, I commit to live a life in which I turn from my sin and actively choose the biblical     principles    of Godly sanctification and righteousness. If and when I misstep, I will confess my struggle to God and to a member of the Business Leaders in Christ executive board acknowledging that I choose to receive grace and forgiveness from God and from others, and turn from my sin.

Exhibit A1.

64.   Toward the middle of the following semester, on February 20, 2017, the member who had sought to be BLinC's vice president filed a complaint with the University of Iowa stating that "I was denied a leadership position (Vice President) due to my being openly gay." *See* Exhibit B.

65.   As relief, he asked the University to "force BLinC to . . . allow openly LGBTQ members to be leaders . . . or take away their status of being a student organization affiliated with the University of Iowa." *Id.*

66.   The student subsequently founded his own University-recognized, "Jesus-Centered" student organization, Love Works, which "seek[s] to advocate for justice … [on] LGBT … issues" and "affirm[s] those in the LGBTQ+ community who have been pushed aside from many other faith communities." Exhibit D.

<u>The University's Policies and Practices</u>

67.   The University's guidelines for student organizations recognize the right of students to organize according to common beliefs and values.

68.   For example, the University's policy regarding "Registration of Student Organizations" states that it is "the policy of the University that all registered student organizations be able to exercise *free choice of members* on the basis of their merits as individuals without restriction in accordance with the University Policy on Human Rights." Exhibit E (emphasis added).

69.   The policy further recognizes that students have the right to "organize and associate with like-minded students" and thus that "any individual *who subscribes to the goals and beliefs of a student organization* may participate in and become a member of the organization." *Id.* (emphasis added).

70.   Student organizations at the University frequently require their members to share the missions of the organizations they seek to join.

71.   For example, The University of Iowa Feminist Union limits its membership to students who "agree[] with [its] purposes and principles," including support for abortion, access to contraception for minors, and even certain positions on the environment. Exhibit F at 2.

72.   Students for Life requires its members to "hold pro-life beliefs." Exhibit G at 1.

73.   The Korean American Student Association requires members to "exhibit an optimistic attitude towards Korean culture" and reserves the right to revoke the membership of any member who "possesses a negative attitude." Exhibit H at 1.

74.   The Association of Women Dentists requires members to support the advancement and recognition of women in dentistry. Exhibit I at 1.

75.   The Islamic organization Imam Mahdi reserves certain membership benefits, including leadership roles, to members who are Shia Muslims. Exhibit J at 3. The group also requires its leaders to "refrain from major sins (*kaba'ir)* and endeavor to avoid minor sins (*saga'ir*)." *Id*. at 1.

76.   Love Works, the religious organization founded by the student who filed the complaint against BLinC, requires its executive officers to "sign and agree to the Mission and Statement of Core Beliefs of Love Works" which includes a section on inclusivity declaring that: "We believe that Jesus was the ultimate example of someone who reaches out to the marginalized. We stand in full support of those who are victims of systemic oppression. We welcome full participation in our

organization, regardless of race, gender, sexual orientation, gender identity, or ability, and affirm those in the LGBTQ+ community who have been pushed aside from many other faith communities." Exhibit D at 2-3.

77.  Multiple Christian student groups condition membership on students agreeing to a "statement of belief," *see, e.g.*, Exhibit K at 2, bearing "clear testimony of conversion to Jesus Christ," Exhibit L at 1, or keeping religion-specific standards.

78.  These requirements for members to support their organizations' missions make sense in light of the University's goal that student organizations bring "like-minded students" together. Exhibit E at I.

79.  Thus, *preventing* BLinC from creating space for students of like-minded religious beliefs violates, not upholds, the University's policies.

80.  In addition, student fraternities and sororities explicitly select members on the basis of their sex.

81.  The Bylaws of the Panhellenic Council, the student organization that governs sororities on campus, note that only "women's fraternal organization[s]" will be recognized as members. Bylaws of the Panhellenic Council at the University of Iowa (Oct. 26, 2017), http://iowafsl.publishpath.com/Websites/iowafsl/images/UPDATED%20PHC%20Bylaws%20(10-26-17).pdf.

82.  The Iowa Fraternity and Sorority Life website notes that fraternities are "for men" while sororities are "for women."  http://iowafsl.publishpath.com/terminology

83.  The University of Iowa actively encourages students to join fraternities and sororities despite the fact that they discriminate on the basis of gender. For instance, the University's Vice President for Student Life has written in a booklet promoting Greek life on campus that "[b]eing

a member of a fraternity or sorority provides one of the best ways to becoming an involved student at Iowa." Tom Rocklin, Iowa Fraternity & Sorority Life 2016-2017, 2, http://iowafsl.publishpath.com/Websites/iowafsl/images/1426-1_-_FSL_2016-2017_Booklet_Updates.pdf.

84.   The University also advertises for fraternities and sororities that affiliate on the basis of race, ethnicity, and sexual orientation. *See* University of Iowa, *Center for Student Involvement & Leadership*, https://csil.uiowa.edu/pickone (advertising that the "UI Fraternity and Sorority Community provides a welcoming social structure for many students" and "offers a verity of choices for a diversity of membership interests," noting that the "44 Greek organizations on campus include six historically African-American fraternities and sororities, three historically Latino/a chapters, two Asian interest groups, and a fraternity and sorority for LGBT men and women and allies"; encouraging students to "investigate your interest early!" to ensure they can sign up in time).

