IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| BUSINESS LEADERS IN CHRIST, an unincorporated association, | ) ) ) | Case No. 3:17-cv-00080-SMR-SBJ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| THE UNIVERSITY OF IOWA; LYN REDINGTON, in her official capacity as Dean of Students and in her individual capacity; THOMAS R. BAKER, in his official capacity as Assistant Dean of Students and in his individual capacity; and WILLIAM R. NELSON, in his official capacity as Executive Director, Iowa Memorial Union, and in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) | ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| Defendants. | ) | |

## I.  INTRODUCTION

This matter comes before the Court on Plaintiff Business Leaders in Christ's ("BLinC")

Motion for Preliminary Injunction.  [ECF No. 7].  BLinC seeks an injunction directing Defendant

University of Iowa ("University") to restore BLinC's status as a registered student organization.

Defendants deregistered BLinC after determining BLinC had violated the University's Policy on

Human Rights.  The Court held a hearing on the motion on January 18, 2018.  The matter is fully

briefed and ready for consideration.  As explained below, BLinC's motion is GRANTED based

solely upon the University's selective enforcement of an otherwise reasonable and viewpoint

neutral nondiscrimination policy.

## II.  BACKGROUND

The following facts come from BLinC's Complaint, [ECF No. 1], and its Motion for a

Preliminary Injunction, [ECF No. 7].  Facts and conclusions determined by a court in granting or

denying a preliminary injunction are provisional and nonbinding. *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (per curiam); *Sak v. City of Aurelia, Iowa*, 832 F. Supp. 2d 1026, 1031 (N.D. Iowa 2011).

The University allows groups of students to apply for registered student organization status. There are over 500 registered student groups at the University. "Student organizations are voluntary special interest group[s] organized for education, social, recreation, and service purposes . . . ." [ECF No. 1-5 at 2]. "Student organizations can exist whether or not the University endorses them" under the registration policy. *Id.* Under the University's registration policy, "Registration of Student Organizations," a group of students may draft a constitution and meet with review staff, then file a registration form online. The form includes the potential organization's "organizational information and [its] Constitution and Bylaws." *Id.* at 3. The Student Organization Review Committee then considers whether to grant the organization registered status.

Regarding membership in student organizations, "[i]t is the policy of the University that all registered student organizations be able to exercise free choice of members on the basis of their merits as individuals without restriction in accordance with the University Policy on Human Rights."[1] *Id.* The University recognizes the interests of students in organizing and associating

---

[1] The University's Policy on Human Rights provides:

[I]n no aspect of the [the University's] programs shall there be differences in treatment of persons because of race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual, and that equal opportunity and access to facilities shall be available to all.

[ECF No. 7-2 at 17].

with like-minded students.  Thus, "any individual who subscribes to the goals and beliefs of a student organization may participate in and become a member of the organization." *Id.*  BLinC provides the constitutions and bylaws of several student organizations as evidence that student organizations often require members to share the missions and beliefs of the organizations they join.

Registered student "organizations are entitled to certain privileges and benefits." *Id.* at 2. These benefits include:

(a) official status as a University organization;

(b) establishment of a financial account and purchasing privileges;

(c) the ability to receive school funding;

(d) inclusion in University publications;

(e) use of University organizational software;

(f) use of the University's trademarks;

(g) use of campus facilities for meetings;

(h) use of University fleet services vehicles;

(i) use of University . . . staff and programming resources;

(j) [ability] once a semester, to use Information Technology Services Mass Mail;

(k) the ability to apply for honors and awards granted to registered organizations; and

(l) use of office and storage space.

[ECF No. 1 at 15].

A small group of students formed BLinC during the spring of 2014 at the Tippie College of Business at the University.  The University recognized BLinC as an on-campus organization in fall 2014.  BLinC holds itself out as a religious organization.  Article I of BLinC's founding constitution stated BLinC's purpose: "[BLinC] is a student organization within the Tippie College

of Business meant to help student learn about how to continually keep Christ first in the fast-paced business world."  [ECF No.  1-3 at 2].

Leaders  within  BLinC  have  several  responsibilities.   During  weekly  meetings,  they  lead the members in prayer, Bible study, and spiritual reflection.  They select Iowa business leaders to come and speak to students about careers and faith.  Leaders also organize service projects on and around campus, such as partnering with a nonprofit's after-school mentoring program for at-risk youth and providing childcare at a local Saturday-school program.  In light of the responsibilities of BLinC's leaders for carrying out BLinC's religious mission and providing religious ministry for BLinC's members, BLinC takes great care in selecting its leaders each year.

Members  can  nominate  themselves  or  others  for  leadership  positions.   BLinC's  leaders then meet with nominated individuals in order to discuss their commitment to BLinC's mission. Candidates receiving approval from the leadership sit for a final vote by the members.  As a matter of  both  institutional  and  personal  integrity,  BLinC  requires  potential  leaders  to  share  the organization's mission, purpose, and beliefs.

In  March  2016,  a  BLinC  member  approached  the  then-president  of  BLinC,  Hannah Thompson, to ask about serving as BLinC's vice-president.  Thompson met with the member in April 2016 to determine whether he could provide spiritual leadership to BLinC.  She asked him questions about his faith and relationship with Jesus Christ.  Of his own volition, the member disclosed that he thought he was gay and that he was struggling with how that related to his faith. Thompson and the member then studied what the Bible teaches about sexual conduct and prayed. Thompson told the member he was welcome to participate in BLinC and that she needed to discuss his candidacy for leadership with the rest of the executive team.

