**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| BUSINESS LEADERS IN CHRIST, an unincorporated association,<br><br>     *Plaintiff*,<br><br>  v.<br><br>THE UNIVERSITY OF IOWA; LYN REDINGTON, in her official capacity as Dean of Students and in her individual capacity; THOMAS R. BAKER, in his official capacity as Assistant Dean of Students and in his individual capacity; and WILLIAM R. NELSON, in his official capacity as Executive Director, Iowa Memorial Union, and in his individual capacity,<br><br>     *Defendants*. | Civil Action No. 17-cv-00080-SMR-SBJ<br><br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

Christopher C. Hagenow
Hagenow & Gustoff, LLP
600 Oakland Rd. NE
Cedar Rapids, IA 52402
(319) 849-8390 phone
(888) 689-1995 fax
*chagenow@whgllp.com*

Eric S. Baxter*
*Lead Counsel*
Daniel H. Blomberg*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC, 20036
(202) 955-0095 phone
(202) 955-0090 fax
*ebaxter@becketlaw.org*
*dblomberg@becketlaw.org*

***Counsel for Plaintiff***

*\*Admitted pro hac vice*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................... 3

LEGAL STANDARD ................................................................................................. 14

ARGUMENT .............................................................................................................. 14

I.   The University infringed BLinC's Free Speech, Free Exercise,
     and Freedom of Association rights without sufficient justification. ......................... 15

  A.   The University infringed BLinC's rights under the Free Speech Clause. ................. 15

    1.   State universities that unreasonably limit access to registered
         status or discriminate based on viewpoint must face strict scrutiny. ................... 15

    2.   The University's deregistration of BLinC was unreasonable
         and discriminatory.  ............................................................................ 18

      a.   The University's application of the Policy against
           BLinC was unreasonable in light of the forum's purpose. ........................... 19

      b.   The University's application of the Policy against
           BLinC was discriminatory on the basis of viewpoint. .................................. 22

    3.   *Martinez* does not support the University's unreasonable,
         discriminatory actions. ......................................................................... 26

  B.   The University infringed BLinC's right to freedom of association.  ....................... 28

  C.   The University infringed BLinC's rights under the Free Exercise Clause.  .............. 29

    1.   The University censored BLinC's religious beliefs. ..................................... 29

    2.   The University discriminated against BLinC's religious exercise.  .................. 30

  D.   The University cannot justify its infringements of BLinC's
       constitutional rights. ............................................................................... 35

II.  Defendants' ban on BLinC's religious leadership selection
     violates the Religion Clauses.  ......................................................................... 38

  A.   BLinC is a religious group.  ....................................................................... 39

B.  BLinC's officers hold religious leadership positions. .........................................40

III. This Court should grant permanent injunctive relief.  ...............................................42

CONCLUSION ...............................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Legal Def. Fund v. Reynolds*,
  297 F. Supp. 3d 901 (S.D. Iowa 2018) ........................................................................ 15-16

*Blackhawk v. Pennsylvania*,
  381 F.3d 202 (3rd Cir. 2004) .........................................................................................30

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000)...........................................................................................28, 29, 36

*Brown v. Entm't Merchants Ass'n*,
  564 U.S. 786 (2011).................................................................................................35, 37

*Burnham v. Ianni*,
  119 F.3d 668 (8th Cir. 1997) .........................................................................................32

*Cal. Democratic Party v. Jones*,
  530 U.S. 567 (2000).......................................................................................................27

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940).......................................................................................................30

*Christian Legal Soc'y v. Martinez*,
  561 U.S. 661 (2010)............................................................................................. *passim*

*Christian Legal Society v. Walker*,
  453 F.3d 853 (7th Cir. 2006) ...........................................................................29, 39, 42, 43

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)............................................................................................. *passim*

*City of Boerne v. Flores*,
  521 U.S. 507 (1997).......................................................................................................35

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985).......................................................................................................32

*Ciurleo v. St. Regis Parish*,
  214 F. Supp. 3d 647 (E.D. Mich. 2016)........................................................................41

*Cohen v. California*,
  403 U.S. (1971)..............................................................................................................32

*Conlon v. InterVarsity Christian Fellowship,*
777 F.3d 829 (6th Cir. 2015) ...........................................................39, 40, 41

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.,*
540 F.3d 752 (8th Cir. 2008) ....................................................14, 38, 42, 43

*Cuffley v. Mickes,*
208 F.3d 702 (8th Cir. 2000) ....................................................... 36-37, 42

*Emp't Div. v. Smith,*
494 U.S. 872 (1990)...................................................................................30

*Fratello v. Archdiocese of New York,*
863 F.3d 190 (2d Cir. 2017)...............................................................40, 41

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,*
170 F.3d 359 (3d. Cir. 1999)....................................................................33

*Gay & Lesbian Students Ass'n v. Gohn,*
850 F.2d 361 (8th Cir. 1988) ....................................................................18

*Gay Lib v. Univ. of Mo.,*
558 F.2d 848 (8th Cir. 1977) ....................................................................18

*Gerlich v. Leath,*
861 F.3d 697 (8th Cir. 2017) ........................................................ *passim*

*Healy v. James,*
408 U.S. 169 (1972).......................................................................... *passim*

*Hosanna-Tabor Evangelical Lutheran Sch. v. EEOC,*
565 U.S. 171 (2012)........................................................................ *passim*

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston,*
515 U.S. 557 (1995).............................................................................28, 36

*Janus v. Am. Fed'n of State, Cty., and Mun. Empl.,*
138 S. Ct. 2448 (2018)...............................................................................27

*Keyishian v. Bd. of Regents,*
385 U.S. 589 (1967)...................................................................................43

*Knox v. Serv. Empl. Union,*
567 U.S. 298 (2012)..............................................................................28, 43

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,*
508 U.S. 384 (1993)........................................................................ *passim*

*Lee v. Sixth Mount Zion Baptist Church*,
  903 F.3d 113 (3d Cir. 2018)..................................................................................39

*Masterpiece Cakeshop Ltd. v. Colo. Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018)........................................................................34, 35, 37

*Matal v. Tam*,
  137 S. Ct. 1744 (2017).................................................................15, 16, 20, 35

*McDaniel v. Paty*,
  435 U.S. 618 (1978)..............................................................................................30

*Mitchell Cty. v. Zimmerman*,
  810 N.W.2d 1 (Iowa 2012) ..............................................................30, 32, 33

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*,
  508 U.S. 656 (1993)..............................................................................................43

*New v. Denver*,
  787 F.3d 895 (8th Cir. 2015) ........................................................................14

*NIFLA v. Becerra*,
  138 S. Ct. 2361 (2018)........................................................................................38

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015)........................................................................................37

*Our Lady's Inn v. City of St. Louis*,
  No. 4:17-cv-01543, 2018 WL 4698785 (E.D. Mo. Sept. 30, 2018) .................28, 29

*Petruska v. Gannon Univ.*,
  462 F.3d 294 (3d Cir. 2006)............................................................................27

*Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012) ....................................42

*Phelps-Roper v. Nixon*,
  545 F.3d 685 (8th Cir. 2008) ........................................................................42

*Rader v. Johnston*,
  924 F. Supp. 1540 (D. Neb. 1996)..........................................................33, 34

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)..............................................................................15, 16, 17

*Scharon v. St. Luke's Episcopal Presbyterian Hosps.*,
  929 F.2d 360 (8th Cir. 1991) ..................................................................38, 39, 40

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
  363 F.3d 299 (4th Cir. 2004) ........................................................................40

v

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ............................................................................................ 42

*Singh v. Carter*,
  168 F. Supp. 3d 216 (D.D.C. 2016) ............................................................. 42-43

*Sundquist v. Nebraska*,
  122 F. Supp. 3d 876 (D. Neb. 2015) ............................................................... 14

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002) ................................................................. 31, 32, 34

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  137 S. Ct. 2012 (2017) .................................................................................. *passim*

*Widmar v. Vincent*,
  454 U.S. 263 (1981) ..................................................................................... 15, 17

## INTRODUCTION

This is an unusual case. It revolves around a decision by Defendant University of Iowa to sanction Business Leaders in Christ ("BLinC"), a religious student group of 8-10 students, because of its statement of faith. The students were somewhat startled to receive a letter from the University—a state institution—telling them that, to exist on campus on equal footing with the University's roughly 500 other student groups, they would have to "make . . . revisions to [their] Statement of Faith" and stop asking their student leaders to agree to it. The offending language, they were told, comprised three sentences expressing BLinC's traditional Christian views concerning marriage, sexuality, and gender identity. According to the University, these views made BLinC's belief statement discriminatory "on its face" and contrary to University policy. Unable to simply change their religious beliefs, BLinC's leaders declined to make revisions and, as a result, were deregistered, an action stripping their ability as a group to have equal access to recruit students at campus fairs, be listed on the University's student-group website, participate in speech opportunities, use campus resources, or otherwise participate in campus life.

The students' shock was magnified as they became aware that dozens of other organizations on campus—including the largest groups on campus, with a membership of 17% of the entire undergraduate class—were allowed to screen both leaders *and* members based on conformance not just with a group's particular beliefs (like Love Works, a Christian group espousing an opposing view of sexuality), but even directly based on a protected status (like sororities and fraternities, which are all segregated by sex). And the University itself, they realized, has dozens of programs, scholarships, awards, and grants whose participants or beneficiaries are also selected on the bases of protected categories in violation of the Policy—including NCAA teams sponsored by the University's $100 million Athletics Department.

But perhaps most confusing was to have all of the Defendants then testify against themselves. Defendant William Nelson, who—ironically—had instructed the students to update BLinC's constitution with a statement of their religious views in the first place, admitted that he would have let them keep their registered status if they just would have deleted their beliefs about marriage and sexuality. And he also admitted that the Policy only prohibits status-based discrimination anyway, not the selection of leaders based on shared beliefs. Defendant Thomas Baker concurred: he too would have let BLinC remain registered, but for those specific religious beliefs. He thought it was okay to have religious standards of sexual morality for leaders, but only if a group's religious beliefs did not distinguish between same- and opposite-sex couples. And Defendant Lyn Redington really rounded out the testimony. She admitted that she only upheld BLinC's deregistration because she failed to review the evidence, and that if she had looked at the evidence, she never would have deregistered BLinC because she knew that pressuring BLinC to revise its Statement of Faith was a clear violation of the First Amendment.

