IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| BUSINESS LEADERS IN CHRIST, <br> *Plaintiff*, <br><br> v. <br><br> THE UNIVERSITY OF IOWA, *et al.*, <br> *Defendants*. | ) Case No. 3:17-cv-00080-SMR-SBJ <br> ) <br> ) PROPOSED BRIEF OF PROPOSED <br> ) *AMICUS CURIAE* CHRISTIAN <br> ) LEGAL SOCIETY IN SUPPORT <br> ) OF PLAINTIFF'S MOTION FOR <br> ) SUMMARY JUDGMENT |

## Table of Contents

Statement of Interest of *Amicus Curiae* ........................................................................................2

Introduction.....................................................................................................................................2

Argument ........................................................................................................................................4

    I. Since at Least 1999, the CLS Student Chapter at University of Iowa College of Law has Been a Registered Student Organization with a Constitution that Requires its Leaders to Affirm Their Agreement with its Religious Beliefs ............................................................4

    II. The University Would Violate the Free Exercise Clause If It Exempted Single-Sex Student Organizations from the Human Rights Policy While Denying an Exemption to Religious Organizations ...............................................……………….……………….11

        A. Federal law does not require universities to exempt fraternities and sororities from university nondiscrimination policies .......................................................................12

        B. The University's exemption for fraternities and sororities precludes the University from claiming to have an "all-comers" policy...........................................................12

        C. The University's denial of an exemption for religious groups while granting an exemption for fraternities and sororities violates the Free Exercise Clause................14

        D. A corresponding exemption for religious groups is necessary to protect religious students from unequal treatment................................................................................15

Conclusion ....................................................................................................................................19

Certificate of Service ....................................................................................................................20

## Statement of Interest of *Amicus Curiae*

Founded in 1961, Christian Legal Society (CLS) is an association of Christian attorneys, law students, and law professors, with student chapters at approximately 90 public and private law schools. CLS believes that it has had a student chapter meeting at the University of Iowa College of Law since 1980. As detailed below, since 1999, the University has given the CLS chapter repeated assurances that it could require its leaders to agree with its religious beliefs by affirming its statement of faith and could expect its leaders to conduct themselves in accordance with its religious beliefs. On June 1, 2018, however, the CLS student chapter received an email from the University informing it that it needed to place the University's Human Rights Clause verbatim in its constitution and that any contradictory material needed to be removed. The email warned that if this was not done by June 15, it would be deregistered. But the CLS constitution already had the Human Rights Clause in it, as it had included that provision in its constitution since 2004; therefore, the CLS chapter re-submitted its constitution without any change and awaited word from the University as to whether the University would deregister CLS. The University deregistered 38 groups, including several religious groups, in July 2018, although the CLS chapter was not among the groups deregistered at that time. On August 14, 2018, the University agreed to reinstate the deregistered religious groups until this Court issues its decision on the merits in the instant case. Like other religious groups that require their leaders to agree with their groups' religious beliefs, the CLS chapter assumes it will be deregistered if this Court rules in favor of the University.

## Introduction

Christian Legal Society has long believed that pluralism, essential to a free society, prospers only when the First Amendment rights of all Americans are protected regardless of the

2

current popularity of their speech and beliefs. For that reason, CLS was instrumental in passage of the Equal Access Act of 1984 ("EAA"), 20 U.S.C. §§ 4071-4074, that protects the right of all students to meet for "religious, political, philosophical or other" speech on public secondary school campuses. 128 Cong. Rec. 11784-85 (1982) (Sen. Hatfield statement) (noting CLS's assistance in drafting). For thirty-four years, the EAA has protected the right of both religious and LGBT student organizations to meet at public secondary schools for disfavored speech. *See*, *e.g.*, *Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990), *aff'g*, 867 F.2d 1076 (8th Cir. 1989) (requiring school officials to recognize religious student group); *Straights and Gays for Equality v. Osseo Area Sch. No. 279*, 540 F.3d 911 (8th Cir. 2008) (requiring school officials to recognize LGBT student group). CLS has supported the free speech rights of student organizations that promote views with which CLS strongly disagrees, such as the legalization of marijuana use. *See* Br. Amicus Curiae of Students for Life, Christian Legal Society, et al., *Gerlich v. Leath*, 861 F.3d 697 (8th Cir. 2017) (No. 16-1518), 2016 WL 3157519 (supporting free speech rights of the Iowa State University student chapter of the National Organization for the Reform of Marijuana Laws).

