**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION**

| | | |
|---|---|---|
| BUSINESS LEADERS IN CHRIST, | ) | |
| an unincorporated association, | ) | Civil No. 3:17-cv-00080-SMR-SBJ |
| | ) | |
| *Plaintiff*, | ) | UNITED STATES' STATEMENT OF |
| | ) | INTEREST IN SUPPORT |
| v. | ) | OF PLAINTIFF'S MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| THE UNIVERISTY OF IOWA, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

INTEREST OF THE UNITED STATES ...........................................................................5

FACTUAL BACKGROUND ..............................................................................................7

ARGUMENT .....................................................................................................................11

    I.   THE UNIVERSITY VIOLATED BLINC'S FREE ASSOCIATION RIGHTS .........11

    II.  THE UNIVERSITY VIOLATED BLINC'S FREE SPEECH AND FREE
        EXERCISE RIGHTS .........................................................................................17

        A. The University's Discrimination Against BLinC's Viewpoint Triggers Strict
           Scrutiny Under The Free Speech Clause .............................................................17

        B. The University's Discrimination Against BLinC Triggers Strict Scrutiny Under
           The Free Exercise Clause.....................................................................................21

        C. The University Has Failed To Carry Its Strict Scrutiny Burden........................... 23

CONCLUSION...................................................................................................................27

# INTRODUCTION

"For millions of people, the university is their first and perhaps most important exposure to the free and open marketplace of ideas which is at the core of our First Amendment rights." *Chess v. Widmar*, 635 F.2d 1310, 1318 (8th Cir. 1980), *aff'd sub nom. Widmar v. Vincent*, 454 U.S. 261 (1981).  Accordingly, the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  *Healy v. James*, 408 U.S. 169, 180 (1972).  Indeed, "[t]he essentiality of freedom in the community of American universities is almost self-evident."  *Sweezy v. State of New Hampshire by Wyman*, 354 U.S. 234, 250 (1957). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."  *Id.*

Unfortunately, the University of Iowa ("University") has failed to uphold these fundamental First Amendment freedoms on its campus.  Plaintiff Business Leaders In Christ ("BLinC") complied with the University's policy for registering as a student organization, including its Human Rights Policy prohibiting discrimination.  Nonetheless, the University deregistered BLinC—and denied it full participation in the campus community—because the University decreed that BLinC's Statement of Faith might be "unwelcoming" to certain students. Defs.' Resp. to Pl.'s Statement of Material Facts ("Defs.' Resp.") ¶ 154.  The University's deregistration of BLinC because its message failed to conform to University orthodoxy not only stymied the free and open discourse "vital . . . in the community of American schools," *Healy*, 408 U.S. at 180, but also violated BLinC's First Amendment rights of free association, free speech, and free exercise.  The Court should grant summary judgment for BLinC.

The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit

pending in a court of the United States." The United States is resolutely committed to protecting First Amendment freedoms and to ensuring, as Congress has directed, that public "institutions of higher education . . . facilitate the free and open exchange of ideas." 20 U.S.C. § 1101a(a)(2). In the United States' view, the Court should grant summary judgment for BLinC because the University's deregistration of BLinC "without justification" violated BLinC's constitutional rights. *Healy*, 408 U.S. at 181.

Where a public university creates a limited public forum for student organizations to register for and receive university recognition and benefits, the right to free association prohibits the university from "restrict[ing] speech or association simply because it finds the views expressed by [the] group to be abhorrent." *Id.* at 187. Nor may a public university, in a limited public forum or elsewhere, "discriminate against speech on the basis of its viewpoint" because such discrimination violates the Free Speech Clause. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). And a public university violates the Free Exercise Clause where it applies university policy to "discriminate[ ] against some or all religious beliefs." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

The University's deregistration of BLinC violates all three of these bedrock First Amendment rules. The University's Human Rights Policy prohibits student organizations from restricting membership or access to leadership positions on any protected status such as race, national origin, sex, sexual orientation, or gender identity. *See* Defs.' Resp. ¶¶ 11-12. The University acknowledges that BLinC has adopted the Human Rights Policy, and offers membership and access to leadership positions to all qualified students regardless of their sexual orientation or gender identity. *Id.* ¶ 135. Thus, the University's deregistration of BLinC did not rest upon any actual violation of the Human Rights Policy. Rather, it rested upon the

University's disagreement with BLinC's Statement of Faith, which BLinC requires all of its leaders to affirm.  The Statement of Faith requires BLinC's leaders to affirm various religious principles—including opposition to "racism," "greed," and "selfishness" and a commitment to serve the underprivileged—among which are the beliefs that "sexual relationship[s]" should exist only "between a man and a wife in the lifelong covenant of marriage" and that "every person should embrace, not reject, their God-given sex."  *Id.* ¶ 222; Appendix to Pl.'s Statement of Materials Fact ("App.") 1230.  According to the University, this Statement of Faith "inherently excludes" and is "unwelcoming" to "gay, lesbian, bisexual, and transgender individuals."  Defs.' Resp. ¶ 154.