85.   Fraternities and sororities are governed by the University Policy of Human Rights just as other student organizations are. *See Registration of Student Organizations,* I.G.2 (explaining that rules and regulations of governing social fraternities must be "consistent with the University Policy on Human Rights").

86.   Further, the University's Statement of Religious Diversity emphasizes that "[r]eligious history, religious diversity, and spiritual values have formed a part of The University of Iowa's curricular and extracurricular programs since the founding of the University" and that "[a]s a public institution, the University neither promotes any particular form of religion nor discriminates against students, staff, or faculty on the basis of their religious viewpoints." Dean of Students, The

University of Iowa, *Statement of Religious Diversity,* https://dos.uiowa.edu/policies/statement-of-religious-diversity-and-the-university-calendar/

87. The University's Human Rights Policy similarly forbids discrimination on the basis of "creed" or "religion," promising that "equal opportunity and access to facilities shall be available to all," including in "policies governing programs of extracurricular life and activities." The University of Iowa, *Operations Manual*, ch. 3.1 Human Rights Policy and Rationale, https://opsmanual.uiowa.edu/community-policies/human-rights#3.1.

88. The University's Human Rights Policy also declares that "[c]onsistent with state and federal law, reasonable accommodations will be provided . . . to accommodate religious practices." *Id.*

89. Additionally, the University's policy on Registration of Student Organizations states that "[t]he reasons for denying or withdrawing registration of a student organization shall not violate the University Policy on Human Rights," which would preclude withdrawing registration on the grounds of "creed" or "religion." Exhibit E at 1.

90. The University has previously admitted that, under these policies, "a student religious group is entitled to require a statement of faith as a pre-condition for joining the group" and that "[a]*sking prospective members to sign the CLS statement of faith would not violate the UI Human Rights Policy*." Exhibit M.

91. Additionally, on the University's website, it notes that "the University encourages the formation of student organizations around the areas of interests of its students" because "[t]hey play an important role in developing student leadership and providing a quality campus environment." *See* Exhibit E.

92.  "Because participation in student organizations may enhance a student's educational experience and the University deems this important to our students' success, registered organizations are entitled to certain privileges and benefits." *See id.* at I.

93.  Those privileges and benefits include:

(a)  official status as a University organization;

(b)  establishment of a financial account and purchasing privileges;

(c)  the ability to receive school funding;

(d)  inclusion in University publications;

(e)  use of University organizational software;

(f)  use of the University's trademarks;

(g)  use of campus facilities for meetings;

(h)  use of University fleet services vehicles;

(i)  use of University of staff and programming resources;

(j)  use, once a semester, to use Information Technology Services Mass Mail;

(k)  the ability to apply for honors and awards granted to registered organizations; and

(l)  use of office and storage space.

*See* Exhibit E at I (listing benefits of recognized status).

<u>The University's Investigation</u>

94.  In response to the member's complaint, the University commenced an investigation of the facts alleged.

95.  University Compliance Coordinator Constance Shriver Cervantes, from the University's Office of Equal Opportunity and Diversity, was assigned to conduct the investigation.

96.   As part of her investigation, Ms. Shriver Cervantes instructed Hannah Thompson and the other members of BLinC's executive board at the time that they could not discuss the member's complaint or the University's investigation with anyone else.

97.   Because of this instruction, when Hannah Thompson was asked to meet with Ms. Shriver Cervantes, she did not seek legal counsel or other guidance.

98.   The member on the other hand, took his story directly to the press. Exhibit N (Naomi Hofferber, *Finding a Home in Faith*, The Daily Iowan, Mar. 2, 2017).

99.   At Ms. Thompson's interview, two University lawyers were present and questioned her aggressively without informing of her right to be represented by counsel.

100. As a follow-along to her interview, Ms. Thompson submitted a written statement emphasizing that BLinC "never discriminate[s] against students because of who they are. All we ask is that our leaders support and uphold our 'goals and beliefs.'" Exhibit O at 2.

101. She also reiterated that the complaining member had "expressly stated that he rejected important parts of our Christian beliefs, would not support them, and would openly oppose them in public. It was for this reason, and this reason only, that [he] was deemed ineligible to serve as our organization's vice-president." *Id*.

102. She concluded that "BLinC's entire purpose is to encourage students to live according to its understanding of Christian principles. It cannot fulfill its core mission if its leaders do not support its beliefs." *Id*.

103. After completing the investigation, Ms. Shriver Cervantes issued a report of her findings on June 30, 2017. Exhibit P.

104. In her report, Ms. Shriver Cervantes stated that the complaining member alleged that he was denied the position because he "was gay *and might pursue a relationship as a gay person*." *Id*. at 2 (emphasis added).

105. The report also notes that Ms. Thompson confirmed that the complainant was denied the position "because of [his] desire to pursue a homosexual . . . relationship." *Id*.