The executive board agreed that the most important qualities for BLinC's leaders were that they had accepted Jesus Christ as their savior and regarded the Bible as the ultimate authority on how to live their lives.  In keeping with these tenets, the board also agreed that leaders who engaged in conduct the Bible regarded as sinful had a Christian duty to admit the conduct was sinful, choose to turn from the conduct, and strive to live in a manner befitting Christ's sacrifice.  The board had concerns that the member did not share BLinC's views of the Bible and did not appear willing to confess and repent of sinful conduct.  The board concluded that, due to these disagreements with BLinC's faith, the member could not lead BLinC in a manner reliably interpreting and applying the Bible's teachings.

Thompson met with the member and asked him if he planned to follow BLinC's beliefs regarding sexual conduct.  The member said he intended to pursue same-sex relationships.  Thompson told the member he could continue to be a member of BLinC, but he was not eligible for a leadership position because his decision to seek same-sex relationships was inconsistent with BLinC's religious beliefs.  "Thompson emphasized to the member that her decision was not because he was gay, but because he did not agree with BLinC's biblically based views on sexual conduct."  [ECF No. 1 at 9].

On February 20, 2017, the member filed a complaint with the University stating, "I was denied a leadership position (Vice President) due to my being openly gay."  [ECF No. 1-2 at 2].  The member requested the University "[e]ither force BLinC to comply with the non-discrimination policy (allow openly LGTBQ members to be leaders) or take away their status of being a student organization affiliated with the University of Iowa."  *Id.*

The University subsequently began an investigation of the facts surrounding the member's complaint.  University Compliance Coordinator Constance Shriver Cervantes from the

University's Office of Equal Opportunity and Diversity was assigned to the investigation. Shriver Cervantes brought Thompson in for an interview where two university lawyers questioned her. Thompson also submitted a written statement in which she emphasized that BLinC "never discriminate[s] against students because of who they are. All we ask is that our leaders support and uphold our 'goals and beliefs.'" [ECF No. 1-16 at 3].

Shriver issued her findings in a report on June 30, 2017. In her report, she concluded that "[t]he evidence produced during the investigation does provide a reasonable basis to believe the *Policy on Human Rights* was violated." [ECF No. 1-15 at 2]. The report summarized the facts of the member's and Thompson's interactions to discuss his candidacy for vice-president. It also quoted an email from Thompson to the member in which she stated: "First and foremost, the reason why I made the decision that I could not allow you to be in a leadership position within BLinC is because of your desire to pursue a homosexual lifestyle/relationship." *Id.* at 4. The report noted that Thompson had confirmed that the email accurately stated the organization's position on homosexuality and leadership within the organization. Thompson had also reportedly stated that "individuals who are gay are welcome to be student members of BLinC, but not leaders of the organization." *Id.* On these facts, Shriver Cervantes found that "the basis for BLinC's refusal to select Complainant for the position of vice-president was his sexual orientation." *Id.* at 6. Shriver Cervantes noted that student organizations could "state a set of beliefs with which their members or leaders must comply" and that BLinC did not have such a statement in its constitution. *Id.* "However, an organization may not adopt a statement of beliefs that is inconsistent with the *Policy on Human Rights*, and base exclusion on a protected classification." *Id.* Shriver Cervantes concluded that "BLinC's action with respect to [the member's] application for the position of vice-

president violates the *Policy on Human Rights* because of the statements made by the president."
*Id.*

On July 14, 2017, BLinC responded to the decision by emailing a letter to Defendant Lyn Redington, Dean of Students, arguing BLinC should not be sanctioned due to the determination. BLinC reiterated that BLinC had not discriminated against the member because of his sexual orientation:   "The student participated in BLinC before asking for a leadership position, and remains welcome to participate—even as a leader, regardless of his sexual orientation." [ECF No. 1-20 at 27].   Rather, "[t]he student was not eligible to be a leader of BLinC only because he stated that he disagrees with, and would not try to live by, BLinC's Christian principles, which means he could not effectively lead our group."   *Id.*

BLinC met with Defendants William Nelson, the Executive Director of the Iowa Memorial Union, and Associate Dean Thomas Baker on September 1, 2017.   During the meeting, Dean Baker allegedly confirmed BLinC could set standards for the beliefs and conduct of its leaders without violating the University Human Rights Policy.   However, BLinC could not discriminate categorically based on status.   BLinC explained its view that gay students could become members and leaders so long as they affirmed BLinC's beliefs and tried to live by them.   Dr. Nelson replied that BLinC should more clearly state its views in its constitution to make students aware of them before they joined.   Dean Baker likewise agreed that a written statement of BLinC's beliefs could aid in avoiding arbitrary applications of those beliefs.   The BLinC leaders at the meeting indicated their willingness to draft such a statement.   The parties to the meeting agreed that once BLinC updated its constitution to provide clear notice of its religious beliefs, the University would end the investigation.   Dr. Nelson stated he would memorialize the meeting's outcome in a letter to BLinC.

On September 13, 2017, Dr. Nelson sent a letter to BLinC regarding the investigation. Dr. Nelson explained he had the authority to impose sanctions for violations of the University's rules.  He found by a preponderance of the evidence that BLinC had violated the University's Human Rights Policy.  However, BLinC would be allowed to function as a registered student organization in good standing if it would: (1) commit to compliance with the Human Rights Policy in the future; (2) submit a list of qualifications for its leaders in order to prevent future disqualification of members based on protected characteristics and ensure that non-heterosexuals would not be categorically eliminated from consideration; and (3) submit a plan to ensure that leaders interviewing leader candidates would ask "questions relevant to the vision statement that are not presumptive of candidates based upon their sexual orientation."  [ECF No. 1-20 at 31].