In short, this should have been an open-and-shut case before it even became a lawsuit. Yet the University persists, confident that despite all the evidence, its targeted discrimination against BLinC can somehow be justified on the ground that, as a registered student group, BLinC received University benefits. But it is black letter law, that the government cannot condition access to generally available programs on participants giving up their First Amendment rights, and it certainly cannot do so when making that demand only of participants with disfavored religious beliefs.

Throughout the entire process University and its officials—Defendants Nelson, Baker, and Redington—have acted with gross disregard for BLinC's constitutional rights. Accordingly, this Court should promptly grant summary judgment against all four defendants.

## FACTUAL BACKGROUND

For decades, the University of Iowa has allowed and "encourage[d] the formation of student organizations around the areas of interest of its students." SoF ¶¶ 4-5. It explicitly recognizes that students benefit from "organiz[ing] and associat[ing] with like-minded" individuals, and thus that student organizations may restrict membership to "any individual who subscribes to the goals and beliefs" of the organization." SoF ¶ 8. Hundreds of groups have participated in this broad forum, from "Greeks" and political groups to religious organizations and sports clubs. *See, e.g.*, SoF ¶¶ 17-19. This extra-curricular activity is highly valued by the University because it creates social networks for students, opportunities for practical application of classroom learning, and a marketplace of ideas where students can grapple with new and challenging concepts—all of which serves to increase the rate of persistence to graduation, along with creating a diverse and dynamic campus culture. SoF ¶¶ 355, 379. The University encourages this activity by giving student groups significant benefits for registering with the University, including access to communications resources, important recruitment events and tools, unique speech opportunities, free meeting facilities, and modest financial aid that the groups can use to promote their missions, recruit new students, conduct activities, and engage with related organizations off campus. SoF ¶¶ 238-39. The University is careful, however, to clarify that these groups are independent from the University and that registration "does not constitute an endorsement of [the organization's] programs or its purposes." SoF ¶ 6. Rather, registration "is merely a charter to exist" at the University on equal footing with other registered student groups. *Id*.

The University also has a Human Rights Policy (the "Policy") that prohibits discrimination on a laundry list of bases, including categories long protected under federal nondiscrimination laws (*e.g.*, race, sex, national origin, religion, and disability), plus a variety of others found in

many state and local nondiscrimination laws (creed, sexual orientation, gender identity, status as a veteran, etc.). SoF ¶ 11. The Policy applies both to the University—in *all* of its activities, SoF ¶ 9 —and to registered student organizations, SoF ¶¶ 10-11. The Policy has no written exceptions, but the University has always applied extensive exclusions for historical reasons, out of practical necessity, or to comply with laws and regulations, not least of which being the First Amendment to the United States Constitution. For example, the University's NCAA sports teams, along with its sports camps, intramural leagues, and recreational clinics, are all overwhelmingly segregated by sex. SoF ¶¶ 28-33, 428-29. And the University has multiple programs, scholarships, grants, and awards designed to benefit members with protected characteristics, including Native Americans, members of the LGBTQ community, veterans, women, and individuals with disabilities, among others. SoF ¶¶ 34-35. Strictly applied, the Policy would condemn all these practices as status-based discrimination. *See, e.g.,* SoF ¶¶ 282, 309, 425. But in applying the Policy, the University has always steered clear of an extremism that would fail to distinguish invidious discrimination from efforts to promote cultural diversity or support positive associations based on shared characteristics. SoF ¶ 330; *see also* SoF ¶¶ 20-23.

Common sense has also been the prevailing principle in applying the Policy to student groups. The University's many club teams (considered student organizations by the University) are largely sex-segregated. SoF ¶¶ 27-28. The same is true for the campus's 50+ fraternities and sororities, whose members make up 17% of the University's undergraduate student body. SoF ¶¶ 24, 330, 420. And many, many groups have formed—and restricted access to membership—based on protected characteristics: to maintain "a space for Black Queer individuals"; to generate recreational or networking opportunities for students from China; to perform all-male or all-female vocal repertoire; or to provide support for military veterans, just to name a few examples.

SoF ¶ 24. And still others have formed without formally restricting access based on protected characteristics, but with a mission to exclusively promote a particular protected class. SoF ¶ 25.

The University admits that the Policy only prohibits status-based discrimination. SoF ¶¶ 209, 260, 272, 322-28, 372, 416. Thus, the selection of members or leaders around a group's defining beliefs or mission falls completely outside the Policy's scope. It has never been understood to prohibit students from forming groups around shared beliefs, including at the exclusion of dissenters. SoF ¶¶ 204, 209, 272-74, 322-28, 416. Students have formed myriad political, religious, ideological, cultural, and advocacy organizations promoting a wide range of views and agendas. SoF ¶¶ 18-9. The Policy has never been applied to these groups' selection of their leaders or members: they associate around shared beliefs, not immutable characteristics. SoF ¶¶ 325-26. This is true even when a group's mission—*e.g.*, promoting transgender rights, mentoring Latina/o graduate students, or advocating Korean Culture (*see* SoF ¶¶ 19-20)—is inextricably bound to a protected category. The Policy prohibits status-based discrimination, not ideological alliances. SoF ¶¶ 204, 209, 272-74, 322-28, 416. And for good reason. A state— including a state university like the University Iowa—faces strict First Amendment constraints in regulating the speech and expressive association of all such groups. And the Free Exercise and Establishment Clauses impose further protective restraints when it comes to religious groups.

The University has long been adamant about honoring these protections. In 1999, it was confronted with whether the Christian Legal Society ("CLS") could require its members to sign a statement of faith affirming their Christian beliefs and promising to abide by Biblical principles, including abstaining from sex outside of marriage between a man and a woman. SoF ¶¶ 36-43. CLS was afraid the University might find a violation of the Policy's prohibition against discrimination on the basis of sexual orientation, but the University approved CLS's constitution.

SoF ¶¶ 43-44. The issue arose again in 2004. SoF ¶¶ 48-51. This time the University was even more resolute, with Defendant Thomas Baker, then an Associate Dean, sending CLS written assurance that "the Human Rights Policy does not prohibit student groups from establishing membership criteria" and that "[*a*]*sking prospective members to sign the CLS statement of faith would not violate the UI Human Rights policy*." SoF ¶¶ 52-61 (emphasis in original). The issue repeated several times over the next five years, once when the student government tried to deny funding to CLS individually, once when other student groups complained about CLS's religious standards, and once when the student government revised its bylaws to bar funding to "exclusive religious groups." SoF ¶¶ 62-87. Each time, the University emphatically iterated that targeting CLS because of its statement of faith was a constitutional violation, warning that the student leaders could face personal liability and loss of their University authority if they did not stop discriminating. SoF ¶¶ 65-67, 71-73, 76, 79-85. Dean Baker and Defendant William Nelson were both intimately involved throughout these incidents. SoF ¶¶ 45, 48-49, 52-54, 68, 74, 85-86, 368. And the University's Policy today is still the exact same, status-based policy that they saw applied to CLS. SoF ¶¶ 14-15, 207-09, 260, 272-74, 325-26, 369-72, 416. The only exception is that the University has recently added language to the Policy making the exemption for sororities and fraternities explicit. SoF ¶¶ 11-12. The Policy is not now, and has never been, an all-comers policy. SoF ¶¶ 1-3, 88-91, 303-04.

With that understanding, the investigation of BLinC should have been an open-and-shut case. But instead, the University's presumptuous disapproval of BLinC's religious beliefs concerning marriage and sexuality generated a tumultuous and confused effort to retrofit the Policy to the supposed crime. It all commenced with a complaint filed by a student named Marcus Miller alleging that BLinC had denied him a leadership position because he was "openly gay" and

demanding that the University "force BLinC to . . . allow openly LGBTQ members to be leaders." SoF ¶ 158. The evidence is undisputed that BLinC and Mr. Miller had a religious disagreement: BLinC subscribes to traditional biblical views concerning marriage and sexuality; Mr. Miller espoused a more progressive view. SoF ¶¶ 99, 111-147. BLinC emphasized repeatedly that (a) anyone could be a member of their group, (b) that a member could be gay and still be a leader as long as they embraced and agreed to live by BLinC's religious beliefs, and (c) that Mr. Miller had not been denied a leadership position because he was gay, but only because he rejected BLinC's religious beliefs. SoF ¶¶ 154-56, 168, 170, 183, 186, 207-08, 211. Connie Cervantes, the University's attorney investigator had access to all that information and included it in her report. SoF ¶¶ 182-84. Indeed, she agreed there was extensive, undisputed evidence— including Mr. Miller's own concession—that he was denied a leadership position only because of his religious beliefs. SoF ¶¶ 285-95. And Ms. Cervantes admitted that, after personally interview BLinC's then-president and co-founder, Hannah Thompson, she had "no reason to believe Hannah was lying [about this.]" SoF ¶ 296. Yet, incredibly, she claimed that Hannah had said "she'd eliminate [Mr. Miller] because he was gay" and that Hannah was "pretty firm about that. There was no discussion of religious beliefs." SoF ¶¶ 297-300. But in the very next breath, Ms. Cervantes admitted she was ignoring all the evidence that Hannah was focused on the core religious disagreement: "Yes, the emails say that. Yes, the letter signed by Hannah Thompson says that. Yes, there are notes where she said other things[.]" SoF ¶ 301.

Cervantes' finding is incontrovertibly false, and the University now admits that it was never subjected to *any* sort of appropriate evidentiary review. SoF ¶¶ 235, 356-60, 399-400. But the finding is also irrelevant, as it was ultimately not the reason for the deregistration. After the findings issued, BLinC's new leaders, Jake Estell and Brett Eikenberry, met with Dean Baker

and Dr. Nelson. SoF ¶¶ 191-94. Before the meeting Dean Baker reminded Dr. Nelson of the CLS rule: "[a]s, you know, an applicant's sexual activity may be the subject of conversation during the process of evaluating a leadership application" and "[e]ngaging in sexual activity outside of marriage is one legitimate ground for denying a leadership position if that principle is one of the tenets of the student organization." SoF ¶¶ 187-190. During the meeting, Dean Baker confirmed to Jake and Brett that the CLS policy was still in effect: it was okay for a religious group to require its leaders to embrace and live by its religious beliefs, including beliefs about sexual conduct, as long as it did not discriminate based on status alone. SoF ¶¶ 195-209. Jake and Brett assured Dean Baker that this was their practice, since BLinC did not discriminate based on status, but only sought to choose leaders based on their beliefs and conduct. SoF ¶ 208, 211-12.