     CLS student chapters typically are small groups of law students who meet for weekly prayer, Bible study, and worship at a time and place convenient to the students. Not only do CLS chapters frequently bring outside speakers into their law schools to address legal issues from a religious perspective, but they also frequently collaborate with other student organizations to present panels with speakers who represent diverse viewpoints on a particular topic.

     All students are welcome at CLS meetings. As Christian groups have done for nearly two millennia, CLS requires its leaders to agree with a statement of faith, signifying agreement with the traditional Christian beliefs that CLS holds. While an attorney member of CLS must affirm

3

the CLS statement of faith, since 2011, a student may be a member of his or her CLS student chapter without being a member of CLS itself. However, once a student is elected to office, he or she must become a member of CLS and agree to the CLS statement of faith.

## Argument

I.  **Since at Least 1999, the CLS Student Chapter at University of Iowa College of Law has Been a Registered Student Organization with a Constitution that Requires its Leaders to Affirm Their Agreement with its Religious Beliefs.**

Beginning in 1993, CLS student chapters, like many religious student organizations, began to encounter the misuse of nondiscrimination policies to exclude religious student groups from campus simply because they require their leaders to agree with the groups' religious beliefs. For example, in 1994, the University of Minnesota threatened to derecognize a CLS chapter because of its requirement that its leaders and members agree with its statement of faith.[1] But the University eventually changed course. Its policy is now a model one that provides: "Religious student groups may require their voting members and officers to adhere to the organization's statement of faith and its rules of conduct." University of Minnesota, *Registration and Classifications/Requirements/Compliance*, at https://sua.umn.edu/groups/management/registration/classification/ (last visited Oct. 28, 2018).[2]

---

[1] Michael Stokes Paulsen, *A Funny Thing Happened on the Way to the Limited Public Forum: Unconstitutional Conditions on "Equal Access" for Religious Speakers and Groups*, 29 U.C. Davis L. Rev. 653, 668-72 (1996) (detailing the University of Minnesota's threat to derecognize CLS chapter).

[2] An excellent model for the appropriate protection of religious freedom within a university nondiscrimination policy is the University of Florida's nondiscrimination policy that reads: "A student organization whose primary purpose is religious will not be denied registration as a Registered Student Organization on the ground that it limits membership or leadership positions to students who share the religious beliefs of the organization. The University has determined that this accommodation of religious belief does not violate its nondiscrimination policy." Student Activities and Involvement, Division of Student Affairs, University of Florida, *Non-Discrimination Policy*, at https://www.studentinvolvement.ufl.edu/Student-Organizations/Organization-Resources/Policies/Non-Discrimination (last visited Oct. 28, 2018). The University of Texas also has a good policy, which reads: "[A]n organization created primarily for religious purposes may restrict the right to vote or hold office to persons who subscribe to the organization's statement of faith." University of Texas, *Chapter 6. Student Organizations, Eligibility*, § 6-202(a)(3)(A), at http://catalog.utexas.edu/general-information/appendices/appendix-c/student-organizations/ (last visited Oct. 27, 2018).

CLS student chapters have never tried to prevent other student groups from being recognized student organizations, no matter how much CLS might disagree with their views. Unfortunately, the same cannot be said of some student organizations that have tried to exclude CLS chapters from campus or otherwise sought to deny them the benefits available to registered student groups. For example, University of Iowa student government officials objected to funding the CLS student chapter because of its religious beliefs in 2004 and 2008-2009, even though University officials explained that CLS was eligible for funding. Plaintiff's Statement of Material Facts in Support of Motion for Summary Judgment (SoF) ¶¶ 63, 69-74, 77-87. In particular, in 2009, four registered student groups – The Outlaws, Law Students for Reproductive Justice, Iowa Campaign for Human Rights, and American Constitution Society – objected to funding the CLS student chapter because of "its constitution and membership requirements." SoF ¶ 75; App.0087-0088. These organizations all remain registered student organizations at the University of Iowa College of Law in the 2018-2019 academic year. University of Iowa College of Law, *Student Organizations*, at https://law.uiowa.edu/student-experience/student-organizations (last visited Oct. 27, 2018).