The University's censoring of BLinC's message because it finds that message "abhorrent," *Healy*, 408 U.S. at 187, "offensive," *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018), or "unwelcoming," Defs.' Resp. ¶ 154, is a textbook violation of BLinC's First Amendment rights to free association and free speech.  That violation alone warrants summary judgment for BLinC—but the University's violation of BLinC's First Amendment rights does not end there.  The University freely admits that it allows registered student organizations to express viewpoints on sexual relationships and gender identity that differ from BLinC's viewpoint—and sometimes even allows registered student organizations to *explicitly* violate the Human Rights Policy—when the University unilaterally determines that, in its view, those viewpoints and organizations "support the University's educational mission."   Defs.' Resistance to Pl.'s Motion for Sum. Judg. ("Defs.' Br.") 18.  Thus, at the same time that it has infringed BLinC's right to express its message through its Statement of Faith, the University has registered many other student organizations "that require[] leaders or members to agree with the group's mission, purpose or faith," including groups that espouse

viewpoints on sexual relationships and gender identity.  *See* Defs.' Resp. ¶¶ 16-18.  Moreover, the University also has registered student organizations that "explicitly restrict or control access to leadership or membership based on race, national origin, sex, sexual orientation, [or] gender identity," in violation of the Human Rights Policy.  *See id.* ¶ 24.  The University's selective application of the Human Rights Policy to discriminate against BLinC's message and "viewpoint," *Rosenberger*, 515 U.S. at 829, and to "[t]arget [BLinC's] religious beliefs," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.4 (2017), violates BLinC's First Amendment rights of free speech and free exercise.

The University wholly fails to carry its strict scrutiny burden, and on this record cannot show that censoring of BLinC's message "is necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end."  *Widmar v. Vincent*, 454 U.S. 263, 270 (1981).  The University principally points to its "heavy responsibility . . . to protect the rights of minority students to equally access their publicly-funded educational opportunities" and to eradicate status-based discrimination on campus.  Defs.' Br. 6.  To be sure, universities have a compelling interest in eradicating discrimination and promoting equality for all students on their campuses.  But state-run institutions like the University also must uphold the bedrock guarantees enshrined in the First Amendment.  Thus, while the University may prohibit discrimination based on *status*, it may not compel BLinC to change its *message* in the name of eradicating discrimination.  That is particularly true here, because the University's deregistration of a student organization that *complied* with the Human Rights Policy's anti-discrimination mandate—especially when coupled with the University's registration of numerous student organizations that *violate* that mandate—does nothing to advance the University's underlying anti-discrimination interest.

The First Amendment demands more.  The Court should apply the Constitution's guarantee of free and open discourse on public campuses and hold that the University's deregistration of BLinC violated the First Amendment.

## INTEREST OF THE UNITED STATES

The United States has an interest in protecting the individual rights guaranteed by the First Amendment.  The right to free speech lies at the heart of a free society and is an "effectual guardian of every other right."  Virginia Resolutions (Dec. 21, 1798), *in* 5 THE FOUNDERS' CONSTITUTION, 135, 136 (Philip B. Kurland & Ralph Lerner, eds., 1987).  State-run colleges and universities are no exception from this rule because "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum."  *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981).  Thus, public universities have "an obligation to justify [their] discriminations and exclusions under applicable constitutional norms."  *Id.* at 267.

The United States has a significant interest in the protection of constitutional freedoms in institutions of higher learning.  Congress has declared that "an institution of higher education should facilitate the free and open exchange of ideas."  20 U.S.C. § 1011(a)(2).  Freedom of expression is "vital" on campuses, *Shelton v. Tucker*, 364 U.S. 479, 487 (1960), which are "peculiarly the 'marketplace of ideas,'" *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967).  And on university campuses, "[a]mong the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs." *Healy*, 408 U.S. at 181.  Similarly, the exclusion of religious viewpoints from colleges and universities "risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life."  *Rosenberger*, 515 U.S. at 836.

The United States also has a significant interest in ensuring that colleges and universities, including recipients of federal funds, do not discriminate in their educational programs. The Attorney General is charged with enforcing laws to address such discrimination—including a university's failure to address discrimination based on race, color, national origin, sex, religion, or disability. *See, e.g.*, 42 U.S.C. § 2000d; 42 U.S.C. § 2000h-2; 42 U.S.C. § 2000c-6; 42 U.S.C. § 1681(a); 42 U.S.C. §§ 12132-12133. Universities therefore are obligated to provide non-discriminatory educational environments to their students while also protecting First Amendment freedoms that are the hallmarks of our public institutions of higher learning.

It is in the interest of the United States to lend its voice to enforce First Amendment rights on campus because "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603. "[O]ur history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker v. Des Moines Indep. Cmt. Sch. Dist.*, 393 U.S. 503, 508-09 (1969).

The United States thus has submitted statements of interest and amicus briefs in a wide range of cases involving discrimination against religious expression in educational contexts. *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993); *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Sch.*, 373 F.3d 589 (4th Cir. 2004); *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211 (3d Cir. 2003); *Bronx Household of Faith v. Bd. of Educ. of the City of N.Y.*, 331 F.3d 342 (2d Cir. 2003); *Uzuegbunam v.*

*Preczewski*, No. 1:16-cv-04658 (N.D. Ga. 2018); *O.T. v. Frenchtown Elementary Sch. Dist. Bd. of Educ.*, 465 F. Supp. 2d 369 (D. N.J. 2006).

## FACTUAL BACKGROUND

The University recognizes that student groups "play an important role in developing student leadership and providing a quality campus environment."  Defs.' Resp. ¶ 381.  The University "encourages the formation of student organizations around the areas of interests of its students, within the limits necessary to accommodate academic needs and ensure public safety."  *Id.*  Accordingly, the University has opened a limited public forum for student organizations to register for and receive University recognition and benefits.

The University "acknowledges the interests of students to organize and associate with like-minded students" and recognizes that "any individual who subscribes to the goals and beliefs of a student organization may participate in and become a member of the organization."  Defs.' Resp. ¶ 8.  The University also recognizes that religious groups have an important role in the extracurricular life of the University.  The University's Statement of Religious Diversity proclaims:  "Religious history, religious diversity, and spiritual values have formed a part of The University of Iowa's curricular and extracurricular programs since the founding of the University."  *See id.* ¶ 21; App. 0374.  And while as a public university it may not "promote[ ] any particular form of religion," the University recognizes that it may not "discriminate[ ] against students, staff, or faculty on the basis of their religious viewpoints."  Defs.' Resp. ¶ 21.