106. The report cites an email from Ms. Thompson to the complainant, which also confirmed that the decision not to offer him a leadership position was "because of [his] desire to pursue a homosexual . . . relationship." *Id*. at 3

107. The report also acknowledged that BLinC welcomes all students as members, regardless of their sexual orientation. *Id.*

108. Leaders are also selected without regard to sexual orientation.

109. Leaders, however, are required to agree with and strive to abide by BLinC's religious beliefs, which include avoiding any sexual activity outside of marriage between a man and a woman. *See* Exhibit A.

110. Despite these clear statements by both the complainant and Ms. Thompson that the complainant was denied a leadership position because of his beliefs and intended conduct, Ms. Shriver Cervantes concluded that "the basis for BLinC's refusal to select [the complainant] for the position of vice-president was his sexual orientation." Exhibit P at 5.

111. The report further stated that "[s]tudent organizations may state a set of beliefs with which their members or leaders must comply," as long as the "statement of beliefs" is not "inconsistent" with the University's policies. *Id.*

112. Ms. Shriver Cervantes then concluded that "BLinC's action with respect to [the complainant's] application for the position of vice-president violates the *Policy on Human Rights* because of the statements made by the president." *Id.*

113. In a response letter dated July 14, 2017, BLinC reiterated that the complainant "participated in BLinC before asking for a leadership position, and remains welcome to participate—even as a leader, regardless of his sexual orientation," and that he was "not eligible to be a leader of BLinC only because he stated that he disagrees with, and would not try to live by, BLinC's Christian principles, which means he could not effectively lead our group." *See* Exhibit Q.

Meeting between BLinC and the University

114. On September 1, 2017, BLinC met with the Defendant William Nelson, the Executive Director of the Iowa Memorial Union, and Associate Dean Thomas Baker to discuss Ms. Shriver Cervantes's findings. BLinC was represented at the meeting by its President, Jacob Estell, its Vice-President, Brett Eikenberry, and two of its lawyers.

115. Early in the discussion, Dean Baker stated that the University recognized its obligation to respect the right of student groups, and particularly religious student groups, to select leaders who share their mission and beliefs.

116. He explained that the issue had arisen previously at the University in 2004 with the Christian Legal Society ("CLS"), which also required its leaders to share its religious beliefs, including beliefs about sexual conduct. The University allowed CLS to remain a registered student organization after it confirmed that its leadership policies were focused on student leaders' *beliefs and conduct* (*i.e.*, affirming religious beliefs on sexual ethics and refraining from sexual intimacy outside of marriage) and not their status (*i.e.*, sexual orientation). *See* Exhibit M.

117.  Dean Baker went on to analogize that a student environmental society established to promote awareness of global warming would be allowed to choose leaders based on that tenet, and that BLinC could expect the same of its leaders regarding its tenets.

118.  In response to a question from Mr. Baxter, Dean Baker confirmed that BLinC could maintain a standard of religious *belief* and *conduct* for its leaders without violating the University's Human Rights Policy, as long as it did not discriminate categorically on *status*.

119.  He explained that the initial finding that BLinC violated University policy was based on the understanding that the complaining student had been denied a leadership position solely because he identified as gay, and that BLinC had never asked if he shared BLinC's faith and would live according to its beliefs.

120.  BLinC explained that this understanding was incorrect, was directly contradicted by the University's own findings, and—in any event—was not in accordance BLinC's leadership policy.

121.  Under that policy, students who identify as gay can be members and leaders of BLinC if they affirm its beliefs and strive to live by them.

122.  Dean Baker confirmed that such a policy would be permissible.

123.  Dr. Nelson added that BLinC's beliefs should be more clearly stated in its constitution so that students would be aware before joining and not risk feeling offended in discovering later that they may not be eligible for a leadership position if they disagreed with those beliefs.

124.  Dean Baker stated that a written articulation of BLinC's beliefs would also help avoid arbitrary application of BLinC's standards.

125.  BLinC's student leaders who were present at the meeting indicated they were willing to provide a written articulation of their religious beliefs.

18

126. BLinC's leaders again confirmed that they do not discriminate based on status of members or leaders, but require leaders to share their beliefs and strive to abide by their standards.

127. All parties thus agreed that once BLinC updated its constitution to more clearly reflect its religious beliefs, the University's investigation would end.

128. Dr. Nelson indicated that he would send a letter to BLinC confirming the outcome of the parties' meeting.

129. As he walked out of the meeting room, Dr. Nelson stopped, turned to address the student leaders, and paid them a compliment along the lines that "some of the University's best students are sitting right here."

Dr. Nelson's Letter & BLinC's Revised Constitution

130. On September 13, 2017, Dr. Nelson issued a letter upholding Ms. Shriver Cervantes's findings and her conclusion that BLinC had violated the University's Policy on Human Rights. *See* Exhibit R.

131. Dr. Nelson also determined that BLinC could retain its status as a recognized student organization if it: (1) confirmed in writing that it complies with the University's policy; (2) submitted an updated list of qualifications in its statement of faith to avoid categorically excluding people based on their sexual orientation; and (3) submitted an "acceptable plan" for ensuring that candidates will be evaluated on BLinC's "vision statement" and not be "presumptive of candidates based upon their sexual orientation." *Id*.