BLinC thereafter attempted to comply with the letter's mandates by submitting a revised constitution on September 27, 2017.  The revised constitution confirmed BLinC's future compliance with the Human Rights Policy.  It also incorporated a "Statement of Faith" intended to "detail BLinC's beliefs and thereby avoid categorically excluding people based on their sexual orientation."  [ECF No. 1 at 21].  The Statement of Faith includes a section labeled "Doctrine of Personal Integrity" that states:

> All Christians are under obligation to seek to follow the example of Christ in their own lives and in human society.  In the spirit of Christ, Christians should oppose racism, every form of greed, selfishness, and vice, and all forms of sexual immorality, including pornography.  We believe God's intention for a sexual relationship is to be between a husband and a wife in the lifelong covenant of marriage.  Every other sexual relationship beyond this is outside of God's design and is not in keeping with God's original plan for humanity.  We believe that every person should embrace, not reject, their God-given sex.  We should work to provide for the orphaned, the needy, the abused, the aged, the helpless, and the sick.  We should speak on behalf of the unborn and contend for the sanctity of all human life from conception to natural death.

[ECF No. 1-1 at 8].  Under Article III of the revised constitution, leaders would be asked to sign the Statement of Faith, affirming that they would accept and strive to live according to BLinC's beliefs.  The affirmance states:

> As I hold an Executive position with Business Leaders in Christ, I commit to live a life in which I turn from my sin and actively choose the biblical principles of Godly sanctification and righteousness.  If and when I misstep, I will confess my struggle to God and to a member of the Business Leaders in Christ executive board acknowledging that I choose to receive grace and forgiveness from God and from other, and turn from my sin.

[ECF No. 1-1 at 9].

On October 19, 2017, Dr. Nelson issued his decision on BLinC's revised constitution, finding it was not in compliance with the University's Human Rights Policy:

> The Statement of Faith, on its face, does not comply with the University's Human Rights policy since its affirmation, as required by the Constitution for leadership positions, would have the effect of disqualifying certain individuals from leadership positions based on sexual orientation or gender identity, both of which are protected classifications under . . . the University of Iowa Human Rights Policy.

[ECF No. 1-20 at 42].  Dr. Nelson informed BLinC that it could revise its Statement of Faith to bring it into compliance with the Human Rights Policy and further "[s]ubmit an acceptable plan for ensuring that group officers who interview candidates for leadership positions will ask questions relevant to the Statement of Faith that are not presumptive of candidates based upon their sexual orientation or gender identity."  *Id.*  Dr. Nelson gave BLinC until November 2, 2017

to submit its revised response. If BLinC chose not to submit the revised materials, Dr. Nelson would find BLinC to not be in compliance with the University's Human Rights Policy and he would revoke its registration. The letter also provided that BLinC could appeal Dr. Nelson's decision to the Office of the Dean of Students.

BLinC appealed Dr. Nelson's decision to Dean Redington on November 2, 2017. BLinC argued the University could not constitutionally censor BLinC's religious beliefs or control the manner in which BLinC selected its leaders. BLinC also contended that Dr. Nelson's decision should be reversed because it was not consistent with University policy and practice in that other groups were allowed to require members to share their missions. One example of this BLinC listed, among others, was that Imam Mahdi, an Islamic student organization, reserves certain membership benefits solely for members who are Shia Muslims. BLinC further argued Dr. Nelson's decision was not supported by the facts.

On November 16, 2017, Dean Redington affirmed Dr. Nelson's decision to revoke BLinC's registration. Dean Redington similarly determined that BLinC's Statement of Faith as drafted "would have the effect of disqualifying certain individuals from leadership positions based on sexual orientation or gender identity, both of which are protected classifications under . . . the University of Iowa Human Rights Policy." [ECF No. 1-21 at 2]. In reaching her decision, Dean Redington observed that in its appeal BLinC had for the first time stated that the complainant–member had not been allowed to seek a leadership position due to an admission by the complainant that he intended to be sexually active in same-sex relationships. Rather, BLinC leadership had told the investigator and stated in an email that it was the complainant's "desire to pursue a homosexual lifestyle/relationship" that led to the denial of his potential candidacy for the vice-president position. Dean Redington additionally noted that BLinC could continue to operate on

campus because "a student organization is a voluntary special interest group organized for educational, social, recreational, and service purposes and comprised of its members." *Id.* "Student organizations are separate legal entities from the University of Iowa and legally are not treated the same as University departments or units." *Id.* Furthermore, "[a] student organization can exist on campus whether or not the University approves its registration pursuant to the Registration of Student Organizations policy." *Id.* (emphasis omitted). Dean Redington advised that her decision was the final university action on the matter and BLinC could appeal her decision to the Board of Regents if it so chose.

BLinC filed its twenty-count Complaint with this Court on December 11, 2017. [ECF No. 1]. BLinC then filed its Motion for Preliminary Injunction, [ECF No. 7], requesting expedited relief by January 24, 2018, the date on which spring recruitment fairs for student organizations are held at the University. As relief, BLinC asks the Court issue an injunction ordering Defendants to reinstate BLinC's status as a registered student organization. The Court held a hearing on the motion on January 18, 2018.

## III.  ANALYSIS

Federal Rule of Civil Procedure 65 gives courts the authority to grant preliminary injunctions. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–690 (2008)). A district court addressing a request for a preliminary injunction must decide "[a]t base . . . whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."

*Winter*, 555 U.S. at 24 (citation omitted) (first quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987); then quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)).