Turning to a separate concern, Dr. Nelson asked Jake and Brett if their beliefs about marriage and sexuality were explained in their constitution. He thought it would be better if students knew BLinC's beliefs before they joined so they wouldn't be offended later. SoF ¶ 213. Jake and Brett agreed to add an explanation of their beliefs, and everyone left the meeting thinking the controversy was coming to a close, with Dr. Nelson even praising Jake and Brett as he walked out the door as being among "the best" of the students at the University. SoF ¶¶ 213-219.

BLinC's revised constitution added a full paragraph reciting their basic Christian beliefs, including three sentences on marriage, sexuality, and gender identity—precisely as requested by Dr. Nelson and fully in keeping with the beliefs of other approved student groups. SoF ¶ 222-25; *see also* SoF ¶¶ 17, 38, 245-49, 262-65. Jake and Brett were then shocked, three weeks later, to receive Dr. Nelson's official written conclusion that their constitution was unacceptable, that it violated the University's Policy, and that, to remain a registered student organization, BLinC would have to make "revisions to [its] Statement of Faith" and "submit an acceptable plan" for

selecting leaders. SoF ¶¶ 226-230. Unable to simply "revis[e]" its beliefs, BLinC appealed to the Dean of Students, Lyn Redington. SoF ¶¶ 231. Her decision mimicked Dr. Nelson's, stating that BLinC's Statement of Face violated the University's policy "on its face." She further accused BLinC of "claim[ing] for the first time" on appeal, that Mr. Miller "was not allowed to hold a leadership position because he 'confirmed that he intended to be sexually active in same sex relationships.'" SoF 232-34. With that, BLinC was officially deregistered and denied equal standing with other student organizations on campus.

Notably, many other religious groups on campus required their leaders to sign statements of faith. Love Works, a gay-affirming Christian group started by Mr. Miller after leaving BLinC, required its leaders and members to sign a statement of faith and to affirm the group's principles. SoF ¶¶ 262-63. Imam Mahdi, a Muslim organization, required its leaders to be Muslim, with many other religious organizations imposing similar faith requirements. SoF ¶ 17. Based on such initial evidence, and in response to a lawsuit and an emergency motion by BLinC seeking to protect its access to the campus, this Court entered a preliminary injunction, requiring the University to maintain BLinC's registered status. SoF ¶¶ 405-07; Dkt. 36, 55.

The University then commenced a flurry of activity to demonstrate "equal" treatment of all campus student groups, ordering a review of all their constitutions for language that might be deemed "contradictory" to the Policy. SoF ¶ 408-12. The University started by ordering a review of *only* the religious organizations. SoF ¶¶ 418. It then did a *second* review of just religious groups, this time to highlight their statements of belief concerning marriage and sexuality. SoF ¶ 419. Only then did the University instigate a review of all other groups—all, that is, except for the fraternities and sororities. SoF ¶ 420. The review team was told to "hold off" on reviewing

their constitutions due to the "complexities" of their "national and international[]" affiliates, although other groups with such associations were reviewed immediately. SoF ¶¶ 421-22.

In ferreting out "contradictory" provisions, the review team was told that any language requiring leaders or members to embrace "beliefs" or "purposes" related to protected categories was verboten. SoF ¶ 414. Groups could have missions related to those categories, but could not require members or leaders to embrace or affirm those missions. SoF ¶ 415. The University admits that this was a complete departure from how the Policy had always previously been applied. SoF ¶ 416; *see also* ¶¶ 428-38. In notes from discussions held amongst themselves, Ms. Cervantes, Dean Baker, and Dr. Nelson discussed the desire that the University could have an "all-comers policy," but "not in pure sense" that would affect "fraternities [and] sororities"; the acknowledgement that the University had a "historical and longstanding" policy interpretation that at least allowed "groups to discrim[inate] at leadership level"; and a sense that it was "imp[ortant]" for the University to have "Men's Glee Club," "Women in Engineering," and a "Black Student Union"; and that the University Policy applied to "membership [and]& participation" of registered organizations and "does not say leadership." SoF ¶ 169.

The mess at the end of the "clean-up" process was roughly the same as at the beginning. Besides BLinC, 38 organizations were deregistered, but mostly only because they did not timely resubmit their constitutions with a complete version of the Policy or because they were already defunct anyway. Many in the former category have since updated their Policy language and been reregistered. SoF ¶ 439. Notably, however, fraternities and sororities are still excused from complying with the prohibition against sex discrimination—indeed, the University has explicitly amended the Policy to formalize their exemption. SoF ¶¶ 12, 423. The University's own sports teams, programs, scholarships, awards, and grants continue to violate the Policy with impunity.

SoF ¶¶ 29-35, 446. There is no intention to force student sports clubs to integrate. SoF ¶ 427. Nor is the University ending its "gender requirements" for intramural sports, children's sports camps, or recreational services. SoF ¶ 33, 446. Groups with political and ideological missions are still permitted to require their leaders or members sign statements affirming the group's beliefs. SoF ¶¶ 444-46. And those without explicit membership requirements can still serve one protected class over the exclusion of others, or pursue missions that favor one particular class at the exclusion of protected classes. SoF ¶ 445. One religious group was told it could not even "encourage" its leaders to be Christian (and was deregistered for wanting to do so), yet other groups registered groups explicitly encourage their members to be "women" or members of other protected classes. SoF ¶¶ 429-38, 440. And although the University guaranteed all religious groups' registered status to avoid a *third* motion for injunction, it now appears many of them were never on the purge list to begin with. *See* Vanessa Miller, *Christian group plans return*, The Gazette (Aug. 14, 2018), *at* https://bit.ly/2Peu5gY; SoF ¶ 444.

The University's witnesses are unanimous in acknowledging that—in sanctioning BLinC— the University was targeting it because of its religious beliefs. Dr. Nelson admitted that if BLinC would have just deleted the three sentences about marriage, sexuality, and gender identity that it had added to its constitution (at his request, ironically), he would have maintained BLinC's status as a registered student organization. SoF ¶ 365. He testified that denying Marcus a leadership position "only because he refused to live by BLinC's Christian principals" was discrimination on the basis of sexual orientation, but that—if Marcus had not been gay—it would have been okay to deny him a leadership position for the exact same reasons. SoF ¶¶ 363-64. In hindsight, when pressed, he was forced to admit that there was nothing wrong with BLinC stating its beliefs about marriage, sexuality, and gender identity in its constitution, and that

pressuring it to "revis[e]" its statements was a violation of the First Amendment. SoF ¶¶ 367-68. Dr. Nelson knew that it was unlawful because of his experience with CLS. SoF ¶ 369. And he knew that other groups on campus were allowed to do what BLinC was doing. SoF ¶¶ 370-71. He also knew it was inconsistent with the Policy itself, at one point discussing with his supervisors whether what they were doing was right. SoF ¶ 374; *see also* SoF 169.

Based on his experience with CLS, Thomas Baker had the best knowledge of what the Policy allowed. SoF ¶ 319. He agreed that a Muslim group could exclude Christians without violating the Policy. SoF ¶ 321. Likewise it was his understanding that "a religious organization could require members to accept the group's tenets as long as those tenets did not *categorically* prohibit gay members from becoming members." SoF ¶ 322 (emphasis added). He even acknowledged that it would be permissible to deny someone membership if they "lived actively as a gay individual," if doing so conflicted with the organization's statement of faith. SoF ¶ 323; *see also* SoF ¶¶ 324-29. Yet, with regard to BLinC, Dean Baker took the position that one religious standard would have been okay (prohibiting sexual activity "outside of marriage" generally), but not BLinC's religious standard (prohibiting sexual activity "outside of marriage between a man and a woman"), because—under the latter standard—"gay marriages are not considered." SoF ¶ 341; *see also* ¶¶ 190, 347 (suggesting that religious standards for sexual conduct were acceptable as long as they did not distinguish between heterosexual and homosexual conduct). Because BLinC's religious beliefs fell onto the unacceptable side of the line, Dean Baker urged that BLinC be asked to "modify" the Statement of Faith in its constitution "in a way that would be acceptable," meaning to "reconcile the [Policy language] with [BLinC's] Doctrine of Personal Integrity." SoF ¶¶ 344-45. Like Dr. Nelson, he admitted that if BLinC would have deleted the three sentences on marriage, sexuality, and gender identity

from its Doctrine of Personal Integrity, that would have "reduced [his] concern about the constitution" and made it more "acceptable" to him. SoF ¶¶ 342-43.