CLS believes that it had a student chapter meeting at the University of Iowa College of Law as early as 1980. But it seems that the chapter's existence may not have been continuous because two law students filed an application to gain recognition of a "new" CLS student chapter at the University of Iowa College of Law in 1999. SoF ¶ 36; App. 0752. The students' letter to Dean Phillip Jones indicated their concerns about including the required nondiscrimination policy -- for all practical purposes the same policy required by the University twenty years later – in the chapter's constitution. SoF ¶ 41; App. 0752. The students had "modified the non-

5

discrimination provision of our constitution," apparently by omitting "creed," "religion," "sexual orientation," and "gender identity." SoF ¶ 43; App. 0752-0755.

The students were "concerned that following our sincerely held religious beliefs may conflict with the non-discrimination pledge" on two grounds. App. 0752. First, the students were concerned that the University would find the CLS chapter's requirement that its officers affirm the CLS statement of faith, and that members "share the mission and purposes of the organization," to be in conflict with the University's nondiscrimination policy and its prohibition on "'discrimination' on account of 'creed' or 'religion.'" App. 0753. The students explained their belief that "the chapter cannot serve its purpose, fulfill its mission, and retain its identity unless its officers and those who proclaim the group's message affirm those beliefs that define the group." *Id*. The students hastened to add that "[t]his belief does not reflect any animus towards those who are unable to embrace these beliefs" because the group "earnestly desire[d] relationships with non-Christians" and "would be a failure if non-Christians were not welcomed." *Id*. Second, the students were concerned that "an individual's participation in conduct our faith deems immoral might disqualify an individual, as either a formal or practical matter, from holding office in our chapter." App. 0754. The students explained their belief that "there is a meaningful difference between a person who sincerely struggles with sinful sexual inclinations and a person who unrepentantly and unremorsefully engages in conduct the Bible says is wrong." *Id*. The students were concerned that the University might view this as "'sexual orientation' discrimination (or even . . . 'gender identity' discrimination, depending upon how that phrase is applied)." App. 0755. The students emphasized that "a person's sexual orientation . . . does not necessarily by itself disqualify someone from participating in the life of our chapter" but "[i]nstead, it is a person's attitude towards those inclinations, their willingness to submit to

6

Biblical authority, and the degree of their success in trying to live a life pleasing to God that really matters." *Id*. The University's Office of General Counsel reviewed the proposed CLS constitution, and it was approved. SoF ¶ 44; App. 0751.

In the 2003-2004 academic year, CLS sought renewal of its registered status, but its constitution was rejected by the Office of Student Life for not including verbatim the language of the University's nondiscrimination policy. SoF ¶ 50; App. 0071. In correspondence with Associate Dean of Students Thomas Baker, CLS asked the University to "create[] a formal, written exemption for religious groups from the religion, creed, sexual orientation, and gender identity language of the University's required Membership Clause." SoF ¶ 51; App. 0076. In response, Dean Baker sent a letter to CLS stating that it could not omit or modify the Human Rights Policy in its constitution, but that "*[a]sking prospective members to sign the CLS statement of faith would not violate the UI Human Rights policy*." SoF ¶ 55, ¶ 57; App. 0079 (emphasis in original). The letter confirmed that "the Human Rights Policy does not prohibit student groups from establishing membership criteria," that a "student religious group is entitled to require a statement of faith as a pre-condition for joining the group," and that "[i]ndividuals who fail to observe the CLS statement of faith may be dismissed as members." SoF ¶ 56, ¶ 59; App. 0079. The letter further clarified that while a group could not "reject prospective student members solely on the basis of race, gender, or sexual orientation," it "would not be required, *and will not be required*, to condone the behavior of student members – after they join your group – that is contrary to the purpose of your organization and its statement of faith." SoF ¶ 58; App. 0079 (emphasis added). The letter explained that, under the Policy, CLS could not "refuse to accept as a member a homosexual law student who professes to be a Christian and is prepared

7

to sign your organization's statement of faith *and observe the CLS group rules for member behavior*." SoF ¶ 60; App. 0079 (emphasis added).