Accordingly, University policy upholds the right of all registered student organizations "to exercise free choice of members on the basis of their merit as individuals without restriction," so long as they do so "in accordance with the University Policy on Human Rights."  *Id.* ¶ 14.  The Human Rights Policy posits:

> The University is guided by the precepts that in no aspect of its programs shall there be any differences in the treatment of persons because of race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences or any other classification that deprives the person of consideration as an individual, and that equal opportunity and access to facilities shall be available to all.

App. 0376.  "These principles are expected to be observed . . . in policies governing programs of extracurricular life and activities."  *Id.*  The Human Rights Policy also acknowledges that the University will "work cooperatively with the community" to further the principle of accommodating the religious practices of members of the community.  *Id.*

In accordance with the Human Rights Policy, the University has "reviewed and approved numerous constitutions for registered student organizations that required leaders or members to agree with the group's mission, purpose, or faith."  Defs.' Resp. ¶ 16.  The University has registered "numerous religious groups, including an actual church, that explicitly require their leaders to sign a statement of faith or satisfy other religious criteria."  *Id.* ¶ 17.  One such group, Love Works, was formed after BLinC denied a student consideration for a leadership position.  *Id.* ¶¶ 17, 263.  Love Works requires executive officers to ascribe to the organization's Core Beliefs, which include a belief that Jesus Christ is the center of all that the members of the group do, a belief that they have a religious calling to stand with "LGBTQ+" persons who have been rejected by other faith communities, a belief in the obligation of service, and a belief that members should share in community together.  *Id.* ¶ 263; App. 239-41.  The University also has "approved the constitutions of many organizations that limit their leadership and their membership based on non-religious creeds or missions as well," such as Feminist Majority Leadership Alliance, the Korean American Student Association, the Latina/o Graduate Student Association, and the National Society of Black Engineers.  Defs.' Resp. ¶ 18.  One of those organizations, Trans Alliance, requires leaders to have "drive to execute the established goals" of

"spread[ing] awareness of transgender issues and work[ing] to increase public knowledge of the transgender population." *Id.*

The University also has registered other student organizations that violate the Human Rights Policy by "explicitly restrict[ing] or control[ling] access to leadership or membership based on race, national origin, sex, sexual orientation, gender identity, status as a U.S. veteran, and/or military service." *Id.* ¶ 24.  Such groups include The House of Lorde, the Chinese Basketball Club, the Chinese Students and Scholars Association, and Hawkapellas – Iowa.  *See id.*  During the course of this litigation, the University exempted single-sex fraternities and sororities from the Human Rights Policy.  *See id.* ¶ 12.

The University has admitted that it permits student organizations to express viewpoints on issues such as sexual relationships and gender identity, and even registers student organizations that violate the Human Rights Policy, "for a variety of reasons."  Defs.' Br. 18. The University reserves the right to register student organizations that violate its policy if it believes that those organizations or their viewpoints "support the educational and social purposes of the forum" or otherwise "support the University's educational mission."  *Id.* 17-18.

BLinC was formed by students of the University's Tippie College of Business.  Its purpose is to help "seekers of Christ" learn "how to continually keep Christ first in the fast-paced business world," with the Bible as a guide, through fellowship, small group discussion, and networking with other Christian students and business leaders.   Defs. Resp. ¶¶ 99-103.  Like other student organizations, it adheres to the Human Rights Policy and does not treat persons differently based on race, religion, sexual orientation, gender identity, or other criteria listed in the University Human Rights Policy.  Defs.' Statement of Material Facts ("Defs.' Statement")

¶ 29, Defs.' Resp. ¶¶ 8, 225; App. 1224.  It therefore permits openly gay students to "be [a] leader with BLinC" if those students meet the other membership criteria.  *Id.* ¶ 135.

Moreover, like other student organizations, BLinC requires that its officers support its mission and affirm that "they accept and seek to live BLinC's religious beliefs."  *Id.* ¶ 223.  BLinC asks officers to "provide spiritual leadership for the organization including leading prayer and Bible study, explaining the content of BLinC's religious beliefs, and ministering to others."  *Id.*  BLinC's Statement of Faith includes belief in the Bible as "the unerring Word of God," *Id.* ¶ 126, and particular beliefs about the nature of God, sin, and salvation, among others.  *Id.* ¶ 127-129.  It includes a paragraph entitled "Doctrine of Personal Integrity," which states:

> All Christians are under obligation to seek to follow the example of Christ in their own lives and in human society.  In the spirit of Christ, Christians should oppose racism, every form of greed, selfishness, and vice, and all forms of sexual immorality, including pornography.  We believe God's intention for a sexual relationship is to be between a husband and wife in the lifelong covenant of marriage.  Every other sexual relationship beyond this is outside of God's design and is not in keeping with God's original plan for humanity.  We believe every person should embrace, not reject, their God-given sex.  We should work to provide for the orphaned, the needy, the abused, the aged, the helpless, and the sick.  We should speak on behalf of the unborn and contend for the sanctity of all human life from conception to natural death.

*Id.* ¶ 222; App. 1230.

In early 2016, a University student who had attended several of BLinC's meetings inquired about leadership positions with the organization.  Defs.' Statement ¶¶ 50-52.  The student, who is gay, *id.* ¶ 53, was denied consideration for a leadership position in BLinC.  *Id.* ¶ 60.  He subsequently filed a complaint with the University.  *Id.* ¶ 68.