132. BLinC understood Dr. Nelson's letter in light of the September 1 discussion, where he and Dean Baker had explained that the nondiscrimination provision mandated by the Policy referred only to status-based, not belief- or conduct-based, discrimination.

133. Thus, on September 27, 2017, BLinC submitted a revised constitution that it believed complied with all of Dr. Nelson's requests. *See* Exhibit A. The revised constitution (1) confirmed

that BLinC would continue to comply with the clarified understanding of the Human Rights Policy; (2) incorporated an amended Statement of Faith to further detail BLinC's beliefs and thereby avoid categorically excluding people based on their sexual orientation; and (3) confirmed in Article III of its revised constitution that leaders would be asked to sign the Statement of Faith, thus avoiding being "presumptive of candidates based upon their sexual orientation."

Dr. Nelson's Final Decision

134.  In a complete about-face, on October 19, 2017, Dr. Nelson issued a final decision letter stating that BLinC's revised Constitution was not in compliance with the University's Human Rights Policy. *See* Exhibit S.

135.  The basis for his decision was that BLinC's Constitution asks BLinC's leaders to affirm that they agree with its Statement of Faith and will seek to live according to its principles. See Exhibit A, Article III, ¶ 1 ("All Officers are required to affirm that they accept and seek to live BLinC's religious beliefs as set forth in its Statement of Faith").

136.  Dr. Nelson determined that BLinC's "Statement of Faith, on its face, does not comply with the University's Human Rights policy since its affirmation, as required by the [BLinC] Constitution for leadership positions, would have the effect of disqualifying certain individuals from leadership positions based on sexual orientation or gender identity." *See* Exhibit S at 1.

137.  Dr. Nelson accordingly determined that BLinC must "make additional revisions to [its] Statement of Faith" and submit an "acceptable plan" for interviewing officer candidates, including by developing "questions relevant to the Statement of Faith that are not presumptive of candidates based upon their sexual orientation or gender identity." *Id.*

138.  Dr. Nelson concluded that if BLinC did not submit the required revisions and the "acceptable plan" by November 2, 2017, he would "find BLinC not to be in compliance with" University policy and "will revoke its registration." *Id.*

139.  Dr. Nelson stated that BLinC could appeal his decision to Dean Lyn Redington, Assistant Vice President and Dean of Students, by November 2. *Id.*

Appeal to Dean Redington

140.  BLinC filed its appeal to Dean Redington on November 2, 2017. Exhibit T.

141.  BLinC argued that Dr. Nelson's determination that BLinC must revise its Statement of Faith and change its manner of selecting leaders should be reversed because the University could not constitutionally censor the content of BLinC's religious beliefs or control the selection of BLinC's religious leaders.

142.  BLinC also argued that Dr. Nelson's determination that BLinC had engaged in impermissible discrimination was unsupported by the facts and should also be vacated.

143.  On November 16, 2017, Dean Redington rejected BLinC's appeal and revoked BLinC's registration. Exhibit U.

144.  Dean Redington found that BLinC's revised constitution "does not satisfy the requirements delineated in order for BLinC to remain as a registered student organization in good standing" because BLinC's "Statement of Faith, on its face, does not comply with the University's Human Rights policy since its affirmation, as required by the Constitution for leadership positions, would have the effect of disqualifying certain individuals from leadership positions based on sexual orientation or gender identity." *Id.* at 1.

145.  Dean Redington noted that BLinC could continue to "exist on campus whether or not the University approves its registration," because "a student organization is a voluntary special interest group organized for educational, social, recreational, and service purposes" and because "[s]tudent organizations are separate legal entities from the University of Iowa and legally are not treated the same as University departments or units." *Id.*

146. Dean Redington, however, did not deny that BLinC would be denied access to the benefits that are afforded to recognized student groups.

147. Finally, despite the University's own findings and the clear statements BLinC repeatedly made to Dean Baker and Dr. Nelson, both in person and in writing, Dean Redington ruled that BLinC was claiming "for the first time" that the complaining member "was not allowed to hold a leadership position because he 'confirmed that he intended to be sexually active in same-sex relationships.'" *Id.*

148. Dean Redington then stated that this claim "was not validated through the investigation process and finding," even while acknowledging that the reason for denying the leadership position was "because of [the complaining member's] 'desire to pursue a homosexual . . . relationship.'" *Id.*

## CLAIMS

### COUNT I

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise & Establishment Clauses**
**Ministerial Exception**

149. BLinC incorporates by reference all preceding paragraphs.

150. Under the Free Exercise and Establishment Clauses of the First Amendment, religious groups have the right to select their leaders without government interference. *See Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012).

151. BLinC is a religious organization created to provide Christian ministry to students and help them apply their faith to their careers.

152. BLinC's leaders provide spiritual ministry by leading BLinC's members in prayer, by leading and determining the content of religious studies, by selecting local Christian business

leaders to provide teaching and mentorship, and by selecting ways that BLinC can serve in the community and with other religious ministries as a means of expressing and developing its members' faith.