In determining whether to grant a party's request for a preliminary injunction, the Court evaluates four factors: "(1) a likelihood of success on the merits; (2) irreparable harm; (3) that the balance of the harms of granting or denying the injunction are in its favor; and (4) that granting the injunction is in the public's interest." *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1000 (8th Cir. 2012); *see Dataphase Sys., Inc.*, 640 F.2d at 113. Of the preliminary injunction factors, "likelihood of success on the merits is most significant." *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995) (quoting *S & M Constuctors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992)). "The plaintiff 'need only establish a likelihood of succeeding on the merits of any one of [its] claims.'" *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (alteration in original) (quoting *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F.Supp.2d 230, 250 (D.D.C. 2003)). "The decision to grant or deny a preliminary injunction rests within the discretion of the district court and will not be disturbed on appeal absent a showing of abuse of discretion." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021 (8th Cir. 2015) (quoting *United States v. Gannaway*, 536 F.2d 784, 786 (8th Cir. 1976)).

### A. Likelihood of Success on the Merits

There are two standards for determining whether a party seeking a preliminary injunction has established the requisite likelihood of success on the merits. The parties dispute which standard applies to the instant motion. Thus, before the Court addresses the merits of BLinC's claims, it must decide the applicable standard under the likelihood of success factor.

### 1. Standard

Ordinarily, to obtain a preliminary injunction, a movant must demonstrate a "fair chance of prevailing" on the merits. *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014). In making this showing, the movant is not required to "prove a greater than fifty percent likelihood that [it] will prevail on the merits." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) (quoting *Dataphase*, 640 F.2d at 113).

The Defendants argue the Court should apply a higher standard under this factor. In *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, the United States Court of Appeals for the Eighth Circuit held that parties who move to enjoin the enforcement of state statutes must establish that they are "likely to prevail on the merits" because policies announced through such provisions are the result of "presumptively reasoned democratic processes." *Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008) (en banc). The purpose of this "elevated standard" is "'to ensure that preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis.'" *1-800-411-Pain Referral Serv., LLC*, 744 F.3d at 1054 (emphasis omitted) (quoting *Rounds*, 530 F.3d at 733). *Rounds* conclusively held that courts should apply this higher standard when a party seeks to enjoin state or federal statutes. *Rounds*, 530 F.3d at 732, n.6.

-13-

This action does not involve the enforcement of a state or federal statute.  Nevertheless, the Defendants argue the University's Human Rights Policy amounts to "a reasoned democratic decision."  [ECF No. 18-1 at 8].  The Defendants reason that since the University is a state entity created by the Iowa constitution and vested with the authority to adopt its own policies, those policies essentially emanate from the state and are deserving of the heightened standard articulated in *Rounds*.

The Court declines to use the higher standard.  The *Rounds* decision applies in a narrower sphere than the one Defendants suggest—it does not apply to every action taken by a government entity.  *See Rounds*, 530 F.3d at 732–33 ("Only in a case such as this one, where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute, must district courts make a threshold finding that a party is likely to prevail on the merits." (footnote omitted)).  The policy here was not created in the manner of a statue or regulation produced through "the full play of the democratic process involving both the legislative and executive branches."  *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam); *see Rounds*, 530 F.3d at 732 n.6.  Accordingly, the Court will apply the lesser "fair chance of prevailing" standard.

## 2.  Free Speech Claims

BLinC first argues the Free Speech Clause prevents the University from revoking its official registration.  Defendants respond that the University is entitled to condition registration on compliance with its policies.

"If a state university creates a limited public forum for speech, it may not 'discriminate against speech on the basis of its viewpoint.'"  *Gerlich v. Leath*, 861 F.3d 697, 704–05 (8th Cir. 2017) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  Universities "establish limited public forums by opening property 'limited to use by certain groups

or dedicated solely to the discussion of certain subjects.'" *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009)).   A university program that grants student organizations official registration or recognition amounts to a limited public forum.  *Id.* at 679.  Universities may constitutionally restrict access to limited public forums so long as the access barriers are "reasonable and viewpoint neutral."  *Id.*

The above principles derive from case law considering previous "clashes between public universities and student groups seeking official recognition or its attendant benefits."  *Id.* at 683. In *Healy v. James*, amid the backdrop of unrest and civil disobedience on university campuses nationwide in the late 1960s and early 1970s, a state college denied official recognition to students who wanted to organize a campus chapter of Students for a Democratic Society.  408 U.S. 169, 171–72 (1972).   The school viewed the purported mission of the group as inclusive of "a philosophy of violence and disruption."  *Id.* at 187.  The denial barred the group from using campus facilities for meetings and campus bulletin boards to distribute their messages.  *Id.* at 176.  The United States Supreme Court held that the college's disagreement with the views of the group was insufficient to justify its denial of official recognition because a public college "may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." *Id.* at 187–88.  However, "[a] college administration may impose a requirement . . . that a group seeking official recognition affirm in advance its willingness to adhere to reasonable campus law." *Id.* at 193.

The Court next applied *Healy* in the context of a registered student group's desire to use a state university's facilities for religious worship and discussion in *Widmar v. Vincent*, 454 U.S. 263, 265 (1981).  The university argued that, as a state institution, it could not open its facilities to

use by religious groups and speakers.  *Id.* at 270–71.  The Court reaffirmed "a [u]niversity's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education."  *Id.* at 277.  Nevertheless, because the university sought "to enforce a content-based exclusion of religious speech," the Court subjected the university's actions to strict scrutiny and found the university's interest was not sufficiently compelling to justify such an exclusion.  *Id.* at 276–77.