Lyn Redington, who made the final decision to deregister BLinC, understood the Policy to permit religious student groups to establish religious membership criteria. SoF ¶ 384. She agreed that student groups had the right to form around common interests, including interests concerning religion, gender identity, politics, sports, the arts, and so forth. SoF ¶¶ 385-86. She knew that, while the Policy prohibited discrimination on the basis of sexual orientation, the University was "obliged to protect the First Amendment right" of students to "espouse [a] group's basic tenets." SoF ¶ 387. She stated it would not "ever be okay for the University of Iowa to tell a religious student group that it cannot consider religion in selecting its leaders," because "that's their belief," which is "protected by the First Amendment." SoF ¶¶ 387-89. The only reason she deregistered BLinC is because she *assumed*—without looking at any of the underlying evidence—that Marcus Miller had been denied a leadership position solely "because he was gay." SoF ¶ 390-94. When shown the communications between Hannah Thompson and Marcus Miller, shown the communications from Hannah Thompson and Jake Estell to the Ms. Cervantes, Dr. Nelson, and Redington, and told about the September 1 meeting BLinC's leaders had with Dr. Nelson and Dean Baker, Dr. Redington admitted that she should have reviewed all of that information *before* deregistering BLinC, and that if she had, she would not have deregistered it. SoF ¶¶ 394-401. She conceded that the appeal process had failed, SoF ¶¶ 391-92, 399-400, that the decision to deregister BLinC lacked evidentiary support, SoF ¶¶ 401-02, and that the factual statements she had made in her decision letter were false, SoF ¶ 402. She admitted that by telling a student group "what kind of beliefs [it] could put in [its] constitution" the University of Iowa had "violate[d] the First Amendment." SoF ¶ 402. She agreed it was

especially problematic to tell a religious group it couldn't use religion as a factor for selecting its leaders, while allowing an environmental group to use its environmental creed as a factor in selecting its leaders. SoF ¶ 402. And she conceded that, under the University's Policy, it was permissible for any group to restrict its leadership to individuals who shared that group's philosophy or beliefs. SoF ¶ 402.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Gerlich v. Leath*, 861 F.3d 697, 704 (8th Cir. 2017). A permanent injunction is appropriate where the movant shows (1) irreparable harm, (2) that the balance of harms favors the movant, (3) that the movant has proven actual success on the merits, and (4) the public interest favors the movant. *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008). And qualified immunity for individual-capacity defendants should be denied where the plaintiff shows that those defendants violated constitutional rights that were clearly established at the time of the violation. *Gerlich*, 861 F.3d at 704; *see also see also Sundquist v. Nebraska*, 122 F. Supp. 3d 876 (D. Neb. 2015), *aff'd* 692 F. App'x 800 (8th Cir. 2017) ("[T]he Eighth Circuit subscribes to a 'broad view' of what constitutes clearly established law," requiring courts to "look to all available decisional law, including decisions of state courts."); *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015) (qualified immunity should "always" be determined "as a matter of law" when there is no material factual dispute).

## ARGUMENT

BLinC is entitled to summary judgment on several of its federal-law claims: its Free Speech Claims (Counts VII-VIII), its Free Association Claim (Count VI), its Free Exercise Claims (Counts III-IV), and its Religion Clause Claims (Counts I-II).

I. **The University infringed BLinC's Free Speech, Free Exercise, and Freedom of Association rights without sufficient justification.**

A. **The University infringed BLinC's rights under the Free Speech Clause.**

1. **State universities that unreasonably limit access to registered status or discriminate based on viewpoint must face strict scrutiny.**

State universities are not obligated to grant official recognition to student-led organizations. But once they do, they have created a limited public forum that is governed by the First Amendment. *Gerlich*, 861 F.3d at 704-05; *Widmar v. Vincent*, 454 U.S. 263, 267 (1981). While "some content- and speaker-based restrictions may be allowed" in the forum, *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017), universities face at least two restrictions: (1) they "may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' and (2) they may not "discriminate against speech on the basis of viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995) (citation omitted); *accord Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 684 (2010); *see also Healy v. James,* 408 U.S. 169, 181 (1972) (universities cannot deny "recognition . . . to college organizations" on the basis of their views).

As to the first factor, a content-based limitation "may" be reasonable if it "preserves the purposes of th[e] limited forum," but only where it "respect[s] the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829-30. Thus, for instance, a forum dedicated to the free exchange of *students'* ideas about *art* can reasonably insist on student speech and exclude content about public transit, but it could not make "other content-based judgments" that disrespect the forum's own boundaries. *Martinez*, 561 U.S. at 703 (Kennedy, J., concurring).

As to the second factor, universities engage in forbidden viewpoint discrimination when their action stems from the "ideology or the opinion or perspective of the speaker," *Gerlich*, 861 F.3d at 705 (quoting *Rosenberger*, 515 U.S. at 829), or when they "proscribe[] views on particular disfavored subjects and suppress[] distinctive ideas conveyed by a distinctive message." *Animal*

*Legal Def. Fund v. Reynolds*, 297 F. Supp. 3d 901, 925-26 (S.D. Iowa 2018) (citation omitted). Courts "use the term 'viewpoint' discrimination in a broad sense," and have said "time and again" that this factor particularly forbids any offense-based restrictions, since "[g]iving offense is a viewpoint." *Matal*, 137 S. Ct. at 1763. Where a particular viewpoint fits "within the forum's limitations," restrictions on it are "presumed impermissible." *Rosenberger*, 515 U.S. at 830. And impermissible restrictions need not be flat bans or censorship. Rather, ideological discrimination or favoritism is enough: "[t]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Matal*, 137 S. Ct. at 1757 (quoting *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)).

Where a university's restriction on a student group's speech or access to the forum is either unreasonable in light of the purpose of the forum or discriminates based on viewpoint, the restriction must undergo strict scrutiny. *Gerlich*, 861 F.3d at 705.

These principles have been long and repeatedly affirmed by the Supreme Court and Eighth Circuit; thus, it is well established that a university's denial of official recognition to a student group because of its views violates the First Amendment. In *Healy v. James*, a state college in Connecticut denied recognition to students forming a local chapter of Students for a Democratic Society, barring them from "plac[ing] announcements . . . in the student newspaper," "from using various campus bulletin boards," and "from using campus facilities for holding meetings." 408 U.S. at 176. The college claimed the chapter was affiliated with a national organization that had espoused "violent and disruptive activities" in the past, and that the chapter implied that it might resort to such means in the future. *Id*. at 178, 173.

The Supreme Court quickly rejected these arguments, stating that—as an "instrumentality of the State"—a public school can never "deny[] rights and privileges solely because of a citizen's

association with an unpopular organization" or "because [the school] finds the views expressed by any group to be abhorrent." *Id*. at 186-89. The Court conceded that student groups may "be bound by reasonable school rules governing conduct." *Id*. at 191. But it emphasized that this referred to "reasonable" time, place, and manner regulations that "in no sense infringe[]" the "freedom to speak out, to assemble, or to petition for changes in school rules." *Id*. at 192-93.

In *Widmar v. Vincent*, the Court emphasized that restrictions on student conduct could not discriminate against religious conduct. The Court held that a university that "makes its facilities generally available" to student groups could not "close its facilities" to a "group desiring to the use the facilities for religious worship and religious discussion." 454 U.S. at 264-65.

Finally, in *Rosenberger*, the University of Virginia maintained a Student Activities Fund from which student groups could seek expense reimbursement for their student magazines. 515 U.S. at 824. Reimbursement was precluded, however, for "religious activities." *Id*. at 824-25. When a student group sought the costs of publishing its magazine, which shared a Christian perspective on a wide range of issues, the university denied reimbursement. *Id*. at 826-27. But the Supreme Court again ruled for the students, rejecting the university's rationalization that it was simply declining to subsidize religious activity. The Court, rather, found viewpoint discrimination, noting that "the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id*. at 831. Because the university chose to reimburse publications presenting a secular point of view, it could not deny reimbursement to those addressing the same issues from a religious perspective. *Id.* at 829.

The Eighth Circuit has likewise long held that a public university cannot restrict student group speech or focus access simply because it disagrees with a group's viewpoints. For

example, more than 40 years ago, when the University of Missouri attempted to deny recognition and funding to an LGBTQ student group, the Eighth Circuit ruled that the First Amendment protected the group's rights to association and equal treatment. *Gay Lib v. Univ. of Mo.*, 558 F.2d 848, 850 (8th Cir. 1977). As the Court explained:

> It is of no moment, in First Amendment jurisprudence, that ideas advocated by an association may to some or most of us be abhorrent, even sickening. The stifling of advocacy is even more abhorrent, even more sickening. It rings the death knell of a free society.

*Id.* at 856; *see also Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 368 (8th Cir. 1988) (stating that while "[c]onduct may be prohibited or regulated . . . [the] government may not discriminate against people because it dislikes their ideas").

In another recent speech case, the Eighth Circuit, and this Court, found that Iowa State University ("ISU") violated the First Amendment when it discriminated against a student chapter of the National Organization for the Legalization of Marijuana (NORML-ISU) for advocating the legalization of marijuana. *Gerlich*, 861 F.3d at 700. Under ISU's recognition policy, student groups could apply to use the school's trademarks on their merchandise. NORML-ISU requested and received permission to use the ISU insignia on a pro-marijuana shirt. But following community backlash, the University withdrew its approval. *Id.* at 703. The Eighth Circuit found a First Amendment violation, emphasizing that once the University "create[d] a limited public forum for speech," it could not single out a group for disfavored treatment because of its position on controversial topics. *Id.* at 704-05.

 2. **The University's deregistration of BLinC was unreasonable and discriminatory.**

These cases clearly establish that the University of Iowa's actions against BLinC violated BLinC's freedom of speech, because the deregistration of BLinC was both inconsistent with the purposes of the forum and discriminatory on the basis of BLinC's religious viewpoint.

### a. The University's application of the Policy against BLinC was unreasonable in light of the forum's purpose.

The University's Registered Student Organization policy ("RSO policy") creates a limited public forum for the specific purpose of letting students associate based on shared beliefs and interests. The policy explicitly "encourages the formation" of groups "around the areas of interest *of its students*" and grants these student groups freedom to "organize and associate with *like-minded students*." SoF ¶¶ 5, 8 (emphases added). It expressly anticipates that groups will limit membership to "any individual who subscribes to the goals and beliefs" of the organization. SoF ¶ 8. And the University guarantees that all student groups will have "equal access" to University resources without inhibiting the their "exercise of First Amendment rights of free expression and association." SoF ¶ 8.

In light of these purposes, outlined by University itself, the decision to deregister BLinC was not reasonable for at least two reasons. First, in deregistering BLinC, the University acted unreasonably when it banned BLinC's Statement of Faith as discriminatory "on its face." SoF ¶¶ 227, 233. Forbidding religious groups from expressing the sincere beliefs around which they would form necessarily frustrates allowing "like-minded students" to associate with any "individual who subscribes to the [group's] goals and beliefs." SoF ¶ 8. Groups cannot associate around hidden beliefs. By thus restricting BLinC's beliefs, the University not only placed unreasonable limitations on the forum, it blatantly violated the entire purpose of the forum.

Second, the University acted unreasonably by refusing to let BLinC select leaders who shared its beliefs. Just as an organization cannot form around hidden beliefs, it cannot survive without leaders who agree with its beliefs. Refusing to let groups select mission-aligned leaders would destroy the University's purpose of allowing students to form *interest*-based organizations. A feminist organization could not exclude leaders who think feminism is an

19

assault on men's rights. A transgender support group could not exclude leaders who advocate against rights for transgender individuals. And minority rights groups could not exclude leaders who ridicule the idea of white privilege or oppose affirmative action. Denying BLinC the ability to select leaders who share its beliefs was thus, again, not just unreasonable, but a direct violation of the RSO policy's core purpose of "encouraging the formation of student organizations" around shared "goals and beliefs. SoF ¶¶ 5, 8.