Relying on the University's own interpretation of its Human Rights Policy, CLS added the Policy to its constitution. The University approved the constitution for resubmission to the University of Iowa student government's Student Organization Recognition Board in a letter explaining that "[a]s long as prospective members are treated as individuals and not categorically barred from applying for membership, organizational leaders may require members to accept the CLS statement of faith as condition for participation." SoF ¶ 62; App. 0081.

Unfortunately, despite the University's reassurances, the student chair of the Student Organization Recognition Board refused to sign off on recognition of the CLS chapter because he objected "on both ethical and moral grounds to this organization's recognition" and found CLS's beliefs "ethically and morally repugnant." SoF ¶ 63; App. 1857. The matter went to the Student Senate. SoF ¶ 64; App. 1858. By memorandum, the Vice President for Student Services and Dean of Students directed the Student Senate that "CLS is entitled to ask its members to adhere to the group's statement of faith" and that "under the law and under University policy" the CLS students were "free[] to promote their beliefs through association." SoF ¶¶ 65-66; App. 1373. He advised the Senate that he would recognize CLS if it did not. SoF ¶ 67; App. 1373. As a result, the CLS chapter's registration was renewed.

In the 2008-2009 academic year, the student government again objected to the CLS constitution and denied CLS funding because members of the student government were "uncomfortable with your organization." SoF ¶ 69; App. 0083. A University Vice President instructed the student government that CLS "has been recognized as a University of Iowa student organization after full review of its application, including its constitution" and that "applicable

8

law, including the United States Constitution . . . requires that funding requests from student organizations are processed in a content neutral manner" and "*without any consideration of the organization's viewpoint, including the Statement of Faith in the CLS constitution*." SoF ¶ 71; App. 0085 (emphasis added). A week later, the Vice President directed the student government leaders to "process" a recognized student organization's "request in a timely manner without consideration of membership rules as stated in the organization's constitution." SoF ¶ 73; App. 0086.

Three months later, four registered student groups – The Outlaws, Law Students for Reproductive Justice, Iowa Campaign for Human Rights, and American Constitution Society – wrote in opposition to the "recent decision to fund the Christian Legal Society" because "its constitution and mandatory 'Statement of Faith' conflicts with" the Human Rights Policy. SoF ¶ 75; App. 0087. (As already noted, these groups continue to be registered student organizations at the College of Law in the 2018-2019 academic year.) A University Vice President responded by reiterating that the Human Rights Policy did "not prohibit student groups from establishing membership criteria" and that the First Amendment protected religious student groups' right to require affirmation of a statement of faith "as a pre-condition for joining the group." SoF ¶ 76; App. 0089.

Nonetheless, the student government attempted to change its bylaws to bar funding for "exclusive-religious groups," that is, "organizations that restrict membership or access to programming *according to religious belief*." SoF ¶ 77; App. 1866, 1868. In response to "the recently adopted bylaws," CLS wrote the University to note that the student government's actions "conflict[ed] with [the University's] previous decisions." SoF ¶ 78; App. 0169. The University Vice President told the student government leaders that he would "consider[]

suspended" the newly adopted bylaws banning funds to "exclusive religious organizations" and instructed the student government leaders to "remove [the bylaws] as soon as possible." SoF ¶ 80-81; App. 0768. A few weeks later, the University informed CLS that the relevant student government bylaws had been removed and that "all religious student organizations will be permitted to apply for . . . funds," which would be "allocated in compliance with constitutional standards." SoF ¶ 87; App. 0770.