After various meetings with University officials, BLinC amended its constitution by adding the "Doctrine of Personal Integrity" set forth above.  The University concedes that BLinC would accept openly gay leadership candidates on equal terms with other leadership candidates

so long as they "agree[ ] with, and agree to live by, BLinC's Statement of Faith." Defs.' Resp.

¶ 135. The University believes, however, that "[t]his statement inherently excludes" and is

"unwelcoming" to "gay, lesbian, bisexual, and transgender individuals." *Id.* ¶ 154. The

University deregistered BLinC because of BLinC's decision to require its leaders to affirm the

Statement of Faith. Defs.' Statement ¶¶ 111, 118.

## ARGUMENT

The University's deregistration of BLinC because it finds the Statement of Faith

"unwelcoming," Defs.' Resp. ¶ 135, violates BLinC's fundamental First Amendment rights of

free association and free speech. *See, e.g.*, *Healy*, 408 U.S. at 187; *Masterpiece Cakeshop*, 138

S. Ct. at 1731. The University's selective application of its policy to favor student organizations

that in its view "support the University's educational mission," Defs.' Br. 18, and to discriminate

against BLinC's "viewpoint," *Rosenberger*, 515 U.S. at 829, and "religious beliefs," *Trinity*

*Lutheran*, 137 S. Ct. at 2024 n.4, also violates BLinC's First Amendment rights of free speech

and free exercise. The University cannot demonstrate that its discriminatory application of the

anti-discrimination policy somehow advances its anti-discrimination interest, much less serves

that interest in a "necessary" and "narrowly drawn" way. *Widmar*, 454 U.S. at 270. The Court

should grant summary judgment for BLinC.

## I.     THE UNIVERSITY VIOLATED BLINC's FREE ASSOCIATION RIGHTS

"Among the rights protected by the First Amendment is the right of individuals to

associate to further their personal beliefs." *Healy*, 408 U.S. at 181; *see also Boy Scouts of*

*America v. Dale*, 530 U.S. 640, 648 (2000). This fundamental right flows from "the freedoms of

speech, assembly, and petition." *Healy*, 408 U.S. at 181. "There can be no doubt that denial of

official recognition, without justification, to college organizations burdens or abridges that associational right." *Id.*

In *Healy*, the Supreme Court held that a public college's unjustified denial of official recognition to a student group violated the First Amendment. The public college there had created a limited public forum for student groups. *See id.* at 172-76. To receive official recognition, student groups had to agree to abide by "any valid campus rules," including rules aimed at preventing disruption in the classroom. *Id.* at 194; *see also id.* at 189. Official recognition carried several benefits, including the right to place announcements in the student newspaper and on campus bulletin boards and the right to hold meetings in "campus facilities." *Id.* at 176.

A group of students requested official recognition for a chapter of the Students for Democratic Socialism (SDS). *See id.* at 172-74. College administrators denied that request because they disagreed with SDS's message: they believed that "the organization's philosophy was antithetical to the school's policies" because it "openly repudiate[d] the College's dedication to academic freedom." *Id.* at 175-76. The Supreme Court rejected that basis for denying recognition, holding that a public college "may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." *Id.* at 187. As the Supreme Court reasoned, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.* at 180. "The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom." *Id.* at 180-81.

The Supreme Court likewise upheld an association's First Amendment rights in *Hurley v. Irish-American Gay Group of Boston*, 515 U.S. 557 (1995). The South Boston Allied War

Veterans Council annually applied for and received a permit to conduct a St. Patrick's Day-Evacuation Day Parade in Boston on March 17.  *See id.* at 560.  A "number of gay, lesbian, and bisexual descendants of Irish immigrants" requested permission to participate in the parade and to carry a banner conveying a message that "express[ed] pride in their Irish heritage as openly gay, lesbian, and bisexual individuals."  *Id.* at 561.  To support their request, that group invoked a state anti-discrimination law that prohibited "any distinction, discrimination or restriction on account of . . . sexual orientation . . . relative to the admission of any person to, or treatment in any place of public accommodation, resort or amusement."  *Id.* (citing Mass. Gen. Laws § 272:98 (1992)).

The Council denied that request.  The Council "disclaim[ed] any intent to exclude" from the parade anyone based on his or her sexual orientation, but instead argued that forcing it to allow the group to carry the banner and convey its message violated the Council's First Amendment rights.  *See id.* at 572.  The Supreme Court agreed.  *See id.* at 571-577.  The Supreme Court first held that applying the state's anti-discrimination law to prohibit the Council from excluding from the parade any person based on his or her sexual orientation did not violate the First Amendment.  *See id.* at 571-72.  That is because "public accommodations laws" of that sort prohibit "the act of discriminating against individuals" rather than protected "speech."  *Id.*

The Supreme Court further held, however, that applying the state's anti-discrimination law to prohibit the Council from excluding any message with which it disagreed—even an anti-discrimination message consistent with the state's anti-discrimination law—violated the First Amendment.  *See id.* at 572-77.  As the Supreme Court reasoned, such an application of the anti-discrimination law would impermissibly "alter the expressive content of [the Council's] parade." *Id.* at 572-73.  Indeed, "[s]ince *all* speech inherently involves choices of what to say and what to

leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak" may "tailor" his or her own message and "also decide what not to say." *Id.* at 573. Thus, in other words, while the state could apply its anti-discrimination law to prohibit exclusion from the parade based on *status*, the First Amendment prevented the state from applying its anti-discrimination law to compel, or prohibit exclusion of, a particular *message*. *See id.* at 571-73.