153.  BLinC's leaders are selected based upon their agreement with BLinC's religious beliefs, their willingness to live according to those beliefs, and their ability to express those beliefs effectively.

154.  BLinC's leaders are the primary means by which BLinC shares its religious beliefs with others and determines how it will express its faith to others.

155.  By threatening to revoke BLinC's status as a registered student group, with the rights, benefits, and privileges that flow from that status, unless BLinC revises its Statement of Faith and modifies its leadership standards, the University infringes BLinC's First Amendment rights to select its own leaders.

156.  Absent injunctive and declaratory relief against the University, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT II

### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise & Establishment Clauses
### Internal Autonomy

157.  BLinC incorporates by reference all preceding paragraphs.

158.  Under the Free Exercise and Establishment Clauses of the First Amendment, religious groups have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952).

159.  BLinC is a religious organization created to provide Christian ministry to students and help them apply their faith to their careers.

160.  The Statement of Faith adopted in BLinC's constitution sets forth BLinC's core religious beliefs that define its mission, guide its work, and help BLinC select its leadership.

161.  BLinC's purpose is to share its beliefs with students to help them learn how to live out these beliefs in the business world.

162.  BLinC requires its leaders to affirm the Statement of Faith to ensure that they are committed to BLinC's mission and are capable of authentically conveying its beliefs to other members.

163.  BLinC's means of selecting its leadership is calibrated toward installing individuals who share and can express BLinC's faith.

164.  By threatening to revoke BLinC's status as a registered student group, with the rights, benefits, and privileges that flow from that status, unless BLinC revises its Statement of Faith and changes its internal method of selecting religious leaders, the University infringes BLinC's First Amendment right to determine the content of its faith and to govern itself regarding the expression of its faith to its members.

165.  Absent injunctive and declaratory relief against the University, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT III

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Religious Animus/Targeting of Religious Beliefs**

166.  BLinC incorporates by reference all preceding paragraphs.

167. "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.4 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

168. The government has no authority to control the content of or the expression of religious beliefs within the context of private religious associations. *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961) ("The freedom to hold religious beliefs and opinions is absolute.").

169. The University derecognized BLinC because the University claims that BLinC's "Statement of Faith, on its face, does not comply with the University's Human Rights policy." Exhibit U (11/16/2017 Letter).

170. Moreover, the University informed BLinC that "[s]tudent organizations may state a set of beliefs with which their members or leaders must comply," but only if the "statement of beliefs" is not "inconsistent" with the University's policies. Exhibit O at 5.

171. The University told BLinC that it could maintain University recognition if it would "make additional revisions to your Statement of Faith" and "submit a version that complies with the University of Iowa Human Rights Policy." Exhibit S.

172. Other student organizations at the University are permitted to establish tenets to advance their missions and expect their leaders and members to agree with and abide by those tenets.

173. The University knows that it is unlawful to penalize BLinC because of the content of its religious beliefs.

174. Dean Baker and Dr. Nelson both acknowledged that they have allowed other religious student groups to maintain their own religious beliefs and choose leaders who uphold them, even when challenged under the Human Rights Policy.

175.  They also acknowledged that targeting BLinC because of its religious beliefs itself violates the Human Rights Policy.

176.  By stripping BLinC's recognition because of its Statement of Faith, the University is targeting and seeking to control BLinC's religious beliefs as such, which violates the Free Exercise Clause of the First Amendment to the United States Constitution.

177.  The University's actions reflect animus toward religion, and BLinC's religious beliefs in particular.

178.  Absent injunctive and declaratory relief against the University, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT IV

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Not Generally Applicable**

179.  BLinC incorporates by reference all preceding paragraphs.

180.  "[L]aws burdening religious practice must be of general applicability." *Lukumi*, 508 U.S. at 542.

181.  The University's Human Rights Policy is not applied to or enforced equally against all student organizations.

182.  The Human Rights Policy requires that membership and participation in student organizations must be "open to all students without regard to race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual" and that "equal

opportunity and equal access to membership, programming, facilities, and benefits shall be open to all persons." Exhibit E.

183.  Many student organizations on campus, including fraternities and sororities, explicitly restrict membership and/or leadership on the basis of one or more of the categories identified in the Human Rights Policy.

184.  Many student organizations on campus have an uninterrupted pattern of restricting membership and/or leadership on the basis of one or more of the categories identified in the Human Rights Policy.

185.  The University has failed to consistently enforce the Human Rights Policy against student organizations that restrict membership and leadership on the basis of one or more of the categories identified in the Human Rights Policy.

186.  BLinC does not restrict membership or leadership on the basis of any of the categories identified in the Human Rights Policy, other than on the basis of religion.

187.  Although BLinC requires its leaders to accept and abide by its Statement of Faith, which includes religious beliefs about sexual orientation and gender identity, BLinC does not restrict membership or leadership on the basis of sexual orientation or gender identity or any other of the categories identified in the Human Rights Policy, other than on the basis of religion.

188.  By stripping BLinC's recognition because of its alleged noncompliance with the University's Human Rights Policy, the University is applying a standard to BLinC that is not generally applicable to other student organizations on campus.