Again in *Rosenberger*, the Court held that a public university could not withhold student organization benefits from a group based on its religious perspective.  515 U.S. at 845–46.  The officially recognized student group in that case sought reimbursement from a student activity fund for the costs of printing its newspaper, which espoused Christian views.  *Id.* at 826–27.  The university affirmed the student government's denial of funds to the group because the newspaper constituted a "religious activity," and a university regulation prohibited such an activity from receiving reimbursement.  *Id.* at 825–26.  The Court determined that by its terms, the prohibition "select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints" and consequently the prohibition, in its terms and application, amounted to viewpoint discrimination.  *Id.* at 831, 832, 837.

It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.  Other principles follow from this precept.  In the realm of private speech or expression, government regulation may not favor one speaker over another.  Discrimination against speech because of its message is presumed to be unconstitutional.  These rules informed our determination that the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression.  When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.  Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

*Id.* at 828–29 (citations and quotation marks omitted).  Importantly, the Court articulated that "[o]nce it has opened a limited forum . . . the State must respect the lawful boundaries it has itself set." *Id.* at 829.  "The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' . . . nor may it discriminate against speech on the basis of its viewpoint." *Id.* (citations omitted) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

In contrast to the preceding decisions, the Court more recently in *Martinez* upheld a public law school's decision to refuse to grant official recognition to a religious group that sought an exception to the university's nondiscrimination policy, which the parties stipulated was an "all-comers" policy.  561 U.S. at 685.  Under this policy, approved organizations had to "allow any student to participate, become a member, or seek leadership positions in the organization, regardless of . . . status or beliefs." *Id.* at 671.  The law school granted official recognition to student groups through a "Registered Student Organization" ("RSO") program; official recognition came with additional benefits. *Id.* at 669.  Members of a formerly-approved student group decided to become a charter student chapter of the Christian Legal Society ("CLS"). *Id.* at 672.  To become an affiliate chapter, the group had to adopt bylaws requiring members to sign a "Statement of Faith" and agree to live their lives by certain principles. *Id.*  Among those

principles was "the belief that sexual activity should not occur outside of marriage between a man and a woman; CLS thus interpret[ed] its bylaws to exclude from affiliation anyone who engage[d] in 'unrepentant homosexual conduct.'" *Id.* The school rejected CLS's application for registered status for noncompliance with nondiscrimination policy because CLS "barred students based on religion and sexual orientation." *Id.* at 672–73. CLS requested an exemption from the policy, which the school refused to grant. *Id.* at 673.

The Court applied the limited public forum analysis to the school's policy and concluded that it was both reasonable and viewpoint neutral. *Id.* at 688–89, 695–97. In first considering the reasonableness of the policy, the Court reiterated "that a State's restriction on access to a limited public forum 'need not be the most reasonable or the only reasonable limitation'" and cautioned against conflating the advisability of a policy with its permissibility. *Id.* at 692 (quoting *Cornelius*, 473 U.S. at 808). The Court considered the justifications the law school offered for the policy, including ensuring the availability of the program to all, the ease of the policy's administration, bringing together diverse beliefs and backgrounds, and its conveyance of the law school's decision "to decline to subsidize with public monies and benefits conduct of which the people of California disapprove." *Id.* at 689. The Court found the policy was reasonable in light of the purpose of the forum. *Id.* at 690. The Court then determined that the all-comers policy was "textbook viewpoint neutral." *Id.* at 694–95. "CLS's conduct—not its Christian perspective—is, from [the school's] vantage point, what stands between the group and RSO status." *Id.* at 696. Accordingly, the Court found the school's policy was constitutional. *Id.* at 698.

In two cases, the Eighth Circuit has applied these same principles. First, in *Gay & Lesbian Students Ass'n v. Gohn*, a state university denied funding to a gay and lesbian advocacy group that was also a registered student organization despite the fact that the group had met all of the technical

requirements for funding.  850 F.2d 361, 362, 365 (8th Cir. 1988).  The court held "that a public body that chooses to fund speech or expression must do so even-handedly, without discriminating among recipients on the basis of their ideology."  *Id.* at 362.  The record clearly showed the university had denied funding due to "distaste for the GLSA's ideas," and amounted to impermissible viewpoint discrimination.  *Id.* at 366, 368.  Then, just this past year, the Eighth Circuit determined that Iowa State University had committed viewpoint discrimination in denying the use of the university's trademarks to a student group that advocated for the reform of marijuana laws.  *Gerlich*, 861 F.3d at 707.  In reaching this conclusion, the court noted that the university had followed an unusual process in evaluating the group's trademark applications, the defendants had implied that the reason for the additional scrutiny was the group's views, and the defendants had been pressured by state politicians.  *Id.*

With the guidance of the above cases firmly in mind, the Court turns to the analysis of BLinC's Free Speech claims.  In their briefing, both parties fail to recognize the applicability of the limited public forum doctrine to this case.[2]  BLinC quotes a reference from *Widmar* to "forum[s] generally open to student groups," then states that the University's "Registration of Student Programs" policy "creates precisely the type of forum that triggers full constitutional protections."  [ECF No. 7-1 at 17, 20].  Defendants do not address forum analysis at all and instead cite general principles about free speech without connecting them to the instant action.

Nevertheless, on the strength of *Gerlich*, *Martinez*, and *Rosenberger*, the Court concludes that the forum at issue is a limited public forum.  The University's student organization registration program is substantially similar to the RSO program at issue in *Martinez*.  *See Martinez*, 561 U.S.