While "some content- and speaker-based restrictions may be allowed" in a limited forum, *Matal*, 137 S. Ct. at 1763, the University has not identified any such restrictions applicable to the facts of the case. The University has not even alleged, for example, that BLinC's mission conflicts with the "academic needs" of the University or its students or somehow threatens "public safety." *See* SoF ¶ 5 (listing those factors as forum limitations). Nor has it alleged that BLinC violated any of the RSO policy's other procedural requirements, such as the requirement that at least 80% of its members be students. *See* SoF ¶ 4. The University instead claimed that BLinC discriminates on the basis of sexual orientation in violation of its Human Rights Policy, which the University proffers as a permissible restriction in a limited forum.[1] But discovery has revealed *overwhelming* evidence that BLinC never violated the Policy and *undisputed* evidence that it has agreed not to violate the policy going forward.

The University has admitted—repeatedly—that the Policy prohibits only status-based discrimination, not selection based on shared beliefs. SoF ¶¶ 14-15, 207-09, 260, 272-74, 325-

---

[1]    A nondiscrimination policy that prohibits discrimination on the basis of religion, with no exemptions for religious organizations, raises significant constitutional concerns. *Martinez*, 561 U.S. at 703-04 (Kennedy, J., concurring) (noting that a "content based" policy would "likely" have lost in *Martinez*). But the Court need not reach those concerns here, because the University has admitted that it does not construe the Policy to prohibit selection based on belief, as opposed to status. SoF ¶¶ 272, 372, 416.

26, 369-72, 416. The only evidence that BLinC engaged in status-based discrimination against Marcus Miller is the investigator Connie Cervantes's lone statement that Hannah "said she'd eliminate [Marcus] because he was gay." SoF ¶ 300. But even Ms. Cervantes herself admitted that this contradicted all the other extensive evidence, including Marcus's own description of what happened. SoF ¶¶ 285-301; *see also* SoF ¶¶ 111-42, 147, 166, 170, 186. After reviewing all of the relevant evidence for the first time at her deposition, Dean Redington—who made the final decision on BLinC's appeal of Ms. Cervantes's findings—conceded that Ms. Cervantes's conclusion was "false" and "not supported by the factual evidence" and that BLinC "never should have been deregistered." SoF ¶¶ 394-402; *see also* SoF ¶ 210 (Dr. Nelson, same). But even setting that aside, it is undisputed that BLinC agreed to avoid violating the policy going forward, by only screenings leaders for shared religious beliefs (as, in fact, it has always done) and by affirming that it would allow anyone—including someone who were gay—to be a leader as long as that person sincerely shared BLinC's religious beliefs, a position the University agreed was acceptable. SoF ¶¶ 135, 192-212, 397. Because BLinC abides by, and has always abided by, the University's Policy, the University violated its own rules of the forum by deregistering BLinC—the very definition of an "unreasonable" application.[2]

---

[2]   Indeed, the University's Policy not only provides no license for its actions towards BLinC, but affirmatively protects BLinC's right to participate fully in the campus community. The University's own Statement of Religious Diversity notes that "[r]eligious history, religious diversity, and spiritual values have formed a part of The University of Iowa's curricular and extracurricular programs since [its] founding" and that "[a]s a public institution," the University cannot "discriminate[] against students, staff, or faculty on the basis of their religious viewpoints." SoF ¶ 21. Additionally, the University's policy on Registration of Student Organizations states that the reasons for denying or withdrawing registration of a student organization shall not "violate the University Policy on Human Rights," including by discriminating on the grounds of "creed" or "religion." SoF ¶ 8, 12; App. 0366.

This explains why, in his 2004 letter to CLS, Dean Baker reiterated that student groups with traditional views on marriage and sexuality did not need an exemption from the "sexual

### b. The University's application of the Policy against BLinC was discriminatory on the basis of viewpoint.

It is beyond reasonable dispute that the University's decision to deregister BLinC also constituted viewpoint discrimination. Dr. Nielson admitted that he would have accepted BLinC's constitution, including the requirement for leaders to sign a statement of faith, if BLinC simply would have deleted the three sentences explaining its beliefs about marriage, sexuality, and gender identity. SoF ¶ 365. Dean Baker said the same thing. SoF ¶¶ 343. He further conceded that while it was permissible for a religious student group to require its leaders and members to be celibate outside of marriage, it was not permissible to require them to be celibate outside of heterosexual marriage, thereby expressly preferring one religious standard over another. Moreover, before *deregistering* BLinC for requiring its leaders to share its beliefs about sexuality, the University *registered* Love Works, which requires its leaders to share opposite beliefs about sexuality. SoF ¶¶ 17, 262-64. Finally, Dr. Nelson revealed that the Policy was not being applied evenly when he testified that "if Marcus Miller were not gay but indicated that he did not agree with BLinC's Christian principles and was denied a leadership position for that reason," the Policy would not have been violated. SoF ¶ 364. The same should be true regardless of Mr. Miller's sexual orientation, and the University's deregistration of BLinC reveals the viewpoint discrimination.

---

orientation[] and gender identity" non-discrimination requirements because "the Human Rights Policy protects groups such as your CLS student clients from discrimination [by the University] on the basis of creed" and that "the University is obliged to protect the right of CLS members to espouse the group's basic tenets." SoF 53. It also explains why Dean Baker, early in the meeting with BLinC's officers on September 1, 2017, stated that the University recognized its obligation to respect the right of student groups, and particularly religious student groups, to select leaders who shared their group's beliefs. SoF ¶¶ 199-209.

Also, it is undisputed that the University had never previously applied the Policy the way it applied it to BLinC. SoF ¶ 375. In working with CLS from 2000 through 2009, the University was adamant that—in Dean Baker's own words—"[a]*sking prospective members to sign the CLS statement of faith would not violate the UI Human Rights policy*" so long as CLS did not "refuse to accept as a member a homosexual law student who professes to be a Christian and is prepared to sign your organization's statement of faith and observe the CLS group rules for member behavior." SoF ¶¶ 57, 60; *see also generally* ¶¶ 36-92. And it repeatedly warned student government leaders that they faced "personal liability" if they discriminated against CLS. SoF ¶¶ 72, 80. Yet BLinC was deregistered for having the same standard, when *no* other registered student organization had *ever* been deregistered for its leadership or membership policies. SoF ¶ 15. To the contrary, the University expressly reviewed, approved, and supported the existence of the dozens of student groups subject to the HR Policy—including Greek groups that included almost 1/5 of total undergraduate population—that had similar leadership and membership requirements, many of which (unlike BLinC) actually discriminated *based on status* in direct violation of the Policy. SoF ¶¶ 16-25. Indeed, the University acknowledged that it had a "historical and longstanding" Policy interpretation that at least allowed "groups to discrim[inate] at [the] leadership level." SoF 169.

The targeting of BLinC was further evinced by the University's internal communications, which revealed a desire by Dean Baker, Dr. Nelson, and others for an "all-comers policy," just "not in pure sense" because that would affect "imp[ortant]" groups that excluded in ways they approve of, such as "fraternities and sororities," the "Men's Glee Club," "Women in Engineering," or the "Black Student Union." SoF ¶ 169. At the time, Dr. Nelson and others worried that what they were doing might not be right. SoF ¶ 374.

Then, after this Court entered a preliminary injunction, the University's scramble to make its Policy fit its judgment against BLinC further revealed a discriminatory motive. The University commenced by reviewing just the religious groups, twice—first to identify leadership restrictions, then to identify groups with explicit beliefs about marriage and sexuality, a step that was entirely unnecessary if the University simply had wanted to eliminate all leadership restrictions, regardless of content. SoF ¶¶ 418-419. And now, at the end of the review, instead of either reinstating BLinC or adopting a true all-comers policy that ended its own programs that discriminate on protected characteristics, the University is continuing to target BLinC. Huge fraternities and sororities that exclude half of the human race from both membership and leadership positions because of their sex remain in the University's good graces. But BLinC and its handful of students, who welcome all students to membership and have only ever excluded one student from leadership because of a religious conflict, are out.

The University's admission that it only prohibits status-based discrimination on the particular characteristics listed in the Policy is telling. For example, speaking on behalf of the University, Ms. Cervantes acknowledged that the Policy would be violated if a group excluded students "because they were a woman" or "because they were a man," but not if it "excluded them because of their beliefs about the relationship between men and women." SoF ¶ 273. The same should apply with respect to other protected categories. A transgender support group might violate the Policy if it excluded someone because they were a cisgender individual, but not if it excluded that individual for espousing an anti-transgender ideology. And a civil rights group would violate the Policy by excluding applicants because they were Caucasian, but not for espousing white supremacism. Yet BLinC welcomes all individuals regardless of their sexual orientation, and was still deregistered for requiring its leaders to share its beliefs about sexuality.

Indeed, the University engages in its own form of invidious discrimination by suggesting that no gay individuals could share BLinC's views about sexuality. Even Ms. Cervantes, speaking for the University, agreed that this should not be, SoF ¶ 274, although she herself refused to see the distinction between status and beliefs in her investigation, SoF ¶¶ 167-168, 182-185.

The entire process, from the investigation to the conclusion of the campus-wide, student-org clean-up, has been a jumble of inconsistencies as the University has struggled to justify the deregistration of BLinC with the reality that its Policy does not prohibit what BLinC does. *See, e.g.,* SoF ¶¶ 268-70, 275-80, 321-23, 341-43, 363-64, 365-68. To the present, the University continues to allow many organizations to discriminate based on protected categories and based on beliefs about protected categories, while BLinC and other religious organizations have been targeted for their religious beliefs. SoF ¶¶ 428-46. And the University itself continues to administer a wide range of programs, scholarships, and awards that violate even the Policy's status-based protections.