In 2010, *The Daily Iowan* ran an article that CLS understood to "suggest[] that the University was being pressed, yet again, by students hostile to CLS-Iowa to reconsider its status at the University" in the immediate aftermath of *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010). SoF ¶ 89; App. 1888. CLS sent a letter to the University explaining why the University should not change its longstanding position of interpreting the Human Rights Policy to permit religious groups to require that their leaders agree with the groups' religious beliefs. SoF ¶ 90; App. 1888. Since 2010, the University has continued to register the CLS chapter with the same constitution that it used in 2004.

In April 2018, the CLS chapter completed the annual re-registration process, using the same constitution that it had used since 2004. It was the CLS chapter's understanding that its re-registration was completed and that it was a registered student organization for the 2018-2019 academic year. But on June 1, 2018, the CLS chapter received an email from the University informing it that it needed to place the University's Human Rights Clause verbatim in its constitution and that any contradictory material needed to be removed. The email warned that if this was not done by June 15, it would be deregistered.

But the CLS constitution, of course, already had the Human Rights Clause in it, as it had included that provision in its constitution since 2004; therefore, the CLS chapter re-submitted its

10

constitution without any change other than to use bold font to highlight the Human Rights Clause in its constitution. The CLS student president then spent an anxious summer waiting for word from the University as to whether the University would deregister CLS like it had deregistered 38 groups, including several religious groups, in July 2018. *University of Iowa De-recognizes Another 38 Groups: Christian Student Group's Lawsuit Prompted Campuswide Review,* The Gazette, July 20, 2018, at https://www.thegazette.com/subject/news/education/university-of-iowa-deregisters-another-38-groups-20180720 (last visited Oct. 28, 2018). On August 14, 2018, the University agreed to reinstate the deregistered religious groups until this Court issues its decision on the merits in the instant case. Like other religious groups that require their leaders to agree with their groups' religious beliefs, CLS assumes it will be deregistered if this Court rules in favor of the University.

## II. The University Would Violate the Free Exercise Clause If It Exempted Single-Sex Student Organizations from the Human Rights Policy While Denying an Exemption to Religious Organizations.

As the experience of the CLS chapter at University of Iowa illustrates, the University has long interpreted its Human Rights Policy to allow religious groups to require their leaders to affirm agreement with the groups' religious beliefs. The University has also long interpreted its Human Rights Policy to not require religious groups "to condone . . . behavior . . . that is contrary to the purpose of [their] organization and its statement of faith." SoF ¶¶ 55-59; App. 0079. And the University has long interpreted its Human Rights Policy to allow single-sex organizations, such as fraternities and sororities, as well as single-sex sports teams and music ensembles, to select their members and leaders on the basis of sex.[3]

---

[3] The evidence is compelling that the University exempts numerous student organizations from its Human Rights Policy's prohibitions on discrimination based on race, national origin, creed, and other categories. SoF ¶¶ 17-35. This brief's focus on the exemption from sex discrimination that the University gives to fraternities and sororities is

11

But in recent months, the University has attempted to rescind its longstanding exemption for religious organizations' religious leadership requirements while reinforcing its exemption for fraternities' and sororities' single-sex leadership and membership requirements. The University's decision has two important legal consequences, both of which require the University to recognize religious organizations as registered student organizations while allowing them to retain their religious leadership requirements. The first legal consequence is that the University does not have an "all-comers" policy. The second legal consequence is that the University is in violation of the Free Exercise Clause's basic requirement that government officials exempt conduct undertaken for *religious* reasons if they exempt analogous conduct undertaken for *nonreligious* reasons.

## A. Federal law does not require universities to exempt fraternities and sororities from university nondiscrimination policies.

Before turning to these legal consequences, it is necessary to clarify that Title IX of the Education Amendments of 1972, 20 U.S.C. ¶¶ 1681-1688, does not provide cover for university officials who wish to exempt fraternities and sororities, but not religious groups, from university nondiscrimination policies. Title IX gives fraternities and sororities an exemption only from Title IX itself. 20 U.S.C. ¶ 1681(a)(6)(A). It does not give fraternities and sororities a blanket exemption from state or local nondiscrimination laws or policies, including a university's own policy, whether that policy is a nondiscrimination policy or an "all-comers" policy. Title IX does not *require* state entities to exempt fraternities and sororities from their nondiscrimination policies. If the University gives fraternities and sororities an exemption from its Human Rights Policy, that is solely in the University's discretion and not something that federal law requires.