*Healy* and *Hurley* demonstrate that the University's deregistration of BLinC violated the First Amendment. The University has admitted that BLinC permits openly gay individuals to join BLinC and even to "be [a] leader with BLinC." Defs.' Resp. ¶ 135. In fact, BLinC has included the University's Human Rights Policy in its charter. *See id.* ¶ 225, App. 1224. Thus, like the Council in *Hurley*, BLinC has "disclaim[ed] any intent to exclude [gay students] as such." 515 U.S. at 572. Accordingly—again like the Council in *Hurley*—BLinC has complied with, rather than violated, the University's anti-discrimination policy since it does not engage in status-based discrimination "because of . . . sexual orientation [or] gender identity." App. 0374; *see also Hurley*, 515 U.S. at 571-72.

Rather, the University attempts to rest the deregistration upon BLinC's Statement of Faith, but that position only underscores the University's violation of BLinC's First Amendment rights. In particular, the University argues that the Statement of Faith "inherently excludes" gay and transgender students because it is "unwelcoming" to them, and that it would reinstate BLinC's registration if BLinC changed the Statement of Faith. Defs.' Resp. ¶ 154; *see also* Defs.' Statement ¶ 111, Defs.' Resp. ¶¶ 227-28, 229-33. But the University's effort to use the Human Rights Policy not merely to prohibit exclusion based on protected status but to force BLinC to "alter the expressive content of" the Statement of Faith violates BLinC's associational (and free speech) rights. *Hurley*, 515 U.S. at 572-73. Indeed, that some members of the student

community or even a class protected by the Human Rights Policy might find a message "unwelcoming" provides no constitutional basis to deregister a student group that otherwise complies with "valid campus rules." *Healy*, 408 U.S. at 194. After all, the University "may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent," *id.* at 187, "offensive," *Masterpiece Cakeshop*, 138 S. Ct. at 1731, or "unwelcoming," Defs.' Resp. ¶ 154.

The University offers two arguments in an attempt to avoid the conclusion that the deregistration violated BLinC's First Amendment associational rights, both of which fail. *First*, the University invokes *Christian Legal Soc'y Chapter of the Univ. of Calif., Hastings Coll. of Law v. Martinez*, 561 U.S. 661 (2010), *see* Defs.' Br. 11-15, but that decision is inapposite. In *Martinez*, the Supreme Court held that a public law school could constitutionally apply an "all-comers policy" to prohibit a student group from excluding members and leaders "who do not share the organization's core beliefs." 561 U.S. at 668. The law school's all-comers policy was neutral and uniformly applied to all student groups. *See id.* at 668-69, 675, 697 n.27. Thus, for example, under that policy, "the Hastings Democratic Caucus cannot bar students holding Republican political beliefs from becoming members or seeking leadership positions in the organization." *Id.* at 675. The Supreme Court upheld this policy as reasonable and viewpoint-neutral. *See id.* at 685-97.

*Martinez* has no bearing here because—as the University itself concedes—the University does not have an all-comers policy. *Id.* at 669; *see also* Defs.' Resp. ¶ 1. Quite to the contrary: the University "acknowledges the interests of students to organize and associate with like-minded students" and expressly recognizes that "any individual *who subscribes to the goals and beliefs of a student organization* may participate in and become a member of the organization."

Defs.' Resp. ¶ 8 (emphasis added).  Accordingly, the University's policy upholds the right of registered student organizations "to exercise free choice of members on the basis of their merit as individuals without restriction," so long as they do so "in accordance with the University Policy on Human Rights."  *Id.* ¶ 14.  Thus, far from a neutral all-comers policy that prohibits conditioning membership or eligibility for leadership positions on "shar[ing] the organization's core beliefs," *Martinez*, 561 U.S. at 668, the University's policy expressly allows student organizations to condition membership and leadership eligibility upon agreement to the organization's "goals and beliefs," Defs.' Resp. ¶ 8.  *Martinez* provides no basis for the University to violate its own policy and to attempt to "restrict speech or association simply because it finds the views expressed by" BLinC "to be abhorrent," *Healey*, 408 U.S. at 187, "offensive," *Masterpiece Cakeshop*, 138 S. Ct. at 1731, or "unwelcoming," Defs.' Resp. ¶ 154. That is particularly true because, as explained more fully below, the University has not applied its policy neutrally like the law school in *Martinez* but, in fact, has discriminated against viewpoints based on whether it deems those viewpoints to "support the University's educational mission."  Defs.' Br. 18; *see infra* Part II.C.

*Second*, the University attempts to minimize the harm that the deregistration has inflicted on BLinC, asserting that "BLinC has not been silenced by this deregistration" but, in the University's view, "may continue its activities and speech as before, and even as an unregistered student organization may access a significant number of University resources."  Defs.' Br. 6. But, of course, "[t]here can be no doubt that denial of official recognition, without justification, to college organizations burdens or abridges th[eir] associational right."  *Healy*, 408 U.S. at 181. "The practical effect" of the deregistration "[is] demonstrated in this case," *id.*, because it results in denial to BLinC of valuable resources for furthering its purpose and message, including

exclusion from the student activity fair, the University's website, and various speech forums on campus, Defs.' Resp. ¶¶ 238-39; *see also Child Evangelism Fellowship of Minn. v. Minneapolis Spec. Sch. Dist. No. 1*, 690 F.3d 996, 1001-02 (8th Cir. 2012) (school district's exclusion of a religious group from a limited public forum violated the First Amendment even though the group "was merely accorded less favorable treatment than other groups, as opposed to being denied access outright").  "[I]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."  *Trinity Lutheran*, 137 S. Ct. at 2022.  The Court should hold that the University violated BLinC's First Amendment right to free association.