189.  The University's enforcement of its Human Rights Policy is under-inclusive in that it fails to restrict nonreligious conduct that endangers the Policy's principles in a similar or greater degree than does BLinC's conduct.

27

190. The University does not have a compelling government interest pursued by the least restrictive means to justify this unequal application of its Human Rights Policy against BLinC.

191. The University's unequal application of its Human Rights Policy violates the Free Exercise Clause of the First Amendment to the United States Constitution.

192. Absent injunctive and declaratory relief against the University, BLinC and its members have been and will continue to be irreparably harmed.

**COUNT V**

**42 U.S.C. §1983**
**Violation of the First Amendment to the U.S. Constitution**
**Establishment Clause**
**Denominational Discrimination**

193. BLinC incorporates by reference all preceding paragraphs.

194. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

195. The University seeks to apply its Human Rights Policy to penalize BLinC because of its religious beliefs concerning sexual morality.

196. The University applies its Human Rights Policy in a manner that privileges groups that have countervailing religious beliefs concerning sexual morality.

197. The University's preference for one set of religious beliefs about sexual morality and against BLinC's religious beliefs about sexual morality violates the Establishment Clause of the First Amendment to the United States Constitution.

198. Absent injunctive and declaratory relief against the University, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT VI

**42 U.S.C. §1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause**
**Expressive Association**

199.  BLinC incorporates by reference all preceding paragraphs.

200.  Applying the University's Human Rights Policy to BLinC would compel it to select leaders who believe and live in contradiction to BLinC's religious beliefs.

201.  BLinC is an association of like-minded Christians who seek to express their Christian faith through word and deed.

202.  BLinC believes that its activities and organization are a witness of its members' faith and thus inherently expressive, having inescapable religious significance.

203.  Causing BLinC to accept leaders who do not believe and act in accordance with BLinC's religious beliefs would force the group to associate with and promote a message with which it disagrees and which runs contrary to the expressive purposes for which BLinC was created and operates.

204.  Compelling BLinC to associate with and promote a message with which it disagrees and which runs contrary to the expressive purposes for which it was created and operates is not narrowly tailored to a compelling governmental interest.

205.  Defendants' actions thus violate BLinC's right of expressive association as secured to it by the First Amendment of the United States Constitution.

206.  Absent injunctive and declaratory relief against the University's Human Rights Policy, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT VII

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause**
**Compelled Speech**

207.   BLinC incorporates by reference all preceding paragraphs.

208.   Applying the University's Human Rights Policy to BLinC would force it to allow leaders who believe and act in direct contradiction to BLinC's religious beliefs.

209.   This forced inclusion of leaders hostile to BLinC's religious beliefs and mission would communicate both to BLinC's own members as well as to the community as large that BLinC's views are different than what BLinC actually espouses.

210.   Defendants' actions would thus violate BLinC's right to be free from compelled speech as secured to them by the First Amendment of the United States Constitution.

211.   Compelling BLinC to convey messages that it disagrees with is not narrowly tailored to a compelling governmental interest.

212.   Absent injunctive and declaratory relief against such compelled speech, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT VIII

**42 U.S.C. §1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause**
**Viewpoint Discrimination**

213.   BLinC incorporates by reference all preceding paragraphs.

214.   Governmental efforts to regulate speech based on the "specific motivating ideology or the opinion or perspective of the speaker" is a "blatant" and "egregious" form of impermissible

speech restriction. *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

215.  The University seeks to apply its Human Rights Policy to penalize BLinC because of its religious opinions and perspectives concerning sexual morality.

216.  The University applies its Human Rights Policy in a manner that privileges the expression and views of groups that have countervailing religious beliefs concerning sexual morality.

217.  The University's preference for one set of opinions and perspectives about sexual morality and against BLinC's religious beliefs about sexual morality violates the Free Speech Clause of the First Amendment to the United States Constitution.

218.   Discriminating against BLinC's expressed religious opinions and perspectives on sexual morality is not narrowly tailored to a compelling governmental interest.

219.  Absent injunctive and declaratory relief against the University, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT IX

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Assembly Clause**

220.  BLinC incorporates by reference all preceding paragraphs.

221.  By denying BLinC registered student group status because of its Statement of Faith, the University infringes BLinC's First Amendment right "peaceably to assemble" to engage in otherwise lawful religious worship and speech activities with persons of their choosing. *See Thomas v. Collins*, 323 U.S. 516, 532-40 (1945).

222.  The University allows other student groups with a wide variety of ideological tenets and a wide variety of restrictions on membership and leadership to use University resources to assemble on campus.

223.  Without registered student group status, BLinC is denied important University resources to meet, share its message, and grow its membership that are available to all other student groups.

224.  Absent injunctive and declaratory relief, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT X

**42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment to the U.S. Constitution**
**Equal Protection**

225.  BLinC incorporates by reference all preceding paragraphs.

226.  The Equal Protection Clause prohibits discrimination on the basis of religion.

227.  The University's application of its Human Rights Policy penalizes BLinC because of its religious beliefs concerning human sexuality by denying BLinC registered status.

228.  Organizations that espouse religious beliefs concerning human sexuality that are contrary to those espoused by BLinC are allowed to maintain registered status.