---

[2]  BLinC later agreed at the hearing that, for purposes of this motion, the University had established a limited public forum.

at 687.  As in that case, the University gives student groups that participate in the program certain benefits so long as they agree to abide conditions established by the University.  The requirement that student groups obtain the University's approval is a "further indication that the student organization program[] [is a] limited public forum[]."  *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 798 (9th Cir. 2011).  Because the University's student organization registration program is a limited public forum, the University's decision to revoke BLinC's registration is permissible if the University's requirement of compliance with the Human Rights Policy is reasonable in light of the purpose of the forum and viewpoint neutral.  *See Martinez*, 561 U.S. at 687.

a.  Reasonableness

A university's restrictions on access to a limited public forum it has created must be "reasonable in light of the purpose served by the forum."  *Rosenberger*, 515 U.S. at 829 (quoting *Cornelius*, 473 U.S. at 806).  An educational institution, "like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated."  *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390 (1993).  "The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics."  *Rosenberger*, 515 U.S. at 829.  Importantly, "restriction[s] on access to a limited public forum 'need not be the most reasonable or the only reasonable limitation.'"  *Martinez*, 561 U.S. at 692.

The University made participation in its student organization registration program contingent on compliance with the University's Human Rights Policy.  To determine whether that restriction is reasonable, it is necessary to examine the purpose of the forum.  According to the University publication "Registration of Student Organizations,"

> Student organizations are an important link in the co-curricular activities of the University of Iowa.  They play an important role in developing student leadership and providing a quality campus environment.  As such, the University encourages the formation of student organizations around the areas of interest of its students, within the limits necessary to accommodate academic needs and ensure public safety.
>
>    . . . .
>
> It is the policy of the University that all registered student organizations be able to exercise free choice of members on the basis of their merits as individuals without restriction in accordance with the University's Policy on Human Rights.  The University acknowledges the interests of students to organize and associate with like-minded students, therefore any individual who subscribes to the goals and beliefs may participate in and become a member of the organization.

[ECF No. 7-2 at 4–5].  "Membership and participation in the organization must be open to all students without regard to . . . classification[s] that deprive[] the person of consideration as an individual.  The organization will guarantee that equal opportunity and equal access to membership, programming, facilities, and benefits shall be open to all persons."  *Id.* at 5.  Additionally, "General student organizations are those that are consistent with the mission and culture of the University and engage primarily in activities that benefit their membership."  *Id.* at 7.  The Human Rights Policy states that the University "brings together in common pursuit of its educational goals persons of many nations, races, and creeds."  *Id.* at 17.  "[I]n no aspect of [the University's] programs shall there be difference in the treatment of persons because of [classifications] that deprive[] the person of consideration as an individual . . . ."  *Id.*

These statements show that the intended purpose of the student organization registration program is to allow students to engage with other students who have similar interests and, in doing so, students should only fear rejection on the basis of their own merits, not because of their membership in a protected class.  Moreover, funds for student organizations are drawn from mandatory student activity fees and the University is a publicly funded institution.  Thus, as in *Martinez*, the policy "conveys [the University's] decision to decline to subsidize with public

monies and benefits conduct of which the people of [Iowa] disapprove." *See Martinez*, 561 U.S. at 689–90; *see also* Iowa Code § 216.1 *et seq.* (prohibiting various forms of discrimination based on protected characteristics). Finally, as the University acknowledges in the registration policy, student organization can exist regardless of whether the University recognizes them. Thus, if a student group finds compliance with the Human Rights Policy and the other requirements for registration to unduly onerous, the group may still operate on campus, albeit without the benefits that official registration provides.

The Court concludes that the policy is reasonable in light of the intended purpose of the forum. The University created a forum for like-minded students to engage with one another and develop their leadership skills with the overall purpose of enhancing students' educational experiences. It also clearly wanted to ensure that every student received individual consideration from the organizations he or she sought to join. Thus, the requirement that student organizations comply with the Human Rights Policy to receive the benefits of registration is reasonable in light of the forum's purpose.

### b.  Viewpoint neutral

The Court next considers whether the policy is viewpoint neutral. At this juncture, the Court must address a significant argument raised by the parties that is not accounted for in the standard analysis. BLinC argues that the University does not consistently apply the Human Rights Policy. The place of such an argument within forum analysis is an issue *Martinez* left unresolved.

This question, however, has been addressed by United States Court of Appeals for the Ninth Circuit. In *Reed*, San Diego State had repeatedly declined to grant official registration to several Christian student groups because their membership requirements violated San Diego State's nondiscrimination policy by requiring officers and members to profess to be Christians.

648 F.3d at 795–96.  The Ninth Circuit largely applied the framework of *Martinez*.  *See id.* at 797 (noting that *Martinez* held that "both freedom of speech and freedom of expressive association challenges are properly analyzed under the limited-public-forum doctrine").  The court determined the nondiscrimination policy was reasonable in light of the purpose of the forum.  *Id.* at 799.  When evaluating whether the policy was viewpoint neutral, the court addressed the policy both as written and as applied.  *Id.* at 800–04.  In light of evidence that some groups had membership requirements that appeared to violate the policy, the court reversed the district court's entry of summary judgment in favor of the defendants and remanded the case.  *Id.* at 804.  In remanding, the court noted that it was "possible that these groups were approved inadvertently because of administrative oversight, or that these groups have, despite the language in their applications, agreed to abide by the nondiscrimination policy."  *Id.*  However, "the record [did] not adequately explain why some official student groups at San Diego State appear[ed] to have membership requirements that violat[ed] the school's nondiscrimination policy."  *Id.*