Finally, besides the University's discriminatory treatment of BLinC in refusing to acknowledge the distinction between sexual orientation (status) and beliefs about sexuality, the University engages in a separate form of viewpoint discrimination by giving sororities and fraternities an exemption from the prohibition against sex discrimination. For both Greek clubs and religious organizations, the selection of leaders is an expressive act, because leaders inherently convey and embody the message of the organizations they lead. By exempting fraternities and sororities from the prohibition against sex discrimination in selecting leaders, but not exempting religious organizations from the prohibition against religious discrimination, the University sends a message that leadership selection on the basis of sex is permissible, but not leadership selection on the basis of religion. This is especially problematic considering that the

First Amendment gives unique protection to religious groups in the selection of their leaders, whereas the University appears to be favoring Greek groups simply because of their popularity.

      3. ***Martinez* does not support the University's unreasonable, discriminatory actions.**

The *Martinez* decision is not to the contrary, and the University has never argued otherwise. There, the Court's consideration was limited to consideration of policies which "mandate acceptance of all comers: School-approved groups must 'allow any student to participate, become a member, or seek leadership positions in the organization, regardless of [her] status or beliefs.'" 561 U.S. 661, 671 (2010). The Court was very clear on this point: "This opinion, therefore, considers only whether conditioning access to a student-organization forum on compliance with an all-comers policy violates the Constitution." *Id. at* 678. The Court expressly refused to address policies that "target solely those groups whose beliefs are based on religion . . . and leave other associations free to limit membership and leadership to individuals committed to the group's ideology." *Id*. at 675. But as shown above, the University's Policy is not an all-comers policy: it expressly allows groups to ensure leaders (and members) embrace their respective missions, SoF ¶¶ 8-16, and it has been applied consistently that way for decades, SoF ¶¶ 8-16, 36-59. The University is plainly both violating its own policy and unconstitutionally targeting BLinC's beliefs and leadership selection.

*Martinez* is also inapplicable because it cannot be applied to religious student groups' selection of their leaders. *Martinez* itself recognized that limitations on leadership selection raise unique constitutional problems. For instance, the majority found it unlikely that students would "seek leadership positions in . . . groups pursuing missions wholly at odds with their personal beliefs," and stated that if such a student did so, the groups could decline to "elect her as an officer." 561 U.S. at 692-93. Justice Kennedy's controlling concurrence made this point even clearer, finding that even with a true all-comers policy, a religious student group would have a

"substantial case" if the policy was used to "challenge [group] leadership." *Id.* at 706 (Kennedy, J., concurring). And, as discussed in greater detail below, the Court later unanimously agreed on this point, ruling that government may not restrict religious groups' selection of religious leaders. *Hosanna-Tabor Evangelical Lutheran Sch. v. EEOC*, 565 U.S. 171 (2012).

The distinction between general members and leaders reflects that selecting the leaders who control the direction and message of a group inescapably has expressive implications. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000) (ruling in favor of plaintiff political parties against a state law which interfered with their ability to select voting members, since their "choice of a candidate is the most effective way in which that party can communicate"). And this distinction "applies with special force with respect to religious groups," because their "very existence is dedicated to the collective expression . . . of shared religious ideals" and "the content and credibility of a religion's message depend vitally upon the character and conduct of its teachers." *Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., joined by Kagan, J., concurring). Compelling faith groups to select unfaithful leaders leaves groups "coerced into betraying their convictions" and "endors[ing] ideas they find objectionable," which is "always demeaning." *Janus v. Am. Fed'n of State, Cty., and Mun. Empl.*, 138 S. Ct. 2448, 2464 (2018). Thus, religious groups must have "the ability to select, and to be selective about, those who will serve as the very 'embodiment of its message.'" *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., joined by Kagan, J., concurring) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 306 (3d Cir. 2006)).

Finally, even if *Martinez* were applicable, the University would have flunked its test for the reasons noted above: the University's actions are unreasonable and viewpoint discriminatory. Thus, the University's targeting of BLinC for its beliefs and for selecting leaders who share its beliefs is a clear infringement of BLinC's freedom of speech and must face strict scrutiny.

**B.  The University infringed BLinC's right to freedom of association.**

The University's actions also violate BLinC's freedom of association. The Supreme Court has clearly established that "the ability of like-minded individuals to associate for the purpose of expressing commonly held views many not be curtailed" by the government. *Knox v. Serv. Empl. Union*, 567 U.S. 298, 309 (2012). In *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, for example, the private organization running a large St. Patrick's Day parade was sued under Massachusetts' antidiscrimination law for excluding a LGBT group that wanted to march "to celebrate its members' identity as openly gay, lesbian, and bisexual descendants of the Irish immigrants." 515 U.S. 557, 570 (1995). The Supreme Court held that the state's nondiscrimination law could not override the parade organizer's First Amendment right to set its own limits on the parade's message. Id. at 570, 572. Similarly, in *Boy Scouts of America v. Dale*, the Supreme Court held that New Jersey's antidiscrimination law could not override the Boy Scouts' right to exclude openly gay scout leaders, since that would "surely interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs." 530 U.S. 640, 654 (2000).

Courts use "a three-step analysis" for free association rights. *Our Lady's Inn v. City of St. Louis*, No. 4:17-cv-01543, 2018 WL 4698785, at *10 (E.D. Mo. Sept. 30, 2018). First, they determine whether the private organization "was an expressive association," using "expansive notions of expressive association" to ensure broad protection of the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* (citations omitted). Here, BLinC qualifies as an expressive association because it undisputedly seeks to promote a core set of religious beliefs and doctrines, which include beliefs about sexual morality. Indeed, religious groups are quintessential examples of expressive

associations, since their "very existence is dedicated to the collective expression . . . of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring).

Second, courts determine whether the government restriction would "significantly affect the [association's] ability to advocate [its] viewpoints." *Dale*, 530 U.S. at 650. Here again, courts broadly construe the right and "must also give deference to an association's view of what would impair its expression." *Id.* at 653. And here again, the answer is clear: BLinC's student leaders are charged with not only leading the organization, but also teaching Bible studies and leading prayers and other religious services. Being forced to accept as leaders individuals who refuse to ascribe to the group's religious beliefs and doctrines would force BLinC "to propound a point of view contrary to its beliefs," *id.* at 654, which is an impermissible restriction on its expressive association. *Christian Legal Society v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (finding that university violated free association rights by derecognizing religious student group for requiring leaders and members to agree with its faith).

Third, courts will uphold such restrictions "only if they serve 'compelling state interests' that are 'unrelated to the suppression of ideas'—interests that cannot be advanced 'through . . . significantly less restrictive [means].'" *Our Lady's Inn*, 2018 WL 4698785, at *11 (quoting *Martinez*, 561 U.S. at 680). As shown below, Defendants cannot meet that standard.

**C. The University infringed BLinC's rights under the Free Exercise Clause.**

The University has violated the Free Exercise Clause by censoring the content of BLinC's internal religious beliefs, which is categorically forbidden, and by singling BLinC's religious practices out for censure while giving itself and numerous other groups a pass.

**1. The University censored BLinC's religious beliefs.**

Under the Free Exercise Clause, "targeting religious beliefs as such is never permissible." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.4 (2017) (citations

omitted). Rather, "freedom to believe . . . is absolute." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). This absolute right is not limited to the confines of one's mind. Rather, it extends to cover "the expression of religious doctrines" among coreligionists. *Emp't Div. v. Smith,* 494 U.S. 872, 877 (1990); *McDaniel v. Paty,* 435 U.S. 618, 635 (1978) (Brennan, J., concurring).

Here, the University targeted the content of BLinC's religious beliefs and its attempt to communicate those beliefs to potential leaders via its Statement of Faith, ruling that BLinC could regain recognition only if it would make "revisions to [its] Statement of Faith." SoF ¶ 228. Censoring the content of religious belief as such is "never permissible." *Trinity Lutheran*, 137 S. Ct. at 2024 n.4, so the constitutional inquiry into the University's belief-revision requirement is "at an end" and need go no further. *McDaniel*, 435 U.S. at 626.

### 2. The University discriminated against BLinC's religious exercise.

The University also violated the Free Exercise Clause by discriminating against BLinC's religious exercise. The Free Exercise Clause "'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws" that disfavor religion. *Trinity Lutheran*, 137 S. Ct. at 2019 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542-43 (1993). Restrictions on religion are thus subject to strict scrutiny unless they are both "neutral" and "generally applicable." *Id*. at 2021; *Mitchell Cty. v. Zimmerman*, 810 N.W.2d 1, 9 (Iowa 2012). The University's actions here are neither.

*General Applicability*. A law is not generally applicable if it "burdens a category of religiously motivated conduct but exempts *or does not reach* a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." *Zimmerman*, 810 N.W.2d at 16; *accord Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3rd Cir. 2004). Here, the University's Policy is not generally applicable for at least three reasons.

First, it was not and is not enforced equally by the University. *Lukumi*, 508 U.S. at 545-46 (regulation that "society is prepared to impose upon [religious groups] but not upon itself'" is the "precise evil . . . the requirement of general applicability is designed to prevent"); *see also Tenafly Eruv Ass'n v. Borough of Tenalfy*, 309 F.3d 144, 167-68 (3d Cir. 2002) (rejecting a "selective, discretionary application of [the law] against" religiously motivated conduct). The University does not enforce the Policy equally against other student groups. Hence the University's approval of Love Works while deregistering BLinC, its long-standing recognition that CLS can require both members and leaders to share its faith, and its toleration that, for instance, the UI Veteran's Association requires members be veterans, or that sports clubs discriminate based on sex. SoF ¶¶ 17-28; ¶¶ 425-427. The University likewise does not enforce its Policy against the programs it offers or administers, including its Iowa Edge Program and Iowa First Nations Summer Program (which limit eligibility based on race), its National Education for Women Leadership program (which limits eligibility based on sex), the Military Veteran and Student Services program (which limits eligibility based on veteran status), and the TRIO program (which limits eligibility based on disability). SoF ¶ 34(a)-(e); *see also* ¶ 33 (intramural sports leagues and recreational programs). And the University does not enforce its Policy in the context of dozens of its scholarships, awards, and funds, which discriminate based on race, color, national origin, status as a U.S. veteran, service in the U.S. military, and sexual orientation or gender identity. SoF ¶ 34. Finally, based on a "long established" tradition, the University's $100-million Athletics Department does not enforce the Policy against its sex-segregated sports teams, which include over twenty Division I NCAA teams that discriminate based on sex. SoF ¶¶ 30-32.