---

not intended to diminish the significance of the other exemptions that the University provides from its Human Rights Policy.

### B. The University's exemption for fraternities and sororities precludes the University from claiming to have an "all-comers" policy.

The University admits that the Human Rights Policy is a nondiscrimination policy and not an "all-comers" policy. SoF ¶¶ 1-3. The University admits that it has not adopted an "all-comers" policy; therefore, *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010), does not apply.

But even if the University were tempted to claim an "all-comers" policy, the exemption for fraternities and sororities would be proof that it does not have an "all-comers" policy. As the *Martinez* decision made clear, an "all-comers" policy may be applied to religious groups *only* if the University applies the policy to *all* groups without exception. *Id.* at 694, 697. The Court held that it was not enough for a university to adopt an "all-comers" policy: A university must actually apply the policy uniformly, without exception, to all groups. The case was remanded for further consideration regarding whether the "all-comers" policy had been "selectively enforce[d]." *Id.* at 697. Justice Ginsburg emphasized that the policy was "one requiring *all* student groups to accept *all* comers." *Id.* at 694 (original emphasis). *See also*, *id.* at 704 (Kennedy, J., concurring) ("the policy applies equally to all groups and views"). Thus, under *Martinez*, if a University exempts fraternities and sororities from its policy, it does not have an "all-comers" policy and forfeits any protection from that decision.

Of course, as a practical matter, an "all-comers" policy is incompatible with the current Greek system at many universities, including at the University of Iowa. Fraternities and sororities epitomize sex discrimination because they consist solely of male or female members, respectively. Moreover, with its highly subjective "rush" system for selecting members, the Greek system is the antithesis of an "all-comers" policy. Besides requiring an end to selection of members and leaders on the basis of sex, an "all-comers" policy would require fraternities and

sororities to adopt a "first-come, first-pledge" process, or some similarly blind selection process. The impact of an "all-comers" policy, uniformly and consistently applied, on single-sex sororities and fraternities, singing groups, intramural and club sports teams, and other organizations would be dramatic.

> **C. The University's denial of an exemption for religious groups while granting an exemption for fraternities and sororities violates the Free Exercise Clause.**

The Supreme Court has ruled that government cannot exempt conduct undertaken for nonreligious reasons while refusing to exempt analogous conduct undertaken for religious reasons. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 537 (1993); *Employment Div. v. Smith*, 494 U.S. 872, 884 (1990). *See Rader v. Johnston*, 924 F. Supp. 1540, 1551-53 (D. Neb. 1996).

Yet this is precisely what the University seems determined to do. On one hand, the University recently began to deny religious groups an exemption from the Human Rights Policy for leadership requirements based on religion. On the other hand, the University grants fraternities and sororities an exemption from the same Policy for leadership and membership requirements based on sex.

This violates the obligation of religious neutrality that the Free Exercise Clause imposes on government officials. The Free Exercise Clause protects "religious observers against unequal treatment." *Lukumi*, 508 U.S. at 542. *See Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1730-32 (2018). It is a fundamental violation of religious neutrality for government officials to exempt conduct undertaken for *nonreligious* reasons while refusing to exempt analogous conduct undertaken for *nonreligious* reasons. *See* Douglas Laycock and Steven T. Collis, *Generally Applicable Law and the Free Exercise of Religion,* 95 Neb. L. Rev. 1

14

(2016). Such a governmental policy is not generally applicable, and laws that are not generally applicable violate the Free Exercise Clause unless a compelling interest can be shown for the unequal treatment of religious persons. *Lukumi,* 508 U.S. at 546.