## II.   THE UNIVERSITY VIOLATED BLINC'S FREE SPEECH AND FREE EXERCISE RIGHTS

### A.  The University's Discrimination Against BLinC's Viewpoint Triggers Strict Scrutiny Under The Free Speech Clause

The parties agree that the University's policy regarding registered student organizations "has created a limited public forum."  Defs.' Br. 15; *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) (the First Amendment standards that courts must "apply to determine whether a [government] has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum").  Even in a limited public forum, a governmental entity "may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum[,] nor may it discriminate against speech on the basis of viewpoint."  *Rosenberger*, 515 U.S. at 829.

"Viewpoint discrimination is . . . an egregious form of content discrimination" that arises when the government justifies regulation of speech based upon "the specific motivating ideology or the opinion or perspective of the speaker."  *Id.*  Even within a limited public forum, a state entity may engage in viewpoint discrimination only where it satisfies strict scrutiny.  *See id.*  The

state entity's strict scrutiny burden attaches to viewpoint discrimination "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas'" being regulated.  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015).

A government entity engages in viewpoint discrimination when it exempts favored speakers from the rules applicable to a forum but strictly enforces those rules against disfavored speakers.  *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional."); *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014) (had abortion clinic escorts but not protesters been permitted to engage in speech in buffer zone, it would be "a clear form of viewpoint discrimination that would support an as-applied challenge to the buffer zone at that clinic").  Thus, the Seventh Circuit held that a university engaged in viewpoint discrimination when "[f]or whatever reason, [it] has applied its antidiscrimination policy to [the Christian Legal Society] alone, even though other student groups discriminate in their membership requirements on grounds that are prohibited by the policy," including religion and sex.  *Christian Legal Society v. Walker*, 453 F.3d 853, 866 (7th Cir. 2006).

Likewise, the Supreme Court has held that a public university engaged in impermissible viewpoint discrimination when it excluded an organization of Christian students from a limited public forum "based on their desire to use a generally open forum to engage in religious worship and discussion," which "are forms of speech and association protected by the First Amendment." *Widmar*, 454 U.S. at 269; *see also Martinez*, 561 U.S. at 684-85, 695 (five-justice majority describing *Widmar* as a "viewpoint" discrimination case); *id.* at 722 (four-justice minority) (same).  The Supreme Court also has struck down as viewpoint discriminatory denials of access to limited public forums to teach "morals and character" from "a Christian perspective," *Good*

*News Club*, 533 U.S. at 108-12, to present films discussing family values from a religious

perspective, *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 389

(1993), and to print publications addressing issues from a religious perspective, *see Rosenberger*,

515 U.S. at 826.  More generally, the Supreme Court has emphasized that governmental

restriction on speech it deems "offensive" is viewpoint discrimination because "[g]iving offense

is a viewpoint."  *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *Masterpiece Cakeshop*, 138 S. Ct.

at 1731 ("[I]t is not, as the Court has repeatedly held, the role of the State or its officials to

prescribe what shall be offensive.").

Here as well, the University's deregistration of BLinC was viewpoint discriminatory.

The University reserves the right to restrict the limited public forum to organizations whose

perspectives, in the view of the University, "support the educational and social purposes of the

forum."  Defs.' Br. 17.  This unilateral decreeing of which perspectives are acceptable to the

University is classic viewpoint discrimination—as the University's deregistration of BLinC

demonstrates.  *See Rosenberger*, 515 U.S. at 829.

BLinC's Statement of Faith adopts the viewpoint that "sexual relationship[s]" should

exist only "between a man and a wife in the lifelong covenant of marriage" and that "every

person should embrace, not reject, their God-given sex."  Defs.' Resp. ¶ 222; App. 1230.  The

University deregistered BLinC because it deemed the Statement of Faith "unwelcoming" to

"gay, lesbian, bisexual, and transgender individuals."  Defs.' Resp. ¶ 154.  At the same time, the

University admits that it has registered other student organizations that require their members

and leaders to affirm adherence to an opposing perspective on the issues of sexual relationships

and gender identity.  *See id.* ¶¶ 17-18.  For example, the University has registered Love Works,

which requires "leaders to sign a gay-affirming statement of Christian faith," *id.* ¶¶ 17; 262-66,

and Trans Alliance, which requires leaders to have "drive to execute the established goals" of "spread[ing] awareness of transgender issues and work[ing] to increase public knowledge of the transgender population," *id.* ¶ 18.  Thus, the University has not imposed a content limitation that forecloses all speech regarding sexual relationships or gender identity from its limited public forum.  *Cf., e.g.*, *Rosenberger*, 515 U.S. at 830 ("content discrimination . . . may be permissible if it preserves the purposes of th[e] limited forum.").  Instead, it has engaged in textbook viewpoint discrimination: it has allowed some speech regarding sexual relationships and gender identity but disallowed other speech on those topics that conveys a viewpoint that the University considers "unwelcoming."  Defs.' Resp. ¶ 154; *Rosenberger*, 515 U.S. at 829 (viewpoint discrimination involves speech restrictions imposed based upon "the specific motivating ideology or the opinion or perspective of the speaker.").

The University's viewpoint discrimination against BLinC does not end there.  The University has registered student organizations that *expressly* engage in status-based discrimination that violates the Human Rights Policy, including by restricting membership or leadership positions based on race, national origin, sex, sexual orientation, or gender identity. *See* Defs.' Resp. ¶ 24.  But the University's rationale for deregistering BLinC is that the Statement of Faith "inherently excludes gay, lesbian, bisexual, and transgender individuals." Defs.' Resp. ¶ 154.  Thus, the University has permitted some student organizations to explicitly violate the Human Rights Policy, but has penalized BLinC for its alleged "inherent[ ]" violation of that policy.  *Id.*  This, too, is classic viewpoint discrimination triggering strict scrutiny.  *See also Rosenberger*, 515 U.S. at 829; *Widmar*, 454 U.S. at 269; *Good News Club*, 533 U.S. at 108-12.