229.  The University's preference for one set of religious beliefs about human sexuality and against BLinC's religious beliefs about human sexuality violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

230.  Absent injunctive and declaratory relief, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT XI

### Violation of the federal Higher Education Act

231. BLinC incorporates by reference all preceding paragraphs.

232. According to section 1011a of the Higher Education Act, "no student attending an institution of higher education . . . should, on the basis of participation in protected speech or protected association, be excluded from participation in, be denied the benefits of, or be subjected to discrimination or official sanction under any education program, activity, or division of the institution . . . whether or not such program, activity, or division is sponsored or officially sanctioned by the institution."

233. BLinC's members are students attending an institution of higher education, and as such are members of the class for whose especial benefit this Act was enacted.

234. There is evidence of legislative intent to create a private right to enforce this section of the Higher Education Act.

235. Forcing BLinC to either comply with the University's Human Rights Policy as to BLinC's requirements for leadership in its group, or to lose registered student group status, violates section 1011a of the Higher Education Act.

236. Absent injunctive and declaratory relief against the University's Human Rights Policy, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT XII

### Violation of the Iowa Human Rights Act

237. BLinC incorporates by reference all preceding paragraphs.

238. Section 216.9 of the Iowa Human Rights Act declares that "[i]t is an unfair or discriminatory practice for any educational institution to discriminate on the basis of . . . religion."

239.   Such discrimination includes "[e]xclusion of a person or persons from participation in, denial of the benefits of, or subjection to discrimination in any . . . extracurricular . . . or other program or activity." *Id.* at § 216.9(a).

240.   The University has discriminated against BLinC, its leadership, and its members on account of their Statement of Faith, their religious beliefs, and their religious practices.

241.   Further, by de-recognizing BLinC, the University is denying BLinC the ability to fully participate in University life on equal grounds with all other student groups.

242.   Such denials constitute a violation of the Iowa Human Rights Act.

243.   Absent injunctive and declaratory relief on the grounds that the University has violated the Iowa Human Rights Act, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT XIII

### Violation of the Iowa Constitution Article I, § 3
### Free Exercise Clause

244.   BLinC incorporates by reference all preceding paragraphs.

245.   Article I, § 3 of the Iowa Constitution provides that "[t]he General Assembly shall make no law . . . prohibiting the free exercise" of religion.

246.   BLinC's selection of leaders who embrace and follow its beliefs is an exercise of religion.

247.   Denying BLinC registered group status for selecting leaders who embrace and follow its religious beliefs would substantially burden BLinC's free exercise of religion.

248.   A decree forcing BLinC to have leaders who believe and act in direct contradiction to its religious beliefs, or lose registered student group status, would not be narrowly tailored to accomplishing a compelling government interest.

249.  Forcing BLinC to have leaders who believe and act in direct contradiction to its religious beliefs, or lose registered student group status, would violate the rights secured to them by Article I, § 3 of the Iowa Constitution.

250.  Absent injunctive and declaratory relief against Defendants' threatened enforcement of the University Human Rights Policy, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT XIV

### Violation of the Iowa Constitution Article I, § 3
### No Punishment for Religious Beliefs

251.  BLinC incorporates by reference all preceding paragraphs.

252.  Article I, § 4 of the Iowa Constitution provides that "no person shall be deprived of any of his rights, privileges, or capacities, or disqualified from the performance of any of his public or private duties . . . in consequence of his opinions on the subject of religion[.]"

253.  Applying the University's Human Rights Policy against BLinC for selecting leaders who endorse and abide by its religious beliefs would punish BLinC and its members for their religious beliefs in violation of the rights secured to them by Article I, § 4 of the Iowa Constitution.

254.  Absent injunctive and declaratory relief against Defendants' threatened enforcement of the University's Human Rights Policy, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT XV

### Violation of the Iowa Constitution Article I, § 3
### Establishment Clause

255.  BLinC incorporates by reference all preceding paragraphs.

256.  Iowa's constitution "does not permit any branch of government to resolve . . . religious debates" over issues such as the proper role of human sexuality, but rather "entrusts to courts the task of ensuring government *avoids* them." *Varnum v. Brien*, 763 N.W.2d 862, 905 (Iowa 2009).

257.  The University, however, seeks to apply its Human Rights Policy to penalize BLinC because of its religious beliefs concerning human sexuality, while at the same time protecting countervailing religious beliefs.

258.  The University's preference for one set of religious beliefs about human sexuality and against BLinC's religious beliefs about human sexuality violates Article I, § 3 of the Iowa Constitution.

259.  Absent injunctive and declaratory relief against the University, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT XVI

### Violation of the Iowa Constitution Article I, § 7
### Compelled Speech

260.  BLinC incorporates by reference all preceding paragraphs.

261.  Applying the University's Human Rights Policy to BLinC would force it to allow leaders who believe and act in direct contradiction to BLinC's religious beliefs.

262.  This forced inclusion of leaders hostile to BLinC's religious beliefs and mission would communicate both to BLinC's own members as well as to the community at large that BLinC's views on sexual morality are different than what BLinC actually espouses.