The Court considers the analysis in *Reed* to be instructive here.  Accordingly, the Court will address both the whether the policy is viewpoint neutral as written and as applied.[3]

---

[3] The Court's decision to interpret BLinC's Free Speech claims as challenges to the Human Rights Policy both as written and as-applied is bolstered by BLinC's request in its motion that the Court enjoin the application of the policy to other similarly situated religious groups.  [ECF No. 7 at 3].  In free speech cases arising outside of the context of limited public forums, challenges are considered either facial or as-applied, which is analogous to the analysis the Court has chosen here.  When determining whether challenges are facial or as-applied, the breadth of the remedy generally determines the scope of the claims.  *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) ("The label is not what matters. The important point is that plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs. They must therefore satisfy our standards for a facial challenge to the extent of that reach."); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (holding that the distinction between a facial challenge and an as-applied challenge "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint").  BLinC's request for relief beyond itself supports considering the policy both as written and in its application.

### i.   *Viewpoint neutral as written*

Viewpoint discrimination occurs when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.  "A regulation that serves purposes unrelated to the content [or viewpoint] of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Here, the policy is clearly not aimed at any particular view, ideology, or opinion.  The language is familiar, essentially boilerplate language repeated in similar terms in civil and human rights codes nationwide, including the Iowa Civil Rights Act and the Iowa City Human Rights Code.  *See* Iowa Code § 216 *et seq.*; Iowa City City Code § 2–1 *et seq.*  The Supreme Court has found that similar codes serve societal interests "unrelated to the suppression of ideas" and are therefore neutral with respect to content and viewpoint.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623–24 (1984) (holding that a state law prohibiting discrimination on the basis of race, color, creed, religion, disability, national origin, or sex "does not aim at the suppression of speech [and] does not distinguish between prohibited and permitted activity on the basis of viewpoint"); *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572 (1995) (determining that stating that statute barring discrimination on the basis of sexual orientation and other grounds did not, "on its face, target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds").

BLinC also appears to argue that the policy has the effect of burdening religious groups like itself more than secular groups.  It produces the constitutions of other groups and states that other groups are allowed to organize around beliefs and tenets while it is not.

-24-

The plaintiffs in *Martinez* and *Reed* made similar arguments.  Both essentially contended that the nondiscrimination policy and the "all-comers" policies at issue in those cases were not effectively neutral due to an alleged disparate impact on religious groups.  *See Martinez*, 561 U.S. at 695; *Reed*, 648 F.3d at 798.   However, a disparate impact does not support a finding that the policy is not viewpoint neutral as written.  *See Ward*, 491 U.S. at 791.  The target of the policy is not religious views but rather discrimination, and "[e]ven if a regulation has a differential impact on groups wishing to enforce exclusionary membership policies, '[w]here the [State] does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.'" *See Martinez*, 561 U.S. at 696 (alteration in original) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 390 (1992).  The Court concludes the University's Human Rights Policy is viewpoint neutral as written.

### ii.   Viewpoint neutral as applied

Finally, BLinC argues the University has not consistently applied the policy and thus the policy should not be regarded as viewpoint neutral in its application.  "A nondiscrimination policy that is viewpoint neutral on its face may still be unconstitutional if not applied uniformly."  *Reed*, 648 F.3d at 803; *see Christian Legal Soc'y v. Walker*, 453 F.3d 853, 866 (7th Cir. 2006).

BLinC points to a letter written by Dean Baker in early 2004 to the Christian Legal Society ("CLS") Chapter at the University of Iowa College of Law.  [ECF No. 7-3 at 5].  In fall 2003, the CLS chapter submitted a proposed constitution that did not include the Human Rights Policy.  *Id.* at 5–7.  The group's application was not approved and in a 2004 letter Dean Baker informed the group that the decision would be upheld until CLS included the Human Rights Policy in its constitution, though it may also include a statement of faith explaining its beliefs.  *Id.*

BLinC argues CLS's views are similar to its own and, since CLS has been allowed registered status for many years, the 2004 letter from Dean Baker shows that the University does not apply its policy even-handedly.  BLinC submitted a declaration from the Director of the CLS's Center for Law and Religious Freedom, wherein she states that CLS chapter leaders are required to adhere to limits on conduct much like those in BLinC's Statement of Faith.  *Id.* at 1.  BLinC also submitted the constitution of the CLS chapter at the University, which includes a statement of faith and mandates that officers subscribe to the statement.  [ECF No. 7-2].  The statement of faith does not contain any references to the group's view on sexual conduct or homosexuality.

The CLS incident is not dispositive of this issue, largely because the facts are simply unclear.  The current constitution and bylaws of the CLS chapter does not contain the relevant statements found in BLinC's proposed Statement of Faith regarding sexual orientation and gender identity.  *Id.* at 63.  BLinC did not submit the CLS chapter's statement of faith that the University eventually approved in 2004.  Although the national CLS representative stated that those are the views of the larger organization, the University is not required to be omniscient.  Without facts showing that the University approved a statement of faith similar to BLinC's, the Court cannot use the CLS incident to conclude the University has engaged in selective enforcement.  Moreover, the Court is not blind to the fact that these events occurred approximately fourteen years ago.  Views regarding sexual orientation and gender identity have changed a great deal over the past fourteen years.  Thus, the CLS incident's probative value with respect to the present dispute is diminished both by its age and its ambiguity.

What is instructive regarding the CLS events in 2003 and 2004 is that they contradict the University's claim at the hearing that it only reviews student organization constitutions when a complaint has been filed.  There is no evidence that CLS's student organization was the subject of

any complaint, adding fuel to BLinC's claim that Christian groups are subject to additional scrutiny.