The University stated to this Court that at least some of this discriminatory enforcement is the result of the University's choice to engage in complaint-driven enforcement of its Policy. *See* Order, Dkt. 36 at 27. Even accepting that as true, *but see id.* (finding that the facts "refute that contention"), that would only drive home the harm of selective enforcement since complaints are far more likely to be filed against unpopular or minority viewpoints on campus. *Cf. Tenafly*, 309 F.3d 151-53 (finding unlawful selective enforcement when an ordinance was enforced in response to "vehement objections" from neighbors); *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (rejecting complaint-driven restrictions on speech); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (striking down an ordinance that was enforced in response to the "negative attitudes" and "fear" of neighbors). Thus, forms of discrimination that are technically forbidden by the Policy but acceptable to the University culture, such as in the contexts of sports and Greek groups, get a pass. *See* SoF ¶ 28 (sports clubs), SoF ¶¶ 425-427 (University has long refused to enforce its policy against sports clubs); App. 1943-1945 (listing several Greek chapters which advertise themselves as catering to specific racial or national groups and are entirely composed such groups). It also allows the University to turn a "blind eye" toward violations of the Policy that would be controversial to enforce, such as requiring its NCAA teams to integrate. SoF ¶¶ 425-427 (admitting that the University's single-sex sports clubs are "going to continue to be allowed to be single sex clubs"). The University's approach thus "effectively empower[s] a majority to silence dissidents" with a University-supported heckler's veto. *Cohen v. California*, 403 U.S. at 15, 21 (1971).

Second, the University has categorically exempted a huge swath of student organizations from the reach of its policy, both historically and currently. While "[a]ll laws are selective to some extent, . . . categories of selection are of paramount concern when a law has the incidental

effect of burdening religious practice." *Zimmerman*, 810 N.W.2d at 11 (quoting *Lukumi*, 508 U.S. at 542). Where a categorical exemption threatens the government's interests "in a similar or greater degree than [the prohibited religious exercise] does," it must face strict scrutiny. *Id.* (quoting *Lukumi*, 508 U.S. at 543). Thus, in *Rader v. Johnston*, the court found that a university's broad secular exemptions to a residential housing requirement triggered (and, ultimately, failed) strict scrutiny when similar exemptions weren't afforded to for religious reasons. 924 F. Supp. 1540, 1553 (D. Neb. 1996); *accord Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d. Cir. 1999) (scrutiny triggered by "categorical exemption for individuals with a secular objection [to the policy] but not for individuals with a religious objection").

The most obvious categorical exemption to the Policy is the express exemption the University offers to Greek groups. 17% of the University's undergraduate class are members of over 50 University fraternities and sororities, which are explicitly exempted from the Policy and allowed to exclude students from *both* leadership and membership on the basis of sex. App. 1938-1940, SoF ¶¶ 12, 24. Far from derecognizing these groups, the University has welcomed them for over 150 years and actively advertises for them now, telling students that they are the "largest and most successful support networks available to Hawkeye students." App. 1938.

Third, a similar, but more stealthy, general-applicability problem arises via not *express* exemptions, but rather when categories of "secular activities that equally threaten[] the purposes of the [Policy] but [a]re not prohibited (and therefore approved by silence)." *Zimmerman*, 810 N.W.2d at 10 (citing *Lukumi*, 508 U.S. at 543). This problem arises here through the University's recent decision to ban any "restriction[s] on leadership related to religious beliefs," while

allowing groups to restrict leadership around all sorts of other ideological and political beliefs. SoF ¶ 432, *id.* ¶¶ 428-438. This acts as a silent categorical exemption for *non*-religious beliefs.

In all three forms of discrimination above, the government "devalues religious reasons for [acting] by judging them to be of lesser import than nonreligious reasons." *Lukumi*, 508 U.S. at 537; *accord Tenafly*, 309 F.3d at 168 (same). That kind of governmental value judgment against religious motivations must face "the strictest scrutiny." *Trinity Lutheran*, 137 S. Ct. at 2019.

**Neutrality.** The "minimum requirement of neutrality" is that a law "not discriminate on its face." *Lukumi*, 508 U.S. at 533. But mere "[f]acial neutrality" is not enough. *Id.* at 534. Rather, the Free Exercise Clause forbids "covert suppression" of religion and "subtle departures from neutrality"; government hostility that is "masked" as well as "overt." *Id.*; *Zimmerman*, 810 N.W.2d at 10 (same). "[E]ven slight suspicion" that state action against religious conduct "stem[s] from animosity to religion or distrust of its practices" is enough to require government officials to reconsider. *Masterpiece Cakeshop Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 547). For instance, though the university's policy in *Rader* was "certainly neutral on its face," the university's refusal to make an "exception[ ] to the policy" for a religiously-motivated request while "routinely" granting them for secular requests was sufficient to show a lack of neutrality. 924 F. Supp. at 1554-55.

Here, the University's new interpretation to ban any "restriction on leadership related to religious beliefs" is facially discriminatory on the basis of religion in violation of the neutrality requirement. SoF ¶ 432. That alone triggers strict scrutiny.

Further, there is nothing subtle or masked about the University's specific hostility to BLinC's statement of faith. The University overtly favors viewpoints that are hostile to BLinC's, both in the University's own policies and in the policies of the student groups it approves, such as Love

Works. SoF ¶¶ 262-266; *Matal*, 137 S. Ct. at 1757 ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."). And the University insists that BLinC's sincere Statement of Faith is impermissible "on its face" and must be censored. This both "passes judgment upon [and] presupposes the illegitimacy of [BLinC's] religious beliefs and practices." *Masterpiece*, 138 S. Ct. at 1731.

Moreover, while the University has for decades knowingly approved numerous other student group constitutions that made both leadership and membership distinctions on the basis of characteristics that it says are forbidden, it chose to single out BLinC for deregistration. Indeed, until this summer, BLinC was the *first and only* student group at the University to be deregistered because of its leadership or membership qualifications. SOF ¶ 15. The "difference in treatment" between how the University has treated BLinC and how it treats other organizations with selective membership or leadership policies provides "[a]nother indication of hostility" and compels strict scrutiny. *Masterpiece*, 138 S. Ct. at 1730; *see also id.* at 1732 ("disparate consideration" of a religious objector compared to secular entities suggests a violation of "the requisite religious neutrality that must be strictly observed"). Thus, again, the University must undergo strict scrutiny.

**D. The University cannot justify its infringements of BLinC's constitutional rights.**

Because the University's action against BLinC unreasonably discriminates against religious groups and religious viewpoints, "it is invalid unless . . . it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011). And it is the University that must prove its Policy meets this high standard, *Gerlich*, 861 F.3d at 705, which is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The University thus bears a "heavy burden" to justify excluding an organization from the full

"range of associational activities" it otherwise permits. *Healy*, 408 U.S. at 184. There are multiple reasons why the University cannot satisfy that burden.

First, as discussed above, the Policy as written does not apply to BLinC's selection of its leaders, so it has no compelling interest in restricting BLinC's leadership selection.

Second, also as discussed above, the University does not extend the same stringent standard that it has set for BLinC's *leadership* to even the *membership* requirements of other student organizations. So, again, no compelling interest is at stake. *Lukumi*, 508 U.S. at 546-47 ("Where government . . . fails to . . . restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling.").

Third, even if the Policy could be broadly construed to prohibit discrimination on *beliefs* concerning sexual orientation, as opposed to just *status*, that would be an insufficient basis for overriding BLinC's freedom of expression. In *Hurley*, for example, the non-governmental organizer of a large St. Patrick's Day parade was sued under Massachusetts' antidiscrimination law for excluding a gay-rights group that wanted to march "to celebrate its members' identity as openly gay, lesbian, and bisexual descendants of the Irish immigrants." 515 U.S. at 570. The Supreme Court held that the State's sexual-orientation nondiscrimination provision could not override the parade organizer's First Amendment right to set its own limits on the parade's message, at least where the organizer "disclaim[ed] any intent to exclude homosexuals as such." *Id*. at 570, 572. Similarly, in *Dale*, the Supreme Court held that New Jersey's antidiscrimination law could not override the Boy Scouts' right to exclude openly gay scout leaders, which would "surely interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs." 530 U.S. at 654; *see also Cuffley v. Mickes*, 208 F.3d 702, 708 (8th Cir. 2000) (holding

nondiscrimination law could not justify excluding group that discriminated "on the basis of race, religion, color, and national origin" from access to Missouri's Adopt-A-Highway program).

Here, BLinC does not exclude on grounds of sexual orientation, but only on grounds of its beliefs. These beliefs are motivated by what the Supreme Court has called "decent and honorable religious . . . premises." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602, 2607 (2015). The Court re-affirmed that such beliefs are "protected forms of expression" that "the First Amendment ensures" will be given "proper protection" for "religious organizations and persons . . . as they seek to teach the principles that are so . . . central to their lives and faiths." *Masterpiece*, 138 S. Ct. at 1727 (quoting *Obergefell*, 135 S. Ct. at 2607). Thus, even if the Policy were misapplied to limit BLinC here, it would still not automatically override BLinC's First Amendment rights.

Finally, even if an antidiscrimination policy in some contexts could justify overriding First Amendment rights, it cannot do so here, because the University does not apply the policy fairly or uniformly. As noted above, the categorical exemptions for and selective enforcement in favor of vastly larger student organizations and hugely expensive University programs leave the Policy "wildly underinclusive," which "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802; *see* SoF ¶¶ 18-35. Moreover, because the University's interpretation and application of its HR Policy "leaves appreciable damage to [its] supposedly vital interest[s] unprohibited," the ban on BLinC "cannot be regarded as protecting an interest of the highest order." *Lukumi*, 508 U.S. at 547 (quotation and alteration marks omitted).

Even if the University could show that it has a compelling interest, complete derecognition is not narrowly tailored to accomplishing that interest. That the University has long managed to accommodate its own programs, scholarships, sports programs, and so forth, along with the

missions of other student groups without sacrificing the overall interests promoted by the Policy is alone sufficient evidence that both diversity and freedom of speech on religious issues can coexist. *Id.* at 546 (underinclusiveness suggests the government's "interests could be achieved by narrower [policies] that burdened religion to a far lesser degree").

Further, the University has not proven that other less-restrictive approaches would insufficiently serve its interests. For instance, if the University wished to warn students that they might not be eligible to lead religious groups with whom they disagree, it could express that message itself instead of forcing either religious groups to do it. *NIFLA v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (finding government flunked the narrow-tailoring test where it had "identified no evidence" to "prove that an [information] campaign is not a sufficient alternative"). While there may be constitutional infirmities with even that approach, it is indisputably less restrictive than what BLinC has faced. On tailoring alone, then, the University fails strict scrutiny.

* * * *

The University's discrimination burdens BLinC's religious beliefs, speech, and association without a sufficient justification and thus violates the First Amendment's protections for free speech and free exercise. This Court should accordingly grant summary judgment to BLinC. It should also award nominal damages. *Lowry*, 540 F.3d at 762 ("nominal damages must be awarded when a plaintiff establishes a violation of the right to free speech").

## II.  Defendants' ban on BLinC's religious leadership selection violates the Religion Clauses.

Government interference with a religious organization's leadership selection "runs headlong into the Religion Clauses of the First Amendment." *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 361 (8th Cir. 1991). Affirming decades of consensus among the courts of appeals, the Supreme Court unanimously held in 2012 that "[t]he Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from

38

interfering with the freedom of religious groups to select their own." *Hosanna-Tabor*, 565 U.S. at 184, 196 & n. 2 (listing cases). The Free Exercise right "protects a religious group's right to shape its own faith and mission through its appointments." *Id.* at 188. And the Establishment Clause structurally safeguards courts from being "impermissibly entangle[d] . . . in religious governance and doctrine," doing this by "categorically prohibit[ting] federal and state governments from becoming involved in religious leadership disputes." *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 121 & n.4 (3d Cir. 2018) (quoting *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015)).

While courts have often labeled this Religion Clause protection as the "ministerial exception," they have "t[aken] pains to clarify that the label was a mere shorthand." *Hosanna-Tabor*, 565 U.S at 199, 202 (Alito, J., joined by Kagan, J., concurring). The substance of the protection concerns the internal "autonomy of religious groups," ensuring they are "free to determine who is qualified to serve in positions of substantial religious importance." *Id.* at 199. And there "can be no clearer example of an intrusion into the internal structure or affairs" of a religious student group than forcing it to accept leaders who do not share its faith. *Walker*, 453 F.3d at 861, 863 (protecting religious student group's leadership policy).

The Religion Clauses apply to bar governmental interference in religious leadership selection where (1) the group in question is a "religious group," and (2) the leadership position in question is for "one of the group's ministers." *Hosanna-Tabor,* 565 U.S. at 177; *accord Scharon*, 929 F.2d at 362 (considering nature of the "institution" and the "position"). Both factors are met here.

### A.  BLinC is a religious group.

A group is a religious organization for purposes of the Religion Clauses if its "mission is marked by clear or obvious religious characteristics." *Conlon*, 777 F.3d at 834 (citation omitted).

Courts have found that this test covers a broad variety of religious organizations, including schools, a nursing home, and a hospital that was "primarily a secular institution." *See Scharon*, 929 F.2d at 362 (hospital); *Fratello v. Archdiocese of New York*, 863 F.3d 190, 201 (2d Cir. 2017) (elementary school); *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 310 (4th Cir. 2004) (nursing home). The Sixth Circuit's 2015 *Conlon* decision applied the ministerial exception to a campus religious group like BLinC because its purpose was "to advance the understanding and practice of Christianity" on campus. 777 F.3d at 833-34.

BLinC likewise qualifies. It is a voluntary religious organization whose name marks it as "in Christ." SoF ¶¶ 5, 94. It was founded by Christian students to help students grow in their faith and integrate their faith into their studies and careers. SoF ¶¶ 99-102. Its official statement of purpose in its constitution is to help students learn about "how to continually keep Christ first in the fast-paced business world." SoF ¶ 99. And BLinC accomplishes that mission by having its members meet together for regular prayer, Bible study, community service, and religious guidance from Christian business leaders. SoF ¶¶ 99-103, 178-179.

Nor is BLinC's distinctive religious identity at all impermissible or unusual at the University. Among its many registered religious student groups is a formal part of a *local church*. SoF ¶ 350. And the University admitted that student groups are permitted to engage in virtually all of the religious activities that would make them the "functional equivalent" of a house of worship, including preaching sermons, holding worship services, conducting prayer meetings, observing sacraments such as baptism and communion, and celebrating holy days. SoF ¶¶ 314, 350.

## B.  BLinC's officers hold religious leadership positions.

BLinC's leaders also qualify as ministers for purposes of the Religion Clauses because they hold positions that require them to engage in important religious functions. The Religion Clauses

ensure that a religious group may, and the government may not, select all those who "minister to the faithful" and "personify its beliefs" or otherwise are important to "conveying the [ministry's] message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 192-195; *Fratello*, 863 F.3d at 206 (noting the doctrine's application to a "press secretary," "Jewish nursing-home staff," and a "music director"); *accord Ciurleo v. St. Regis Parish*, 214 F. Supp. 3d 647, 652 (E.D. Mich. 2016) ("religious function alone" can "provide[] the decisional pathway").

Here, BLinC's elected officers are the central means by which BLinC ministers to its members, personifies its beliefs, conveys its message, and carries out its mission. Officers lead BLinC's members in prayer, choose and express the content of BLinC's religious Bible study, help guide the group in determining how to apply religious principles to their lives, and model BLinC's faith to members and to the campus community. SoF ¶ 114. The officers are responsible for evaluating and selecting Christian business leaders to speak to students about how they integrate their faith and careers. SoF ¶¶ 103, 178. And BLinC's leaders organize religious service projects on and around campus. SoF ¶ 179. Because of their unique religious leadership roles, BLinC's officer candidates are screened to ensure that they embrace and follow BLinC's religious beliefs and must sign a Statement of Faith agreeing to the same. SoF ¶¶ 113-116, 173. The most important qualification for BLinC's officers is that they fully align with BLinC's faith. SoF ¶¶ 115, 127. Thus, given their undisputed and essential role to BLinC's religious beliefs and mission, BLinC's officers qualify as its religious leadership.

The University has thus violated the Religion Clauses' rule that the it "cannot dictate to a religious organization who its spiritual leaders would be." *Conlon*, 777 F.3d at 835-36. Because the ministerial exception is a categorical structural limitation, there is no strict scrutiny affirmative defense. *Hosanna-Tabor*, 565 U.S. at 196. Summary judgment is thus appropriate.

**III.  This Court should grant permanent injunctive relief.**

As established above, BLinC has "prove[n] actual success on the merits" of its legal claims, which is the third factor for permanent injunctive relief. *Lowry*, 540 F.3d at 762. It is also the key factor in First Amendment cases. Showing that factor establishes factors one and four, irreparable harm and public interest, since loss of First Amendment rights "unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester, Mo.,* 697 F.3d 678 (8th Cir. 2012). And the second factor, balance of equities, "generally favors the constitutionally-protected freedom of expression." *Id.* Further consideration of each factor supports granting a permanent injunction.

*Irreparable harm.* Defendants argue that RSO status is a government benefit to which BLinC is not entitled. But Defendants may not condition even a "gratuitous benefit" on "disavowing [BLinC's] religious" beliefs and conduct, since that "inevitably deter[s] or discourage[s] the exercise of First Amendment rights." *Trinity Lutheran*, 137 S. Ct. at 2022 (quoting *Sherbert v. Verner*, 374 U.S. 398, 405 (1963)); *accord Cuffley*, 208 F.3d at 707.

Further, courts have repeatedly rejected the argument that a derecognized student group might have a "possible ability to exist outside the campus community," since that "does not ameliorate significantly the disabilities imposed by the [university's] action." *Healy*, 408 U.S. at 183. This is true for two reasons. First, derecognized student groups are undisputedly "denied university money and access to . . . university facilities for meetings," which is a clear burden. *Walker*, 453 F.3d at 864. That's particularly salient here, where BLinC is a small, new group that would suffer significantly if it was unable to equally recruit new members, speak to its campus community, meet in campus spaces, or access campus resources. SoF ¶¶ 104-110, 237-240. Second, the discrimination itself is a harm. *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C.

2016) ("being subjected to discrimination is by itself an irreparable harm"). When government "makes it more difficult for members of one group to obtain a benefit than it is for members of another group," the injury includes "the denial of equal treatment," not just "the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *Trinity Lutheran*, 137 S. Ct. at 2022.

**Balance of Harms.** Defendants identify no injury from a permanent injunction, which would simply preserve the status quo, allowing BLinC to operate on campus in the same manner that hundreds of other student organizations have done for decades.  By contrast, BLinC will suffer irreparable injury if it continues to be punished for its faith. *See Lowry*, 540 F.3d at 762.

**Public Interest.** By vindicating First Amendment rights, an injunction would also further the public's interest in the "open marketplace" of ideas, where "differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference." *Knox*, 567 U.S. at 309. And "nowhere" is this interest "more vital than in the community of American schools." *Walker*, 453 F.3d at 864 (quoting *Healy*, 408 U.S. at 180). By contrast, the University's exclusionary Policy has a chilling effect on BLinC's expression of its beliefs, impermissibly "cast[ing] a pall of orthodoxy" over the marketplace of ideas at the University of Iowa. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

## CONCLUSION

For all the foregoing reasons, BLinC respectfully urges the Court to grant this motion for summary judgment, award nominal damages, and issue a permanent injunction. BLinC respectfully requests oral argument on this motion.

Respectfully submitted this 22nd day of October, 2018.

Respectfully submitted,

/s/ *Eric S. Baxter*
Eric S. Baxter*
    *Lead Counsel*
Daniel H. Blomberg*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC, 20036
(202) 955-0095 PHONE
(202) 955-0090 FAX
*ebaxter@becketlaw.org*

Christopher C. Hagenow
Hagenow & Gustoff, LLP
600 Oakland Rd. NE
Cedar Rapids, IA 52402
(515) 868-0212 phone
(888) 689-1995 fax
*chagenow@whgllp.com*

***Counsel for Plaintiff***
    *\*Admitted pro hac vice*