### D. A corresponding exemption for religious groups is necessary to protect religious students from unequal treatment.

The requirement that a law be generally applicable is based on the commonsense observation that "there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." *Railway Express Agency v. New York*, 336 U.S. 106, 112 (1949) (Jackson, J., concurring). As the Supreme Court instructed in *Lukumi,* a regulation that "society is prepared to impose upon [religious groups] but not upon itself" is the "precise evil . . . the requirement of general applicability is designed to prevent." 508 U.S. at 545-46 (quotation omitted). As a leading scholar, Professor Doug Laycock, has explained, "[s]mall religious minorities will rarely have the political clout to defeat a burdensome law or regulation. But if that regulation also burdens other, more powerful interests, there will be stronger opposition and the regulation is less likely to be enacted." Laycock, *supra*, at 25. That is, burdened secular interests provide "vicarious political protection for religious minorities." *Id.* at 24-26.

Moreover, when religious conduct is regulated and analogous secular conduct is not, the state implies a value judgment about the specific religious conduct and beliefs being regulated. The religious conduct is more objectionable, less deserving of protection, not important enough to overcome the state's regulatory interests, as compared to the protected secular conduct. *See id.* at 23-24. *See also, Lukumi*, 508 U.S. at 537; *Masterpiece Cakeshop*, 138 S. Ct. at 1731; *Fraternal Order of Police v. City of Newark,* 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.)

15

(regulation not generally applicable because of single secular exception so religious exemption required).

The need for heightened vigilance in protecting religious groups from unequal treatment by the University in its application of its Human Rights Policy is compounded by the fact that the Policy itself was originally intended to *protect* religious students, not *punish* them. It is common sense and basic religious liberty – not discrimination – for religious groups to expect their leaders to agree with their religious beliefs. But when a university interprets its nondiscrimination policy to penalize religious groups for having religious leadership requirements, it actually misuses the nondiscrimination policy by weaponizing it to be a sword against students who hold the "wrong" religious beliefs, rather than a shield to protect those students. By misusing the Human Rights Policy to *exclude* religious student groups, the University actually undermines the Policy's basic purpose.[4]

Something has gone badly wrong when, in the name of inclusion, a university excludes religious groups from campus. Diversity is diminished when a university excludes religious students from campus because of their religious beliefs.

The idea that nondiscrimination policies are being misused when used to exclude unpopular religious groups from college campuses finds support in a recent series of articles by Eboo Patel, the founder and president of Interfaith Youth Core and author of *Inside Higher Education*'s *Conversations on Diversity* blog. Eboo Patel, *Should Colleges De-Register Student Groups?*, Inside Higher Education, Conversations on Diversity Blog, Sept. 28, 2018, at

---

[4] Indeed, University officials themselves noted in their "Executive Summary Student Organization Constitution Review" that: "Student organizations with language inconsistent with the Human Rights Statement, are primarily those associated with one of the protected classes/characteristics in the statement. The inconsistency is typically related to the class/characteristic with which the group is associated. Approximately 18% of the organizations were noted with some inconsistency, primary based on gender identity as the class/characteristic of the organization." App. 0412.

https://www.insidehighered.com/blogs/conversations-diversity/should-colleges-de-register-student-groups (last visited Oct. 28, 2018). In the articles, Mr. Patel explores whether colleges should deregister religious student groups that have religious leadership requirements.

Mr. Patel takes as his starting point the University of Iowa's decision to deregister BLinC and InterVarsity Graduate Christian Fellowship but branches out into a more comprehensive overview of how religious student groups are treated on many campuses. Mr. Patel approaches the topic from his perspective as the member of a religious minority, the Ismaili Muslim community. He concludes that the use of nondiscrimination policies to exclude religious groups from campus because of their religious leadership standards would have a significantly detrimental impact on a hypothetical Ismaili Students Association, as well as other minority religious groups, which often have religious leadership requirements.

Mr. Patel also reports that in his general experience "based on visits to over a hundred campuses and attendance at literally dozens of conferences of college administrators there is also an instinctive suspicion of Evangelical Christianity" based on college administrators' "own negative personal experiences with conservative churches." *Id.* He believes that these negative personal experiences have "influenced [college administrators'] general view of Evangelicals, including the students on their campuses." *Id.* He further observes that, in his experience, another reason for "the instinctive suspicion that many college administrators harbor toward Evangelical Christian groups" is the administrators' belief that Evangelical Christians generally have political power that they use in ways that the administrators view to be negative.[5] But Mr.

---

[5] Contrary to this perception, CLS is a nonpartisan organization, and the law students in CLS student chapters hold a wide range of political views – including liberal, conservative, libertarian, and apolitical. Tish Harrison Warren, an evangelical Christian who was on InterVarsity Christian Fellowship staff and identifies as politically liberal, described her attempts to communicate with Vanderbilt University administrators when it instituted a new policy in order to prohibit religious student groups' religious leadership requirements. Tish Harrison Warren, *The Wrong Kind of Christian*, Christianity Today, Aug. 27, 2014, at https://www.christianitytoday.com/ct/2014/september/wrong-kind-of-christian-vanderbilt-university.html ("It didn't matter to [Vanderbilt administrators] if we were politically or

17

Patel questions whether this should have anything to do with how Evangelical student groups are treated on campus. As he notes, many Evangelical Christian groups are numerically small and "decidedly countercultural on most campuses where a norm of hard partying and sexual permissiveness reign." *Id.* And he further explains that, in his experience, Evangelical student groups "are building coalitions with individuals and groups with whom they disagree on the principle that everyone should have the freedom to express and associate as they wish – Muslims, Jews, atheists, gays, everyone, which includes Evangelical Christians." *Id.*

Nondiscrimination policies provide vital protection for religious students who hold unpopular religious beliefs. Equally importantly, a commonsense exemption to a nondiscrimination policy that allows religious student groups to require their leaders to agree with the groups' religious beliefs provides important protection for religious students who hold countercultural religious beliefs. For many years, the University of Iowa provided religious students with these important protections. But recently, it has misused its Human Rights Policy to threaten religious students with exclusion from campus because of their religious beliefs.

As a practical matter, if interpreted with appropriate sensitivity, nondiscrimination policies and religious freedom are eminently compatible. The policies of several major universities, discussed *supra* at note 2 and accompanying text, demonstrate that it is possible to create a sustainable campus environment in which nondiscrimination principles and religious freedom both harmoniously thrive. Indeed, until quite recently, the University's longstanding interpretation of its Human Rights Policy achieved this desirable, if delicate, balance of nondiscrimination principles and religious freedom.

---

racially diverse, if we cared about the environment or built Habitat homes. It didn't matter if our students were top in their fields and some of the kindest, most thoughtful, most compassionate leaders on campus. There was a line in the sand, and we fell on the wrong side of it.").

As a legal matter, the University's denial of a narrow exemption to religious groups for their religious leadership requirements while granting fraternities and sororities a broad exemption for their single-sex leadership and membership requirements violates the Free Exercise Clause and sends a forbidden message to religious students that they are unwelcome at the University if they hold religious beliefs that the Supreme Court itself has characterized as "decent and honorable." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015).

**Conclusion**

CLS respectfully urges this Court to grant Plaintiff's Motion for Summary Judgment and to deny Defendants' Motion for Partial Summary Judgment.

By: /s/ Timm Reid
Timm W. Reid
Reid Law Firm
The Plaza Suite 5
300 Walnut Street
Des Moines, IA 50309
Telephone: 515-381-9842
Facsimile: 515-282-0318
Email: timm@treidlawfirm.com


/s/ Kimberlee Wood Colby
Kimberlee Wood Colby
Center for Law and Religious Freedom
Christian Legal Society
8001 Braddock Road, Ste. 302
Springfield, VA 22151
Telephone: (703) 894-1087
Facsimile: (703) 642-1070
Email: kcolby@clsnet.org

*Counsel for Proposed Amicus Curiae*
*Christian Legal Society*

# **CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of October, 2018, I electronically filed a true and accurate copy of the foregoing document with the Clerk of Court using the C/ECF system. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

By: /s/ Timm Reid
Timm W. Reid
*Attorney for Proposed Amicus Curiae*
*Christian Legal Society*