**B.  The University's Discrimination Against BLinC Triggers Strict Scrutiny Under The Free Exercise Clause**

The Free Exercise Clause guarantees all Americans the "right to believe and profess whatever religious doctrine [they] desire[ ]." *Empl't Div., Dept. of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990).  The Free Exercise Clause therefore prohibits the government from attempting to regulate, compel, or punish religious beliefs.  *See id.*; *Sherbert v. Verner*, 374 U.S. 398, 402 (1963); *Torcaso v. Watkins*, 367 U.S. 488, 492-95 (1961); *United States v. Ballard*, 322 U.S. 78, 86 (1944).  Thus, while the Free Exercise Clause does not provide an exemption from neutral and generally applicable laws based upon religious belief, it does subject to heightened scrutiny government action that discriminates against or imposes special burdens upon individuals because of their religious beliefs or status.  *See Smith*, 494 U.S. at 877; *McDaniel v. Paty*, 435 U.S. 618, 627 (1978).

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs." *Lukumi*, 508 U.S. at 532 (striking down local ordinances that sought to prevent animal sacrifice of the Santaria religion).  The government also may not require a religious group "to renounce its religious character in order to participate in an otherwise generally available public benefit program, for which it is fully qualified." *Trinity Lutheran*, 137 S. Ct. at 2024.  Nor may the government "penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities." *Sherbert*, 374 U.S. at 402.  "Targeting religious beliefs as such is never permissible." *Trinity Lutheran*, 137 S. Ct. at 2024 n.4.

A governmental entity engages in discrimination that triggers heightened scrutiny under the Free Exercise Clause where it grants exemptions from a neutral and generally applicable rule for one or more secular reasons, but fails to grant the same exemption for religious reasons.

Thus, for example, the Third Circuit has applied strict scrutiny—and found a Free Exercise violation—because a police department provided exemptions to its no-beard policy to officers with a skin condition that made shaving painful but not to Muslim officers who claimed a religious need to wear beards.  *See Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999).  A district court likewise found that a university violated the Free Exercise Clause when it granted exemptions to a rule requiring freshman to live on campus for secular reasons but denied a similar exemption requested by a student wishing to live off campus in a religious group home.  *Rader v. Johnston*, 924 F. Supp. 1540 (D. Neb. 1996).  "State actors may not without justification refuse to extend exceptions that they routinely grant to persons for non-religious reasons to those requesting the same exception based on sincerely held religious beliefs."  *Id.* at 1555.

The University's deregistration of BLinC encompassed discrimination based upon religious beliefs that triggers heightened scrutiny under the Free Exercise Clause for two reasons.  *First*, and most fundamentally, the University "[t]argeted [BLinC's] religious beliefs."  *Trinity Lutheran*, 137 S. Ct. at 2024 n.4.  As explained, BLinC complied with, rather than violated, the Human Rights Policy and its ban on status-based discrimination.  The University deregistered BLinC because it found BLinC's Statement of Faith to be "unwelcoming," and offered to re-register BLinC if it changed its Statement of Faith to conform to University orthodoxy.  Defs.' Resp. ¶ 154.  This mandate that BLinC "renounce its religious character in order to participate in an otherwise generally available public benefit program, for which it is fully qualified," alone triggers heightened scrutiny.  *Trinity Lutheran*, 137 S. Ct. at 2024.

*Second*, by its own admission, the University granted exemptions to its Human Rights Policy for organizations that, in the University's view, "support the educational and social

purposes of the forum."  Defs.' Br. 17.  Indeed, the University has registered "many

organizations that limit their leadership or membership based on non-religious creeds or

missions" as well as "dozens of organizations that explicitly restrict or control access to

leadership or membership based on race, national origin, sex, sexual orientation, gender identity,

status as a U.S. veteran, and/or military service" in express violation of the Human Rights

Policy.  Defs.' Resp. ¶¶ 18, 24.  Yet it has refused to accord BLinC similar exemptions to its

putative policy based on BLinC's religious belief or status.  This refusal likewise triggers

heightened scrutiny.  *Rader*, 924 F. Supp. at 1555-56;  *Fraternal Order of Police*, 170 F.3d at

366-67.

### C.  The University Has Failed To Carry Its Strict Scrutiny Burden

The University may establish that its deregistration of BLinC does not violate BLinC's

free association, free speech, and free exercise rights only by satisfying strict scrutiny.  *See, e.g.*,

*Widmar*, 454 U.S. at 270; *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("[O]nly those interests

of the highest order . . . can overbalance legitimate claims to the free exercise of religion.").  The

University can carry its strict scrutiny burden only by showing that the discrimination "is

necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end."

*Widmar*, 454 U.S. at 270.  The University has wholly failed to carry that burden here.

*First*, the University principally argues that it bears a "heavy responsibility . . . to protect

the rights of minority students to equally access their publicly-funded educational opportunities"

and that its deregistration of BLinC is necessary to eradicate status-based discrimination on

campus.  Defs.' Br. 6.  To be sure, the eradication of discrimination, unrelated to the suppression

of expression, is a compelling government interest.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624

(1984).  But the University's deregistration of BLinC does not "serve" that interest, let alone do

so in a "necessary" or "narrowly drawn" way. *Widmar*, 454 U.S. at 270. After all, BLinC *complies* with the University's anti-discrimination policy because it complies with the Human Rights Policy and does not discriminate on the basis of any protected status. Defs.' Statement ¶ 29; Defs.' Resp. ¶¶ 8, 135, 225; App. 1224. Rather, the University deregistered BLinC because it finds BLinC's Statement of Faith "unwelcoming" to some members of a protected class. Defs.' Resp. ¶ 154. At the same time, the University freely admits that it allows registered student organizations to express viewpoints on sexual relationships and gender identity that differ from BLinC's viewpoint—and sometimes even allows registered student organizations to *explicitly* violate the Human Rights Policy—where the University unilaterally determines that, in its view, those viewpoints and organizations "support the University's educational mission." Defs.' Br. 18; *see also* Defs.' Resp. ¶¶ 17-18, 24. The University's selective application of the Human Rights Policy to discriminate against a student organization that *complied* with the policy and in favor of student organizations that flout it does nothing to advance the University's putative interest in eradicating discrimination, let alone to satisfy strict scrutiny. *See, e.g.*, *Widmar*, 454 U.S. at 270; *Rosenberger*, 515 U.S. at 829; *Good News Club*, 533 U.S. at 108-12; *Lamb's Chapel*, 508 U.S. 384.

If more were somehow needed, the Supreme Court has emphasized that even the compelling governmental interest in eradicating discrimination does not justify application of rules that "materially interfere with the ideas that the organization s[eeks] to express." *Dale*, 530 U.S. at 657. Thus—as the unanimous Supreme Court explained in *Hurley*—the First Amendment prohibits the government from pursuing the interest in eradicating discrimination by forcing a speaker to alter its message in order to "produce a society free of the corresponding biases." *Hurley*, 515 U.S. at 578-79. In other words, while the government may combat

discrimination based on *status*, it may not dictate orthodoxy in a speaker's *message*, even where that message might pertain or be "unwelcoming" to some members of a protected class. *See id.*; Defs.' Resp. ¶ 154. The University's laudable and compelling goal of eliminating discrimination does not permit it to force BLinC to abandon its Statement of Faith on pain of deregistration. *See, e.g.*, *Dale*, 530 U.S. at 657; *Hurley*, 515 U.S. at 578-79; *see also Gay Lib v. University of Missouri*, 558 F.2d 848, 857 (8th Cir. 1977) (upholding the right of a group supporting "gay liberation" to registered student status because "[t]o invoke censorship in an academic environment is hardly the recognition of a healthy democratic society").

> *Second*, the University repeatedly mentions that it may have registered, or permitted to remain registered, certain student organizations that violate the Human Rights Policy because of "administrative oversight" or a lack of student "complaints" against those organizations. *See, e.g.*, Defs.' Br. 17-18. But as the Court already has explained, these excuses fail because "[a]n organization's proposed constitution and bylaws are reviewed with its registration form before an organization is granted registered status." Order On Plaintiff's Motion For Preliminary Injunction at 27-28 (Dkt. No. 36 Jan. 23, 2018). In any event, the University never explains how its negligent or selective failure to address violations of the Human Rights Policy demonstrates a compelling interest in enforcing that policy. *See id.* Indeed, the University cannot use instances where it has *failed* to enforce the Human Rights Policy to satisfy strict scrutiny in its *misapplication* of that policy to deregister BLinC. That is especially true here, where the University has admitted that at least some of its selective application of the Human Rights Policy is viewpoint-driven and favors organizations and sanction perspectives that, in the University's view, "support the University's educational mission." Defs.' Br. 18.

*Finally*, the University's violation of its own policy to deregister BLinC is not "narrowly drawn" to the goals of allowing students "to equally access their publicly-funded educational opportunities," Defs.' Resp. 6, because other means that are far less restrictive of First Amendment freedoms exist to advance that objective, *Widmar*, 454 U.S. at 270; *Dale*, 530 U.S. at 648; *Roberts*, 468 U.S. at 623.  In the first place, the University could neutrally and consistently apply the Human Rights Policy to ensure that the full swath of student organizations are open to all students.  For example, the University could apply the Human Rights Policy neutrally to ensure that groups that currently discriminate on the basis of status, *see* Defs.' Resp. ¶ 24, accept students regardless of status.  It may also permissibly ensure that BLinC continues to abide by the Human Rights Policy and its prohibition on status-based discrimination.  And another less restrictive alternative would be to eliminate unnecessary barriers to registration and to facilitate widespread registration of student organizations.  That the student who complained about BLinC's Statement of Faith formed a new Christian group embracing openness to "LGBTQ+" lifestyles demonstrates that this alternative already is in place.  *See id.* ¶ 262; App. 239-43.  It simply is not "necessary" for the University to violate its own policy and BLinC's First Amendment rights in the name of a deregistration that fails to advance the University's goal of eradicating status-based discrimination.  *Widmar*, 454 U.S. at 270.  The Court should hold that the University violated BLinC's free speech and free exercise rights.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for the Plaintiff on

its First Amendment claims.

Dated:  December 21, 2018

Respectfully submitted,

Marc Krickbaum
United States Attorney


By: */s/William C. Purdy*
    William C. Purdy  AT0006466
    Assistant United States Attorney
    U.S. Courthouse Annex, Suite 286
    110 E. Court Avenue
    Des Moines, Iowa 50309
    Telephone: (515) 473-9315
    Facsimile: (515) 473-9282
    Email: usaias.nefiadc@usdoj.gov

    Eric S. Dreiband
    Assistant Attorney General

    John M. Gore
    Principal Deputy Assistant Attorney General

By:
    Eric W. Treene
    Special Counsel
    Civil Rights Division
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20006
    Telephone:  (202) 514-2228
    E-Mail: eric.treene@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 21st day of December, 2018, filed the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sent counsel of record e-mail notification of such filing.

*/s/William C. Purdy*
William C. Purdy
Assistant U.S. Attorney