263.  Defendants' actions would thus violate BLinC's right to be free from compelled speech as secured to them by the First Amendment of the United States Constitution.

264.  Compelling BLinC to convey messages that it disagrees with is not narrowly tailored to a compelling governmental interest.

265.  Absent injunctive and declaratory relief against such compelled speech, BLinC and its members have been and will continue to be harmed.

## COUNT XVII

**Violation of the Iowa Constitution Article I, § 7**
**Viewpoint Discrimination**

266.   BLinC incorporates by reference all preceding paragraphs.

267.  Governmental efforts to regulate speech based on the viewpoint of the speaker are impermissible viewpoint discrimination.

268.  The University seeks to apply its Human Rights Policy to penalize BLinC because of its religious opinions and perspectives concerning sexual morality.

269.  The University applies its Human Rights Policy in a manner that privileges the expression and views of groups that have countervailing religious beliefs concerning sexual morality.

270.  The University's preference for one set of opinions and perspectives about sexual morality and against BLinC's religious beliefs about sexual morality violates Article I, § 7 of the Iowa Constitution.

271.   Discriminating against BLinC's expressed religious opinions and perspectives on sexual morality is not narrowly tailored to a compelling governmental interest.

272.  Absent injunctive and declaratory relief against the University, BLinC and its members have been and will continue to be irreparably harmed.

## COUNT XVIII

**Violation of the Iowa Constitution Article I, § 7**
**Expressive Association**

273.  BLinC incorporates by reference all preceding paragraphs.

274.  Applying the University's Human Rights Policy to BLinC would compel it to select leaders who believe and live in contradiction to BLinC's religious beliefs.

275.  BLinC is an association of like-minded Christians who seek to express their Christian faith through word and deed.

276.  BLinC believes that its activities and organization are a witness of its members' faith and thus inherently expressive, having inescapable religious significance.

277.  Causing BLinC to accept leaders who do not believe and act in accordance with BLinC's religious beliefs would force the group to associate with and promote a message with which it disagrees and which runs contrary to the expressive purposes for which BLinC was created and operates.

278.  Defendants' actions thus would violate BLinC's right of expressive association as secured to it by Article I, Section 7 of the Iowa Constitution.

279.  Absent injunctive and declaratory relief against the University's Human Rights Policy, BLinC and its members have been and will continue to be harmed.

## COUNT XIX

### Violation of Article I, § 20 of the Iowa Constitution
### Assembly Clause

280.  BLinC incorporates by reference all preceding paragraphs.

281.  By denying BLinC registered student group status because of BLinC's adherence to only allowing individuals to be leaders who are in accord with BLinC's religious beliefs and practices regarding sexual morality, but allowing other groups to determine their own members in harmony with their group's views, much less their own leaders, the University infringes BLinC's right of assembly in Article I, Section 20 of the Iowa Constitution.

282.  Without registered student group status, BLinC is not eligible to use University resources to meet, share its message, or grow its membership numbers.

283.  Absent injunctive and declaratory relief against such compelled speech, BLinC and its members have been and will continue to be harmed.

## COUNT XX

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause**

284.    BLinC incorporates by reference all preceding paragraphs.

285.    After the University opened the investigation against BLinC, it told BLinC's executive officers that they could not talk to anyone about the complaint that had been filed against BLinC or about the investigation.

286.    BLinC's executive officers were told that if they did talk to anyone about the complaint or investigation, they could found to have engaged in retaliation against the complaining student in violation of University policy.

287.    Because of the University's warning, BLinC's officers thought they were not allowed even to seek legal advice concerning their rights.

288.    The University's warning was an unlawful attempt to suppress the students' freedom of speech.

289.    Absent injunctive and declaratory relief against such compelled speech, BLinC and its members have been and will continue to be harmed.

## **PRAYER FOR RELIEF**

Wherefore, BLinC requests that the Court:

a.     Declare that the First and Fourteenth Amendments to the United States Constitution, the Higher Education Act, the Iowa Constitution, and the Iowa Human Rights Act require Defendants to cease discriminating against BLinC and to cease withholding registered status on the basis of BLinC's Statement of Faith and leadership selection policies.

b.     Issue a permanent injunction prohibiting enforcement of the University's Human Rights Policy against BLinC based on the content of BLinC's Statement of Faith and leadership selection policies.

c.     Award BLinC nominal damages for the loss of their rights as protected by the United States and Iowa Constitutions.

d.     Award BLinC the costs of this action and reasonable attorney's fees; and

e.     Award such other and further relief as the Court deems equitable and just.

## **JURY REQUEST/DEMAND**

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted,

/s/ *Matt M. Dummermuth*
Matt M. Dummermuth
Hagenow & Gustoff, LLP
600 Oakland Rd. NE
Cedar Rapids, IA 52402
(319) 849-8390 phone
(888) 689-1995 fax
*mdummermuth@whgllp.com*

Eric S. Baxter*
   *Lead Counsel*
Daniel H. Blomberg*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC, 20036
(202) 955-0095 PHONE
(202) 955-0090 FAX
*ebaxter@becketlaw.org*
*dblomberg@becketlaw.org*

**Counsel for Plaintiff**

   *\*Admission pro hac vice pending*