Moreover, the constitution of the CLS chapter is not the only one in the current record.  As previously noted, BLinC submits the constitutions of several organizations in an effort to show that other student organizations like Students for Life, the Korean American Student Association, and the University of Iowa Feminist Majority Leadership Alliance are permitted to organize around their missions and beliefs, though it cannot.

Another of these constitutions is that of the Imam Mahdi organization.  *Id.* at 49.  Imam Mahdi is a Muslim registered student organization.  The organization's constitution lists qualifications for membership.  For full membership in the organization, an individual must be eighteen years or older and "[b]e Muslim, Shiea, and obtain the recommendation of two Members."  *Id.* at 51.  "The reason behind the recommendation is to be sure that the person who desires to join this organization as a full member[] is Muslim, Shiea, who respects the religion rules, and willing to practice the faith."  *Id.*

Although not mentioned in its brief, BLinC did call attention to Imam Mahdi's membership requirements in its November 2, 2017 letter to Dean Redington.  [ECF No. 7-4 at 42].  The Court broached the subject of Imam Mahdi's membership requirements at the hearing on BLinC's motion.  The University does not appear to have taken any action with respect to Imam Mahdi, despite its clear violation of the University's Human Rights Policy.  At the hearing, Defendants' only response was that the process is "complaint-driven."  The University's registration policy and the established facts of the episode with CLS refute that contention.  An organization's proposed constitution and bylaws are reviewed with its registration form before an organization is granted registered status.  [ECF No. 7-2 at 5].  As discussed above, CLS's failure to include the Human

-27-

Rights Policy in its constitution was noted during this review process and CLS's application for registration was rejected.  [ECF No. 7-3 at 5].

Imam Mahdi's requirement that only Shiea Muslims are eligible for full membership in its organization is a requirement based upon at least one protected classification—that of religion. The record does not indicate why Imam Mahdi has been able to maintain these requirements.  The constitution containing the membership requirements could have been "approved inadvertently because of administrative oversight," *see Reed*, 648 F.3d at 804, or the organization may have been allowed to operate in this manner for some other reason.  Nevertheless, the Court must conclude on the current record that BLinC has shown that the University does not consistently and equally apply its Human Rights Policy.  This raises an issue regarding whether BLinC's viewpoint was the reason it was not allowed to operate with membership requirements that the University had determined violated the policy, while at the same time Imam Mahdi was not subjected to any enforcement action.  *See Walker*, 453 F.3d at 866–67 (finding evidence of other groups operating with member requirements that were violative of nondiscrimination policy established a likelihood of success on claim that policy had not been applied in viewpoint neutral manner).   In light of this selective enforcement, the Court finds BLinC has established the requisite fair chance of prevailing on the merits of its claims under the Free Speech Clause.  Because BLinC has established the required likelihood of success on one of its claims, the Court will not address BLinC's claims under the Religious Clauses.

### B.  Irreparable Harm

The second factor of preliminary injunction analysis is irreparable harm.  "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).   "It is well established that

'[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.'" *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Gen. Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). "To succeed in demonstrating a threat of irreparable harm," the movant must show that this type of harm "'is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *S.J.W. ex rel. Wilson v. lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012) (*Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011)).

The harm BLinC alleges includes the loss of its ability to access the benefits of registered groups and of its ability to exercise its First Amendment freedoms. Some of this harm can be quantified as damages—for instance, funds BLinC expends that would ordinarily have been reimbursed through the student activity fund. However, some of the harm BLinC alleges cannot be calculated so easily, including the loss of exposure at the student activity fairs and through the University's website for student organizations to potential members who would not have otherwise become aware of BLinC.

"The loss of First Amendment freedoms constitutes irreparable injury . . . ." *Powell v. Ryan*, 855 F.3d 899, 904 (8th Cir. 2017). Such a loss "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, as the United States Court of Appeals for the Seventh Circuit has noted, "violations of First Amendment rights are presumed to constitute irreparable injuries." *Walker*, 453 F.3d at 867.

Because BLinC will likely suffer a loss of First Amendment freedoms, including its freedoms of speech and expressive association, the Court concludes BLinC has shown it will be irreparably harmed absent an injunction.

## C.  Balance of Harms and Public Interest

The last two factors the Court must consider are the balance of harms and whether an injunction would serve the public interest.  The balance of harms in this case is a close question. If the Court did not issue an injunction, BLinC would likely suffer a loss in First Amendment rights, which is undoubtedly a significant harm as noted above.  An injunction may not affect Defendants inasmuch as it may impact the University community by exposing members of the student body to discrimination.  Nevertheless, the likelihood of this occurring appears slim; BLinC is a small organization and one of over 500 student organizations.  The Court concludes the balance of harms favors BLinC.

The last factor is whether the issuance of an injunction is in the public interest.  "[I]t is always in the public interest to protect constitutional rights."  *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012).  The public interest and the First Amendment favor the expression of ideas, even those the public and courts may find abhorrent.  The Court concludes the public interest factor favors BLinC.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff BLinC's Motion for Preliminary Injunction, [ECF No. 7], is GRANTED.   The Court orders Defendants to restore BLinC to registered student organization status for ninety days.  Following this ninety-day period, BLinC may seek further action as necessary, and Defendants may respond by detailing any changes to the enforcement of its Human Rights Policy to registered student organizations.  This injunction shall take immediate effect.  The Court waives the security requirement in Federal Rule of Civil Procedure 65(c).

IT IS SO ORDERED.

Dated this 23rd day of January, 2018.

_____
STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT