IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| BUSINESS LEADERS IN CHRIST, an unincorporated association, | ) ) ) | Case No. 3:17-CV-00080-SMR-SBJ |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| THE UNIVERSITY OF IOWA; LYN REDINGTON, in her official capacity as Dean of Students and in her individual capacity; THOMAS R. BAKER, in his official capacity as Assistant Dean of Students and in his individual capacity; and WILLIAM R. NELSON, in his official capacity as Executive Director, Iowa Memorial Union, and in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| Defendants. | ) ) | |

Civil and human rights laws that prohibit discrimination based on an individual's status—including his or her, gender, race, or sexual orientation—are common. The scope of their protection continues to evolve, but they are a familiar expression of society's values. They reflect a broad consensus as to the evils of discrimination and the benefits of equal opportunity. This case involves a policy of the University of Iowa that, like those laws, prohibits discrimination based on various protected characteristics. But even the most noble government pursuits are bound by the Constitution's protection of individual liberties. This case underscores the importance of pursuing the best-intentioned policies in an even-handed manner.

Plaintiff Business Leaders in Christ ("BLinC") seeks summary judgement in its favor on its various claims that the University violated its First Amendment rights through the application of its nondiscrimination policy. [ECF No. 71]. Defendants University of Iowa (the "University"),

Lyn Redington, Thomas Baker, and William Nelson resist BLinC's motion and move for partial summary judgment in favor of the individual Defendants on the grounds of qualified immunity. [ECF No. 70]. The Court held a hearing on the parties' cross-motions for summary judgment on February 1, 2019. The matter is fully briefed and ready for decision. As explained below, both motions are GRANTED in part and DENIED in part.

## I. BACKGROUND[1]

The University is a public institution of higher education governed by the Iowa State Board of Regents. [ECF No. 84-1 ¶ 1]. The University allows students to form student organizations, defined as "voluntary special interest group[s] organized for education, social, recreational, and service purposes and comprised of its members." *Id.* ¶ 21. Such groups are separate legal entities from the University and may exist on campus whether or not they receive official recognition from the University. *See id.* ¶¶ 22–23.

Some student organizations may register with the University as a Registered Student Organization ("RSO"). *See id.* ¶ 24. RSO status carries with it many benefits, including, eligibility to apply for funds from mandatory Student Activity Fees, inclusion in University publications, utilization of the University's trademarks, and eligibility to use campus meeting facilities and outdoor spaces. [ECF No. 71-3 at 114]. To be eligible for RSO status, a student organization must have at least five members, of which 80% must be University students, and have "purposes [that] are consistent with the educational objectives of the University, and do not violate local, state or federal law." *Id.* at 115. Eligible organizations wishing to register as an RSO must first hold a pre-registration meeting with appropriate University staff. *See id.* University staff will review the

---

[1] The facts are derived from the parties' respective statements of undisputed facts and the documents cited therein.

organization's proposed constitution and application for RSO status, and then submit it to the University's Student Organization Review Committee for final review. *See id.* at 116.

University policies impose various restrictions on RSOs. For example, an RSO must "adhere to the mission of [the] University, its supporting strategic plan, policies and procedures." *Id.* at 114. Also, an RSO's "goals, objectives, and activities must not deviate from established University policies and procedures." [ECF No. 84-1 ¶ 26]. Among those policies is the University's Policy on Human Rights (the "Human Rights Policy"). Relevantly, it states:

> [I]n no aspect of [the University's] programs shall there be differences in the treatment of persons because of race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual, and that equal opportunity and access to facilities shall be available to all.

*Id.* ¶ 9. This language, with only minor changes, is incorporated into the constitution of each RSO through a mandatory "UI Human Rights Clause" (the "Human Rights Clause"). *See id.* ¶ 29.

The University does not have an "all-comers policy." [ECF No. 82-2 ¶ 1]. The University's "Registration of Student Organizations" policy "encourages the formation of student organizations around the areas of interests of its students, within the limits necessary to accommodate academic needs and ensure public safety." [ECF No. 71-3 at 114]. Thus:

> It is the policy of the University that all registered student organizations be able to exercise free choice of members on the basis of their merits as individuals without restriction in accordance with the University Policy on Human Rights. The University acknowledges the interests of students to organize and associate with like-minded students, therefore any individual who subscribes to the goals and beliefs of a student organization may participate in and become a member of the organization.

*Id.* at 115. Within these parameters, the University has approved the constitutions of numerous RSOs that require members to subscribe to their respective missions. *See* [ECF No. 82-2 ¶ 18]. For example, the Iowa National Lawyers Guild requires its members to agree with the group's aim of bringing about "basic change in the structure of our political and economic system," and the Latina/o Graduate Student Association limits membership to "[a]nyone who supports the purpose of the organization, and is willing to commit to its objectives." *Id.*

However, the Registration of Student Organizations policy stresses that membership and participation in an RSO "must be open to all students without regard to" the protected traits listed in the Human Rights Policy—i.e., race, sex, religion, gender identity, sexual orientation, etc.—and RSOs must "guarantee that equal opportunity and equal access to membership, programming, facilities, and benefits shall be open to all persons." [ECF No. 71-3 at 115]. Yet, the University has approved the constitutions of numerous organizations that explicitly limit access to leadership or membership based on religious views, race, sex, and other characteristics protected by the Human Rights Policy.[2]  These groups include Love Works, which requires leaders to sign a "gay-affirming statement of Christian faith"; 24-7, which requires leaders to sign and affirm a statement of faith and live according to a code of conduct (which includes abstaining from sexual conduct and relations outside of traditional marriage); House of Lorde, which implements membership "interview[s]" to maintain "a space for Black Queer individuals and/or the support thereof"; the Chinese Students and Scholars Association, which limits membership to "enrolled Chinese Students and Scholars"; and Hawkapellas—Iowa ("Hawkapellas"), an "all-female

---

[2] Defendants admit the University approved the constitutions of "numerous religious groups, including an actual church, that explicitly require their leaders to sign a statement of faith or satisfy other religious criteria," and "dozens of organizations that explicitly restrict or control access to leadership or membership based on race, national origin, sex, sexual orientation, gender identity, status as a U.S. veteran, and/or military service." [ECF No. 82-2 ¶¶ 17, 24].

a cappella group" with membership controlled by "vocal auditions." [ECF No. 82-2 ¶¶ 17, 24].

Defendant Nelson also testified during a deposition that when certain groups, such as the Iowa

National Lawyer's Guild, exclude individuals because of their political views, they violate the

Human Rights Policy by discriminating based on an individual's creed. *See id.* ¶ 442.

Defendants argue that some of these groups continue to exist as RSOs—despite their

apparent violations of the Human Rights Policy—due to administrative oversight. [ECF

No. 81-1 at 18]. But Defendants also admit that some such groups continue as RSOs "for reasons

which support the University's educational mission" and the "social purposes of the forum."

*Id.* at 17–18. As an example, Defendants note that some of the groups in question "provide safe

spaces for minorities which have historically been the victims of discrimination." *Id.* at 18.

In the spring of 2014, students from the University's Tippie College of Business formed

BLinC. *See* [ECF No. 82-2 ¶¶ 93–95]. It was registered as an RSO that fall. *Id.* ¶ 95.

BLinC maintains it was founded as a religious organization to help "seekers of Christ" learn "how

to continually keep Christ first in the fast-paced business world." *Id.* ¶ 99. Its members participate

in weekly meetings that include prayer, Bible discussion, and spiritual reflection. *See id.* ¶ 101.

The group claims to be a "Bible-based group that believes the Bible is the unerring Word of God."

*Id.* ¶ 126. The group believes homosexual relationships are "outside of God's design" and that

"every person should embrace, not reject, their God-given sex." *Id.* ¶ 222. The parties agree

BLinC's beliefs "are based on its sincere religious interpretation of the Bible." *Id.* ¶ 230.

In March 2016, one of BLinC's members, Marcus Miller, approached the group's

then-president Hannah Thompson to discuss his interest in serving on BLinC's executive board.

*Id.* ¶ 109. BLinC's officers are responsible for leading its members in prayer, Bible discussion,

and spiritual teaching; for implementing and protecting the religious mission of the group; and for

modeling BLinC's faith to the group and to the public.  *Id.* ¶ 114. BLinC claims that its leaders therefore screen prospective officers "to ensure they agree with and can represent the group's religious beliefs." *Id.* ¶ 116. To that end, Thompson met with Miller in April 2016 for roughly two hours to "find out if he was ready to provide spiritual leadership." [ECF No. 71-6 at 108].[3] Thompson claims Miller revealed to her that he thought he was gay. *Id.* She said Miller was open about his desire to engage in same-sex relationships, and he had been struggling with the Bible's teachings on that topic. *Id.*

Thompson discussed Miller's candidacy with the other members of BLinC's executive board. According to Thompson, the board was concerned Miller did not share BLinC's views on the Bible's teachings about sexual conduct. *Id.* at 109. They concluded that Miller fundamentally disagreed with BLinC's faith and thus could not lead their members with "sound doctrine and interpretation of Scripture." *Id.* Thompson met with Miller to convey the board's decision. *Id.* At that meeting, she restated BLinC's view on the Bible's authority and its teachings about sexual morality, and asked Miller if he would be willing to forgo romantic same-sex relationships. *Id.* Miller told Thompson that he was not willing to do so. *Id.* Thompson told him he could not join BLinC's executive leadership. *See id.*

The parties disagree on why BLinC rejected Miller for a leadership position. BLinC maintains it rejected Miller because his religious views on sexual relationships conflicted with those of the group; Defendants assert Miller was rejected because of his status as a gay man. *See* [ECF No. 82-2 ¶ 133]. Ultimately, this issue is not material to the outcome of this case.

---

[3] Thompson's account of her discussions with Miller comes from her sworn affidavit, dated December 12, 2017. [ECF No. 71-6 at 105–12]. Defendants have not challenged her account of those discussions. *See generally* [ECF No. 82-2 ¶¶ 117–32, 136–45].

On February 20, 2017, Miller filed a complaint with the University stating that BLinC denied him a leadership position because he was "openly gay." *Id.* ¶ 158. He demanded that the University "[e]ither force BLinC to comply with the non-discrimination policy (allow openly LGTBQ members to be leaders) or take away their status of being a student organization." [ECF No. 71-6 at 132].

The University launched an investigation into the complaint. University Compliance Coordinator Constance Shriver Cervantes, from the University's Office of Equal Opportunity and Diversity, was assigned to the investigation. *See* [ECF No. 82-2 ¶¶ 159–60]. Throughout the investigation, BLinC maintained that it rejected Miller as a leader because he "disagreed with, and would not agree to live by [BLinC's] religious beliefs." *Id.* ¶ 168. Cervantes disagreed, concluding that BLinC denied Miller a leadership position because of his sexual orientation. *Id.* ¶ 182.

BLinC appealed. As part of that process, Jacob Estell met with Defendants Dr. William Nelson and Associate Dean Thomas Baker on September 1, 2017. *Id.* ¶¶ 191–92, 194. Estell replaced Thompson as BLinC's president after Thompson graduated in May 2017. *Id.* ¶ 171. At the time of the meeting, Nelson was the Executive Director of the Iowa Memorial Union and was responsible for registering student groups on campus. *See id.* ¶ 191; [ECF No. 84-1 ¶ 6].[4] Baker is an attorney and works in the Office of the Dean of Students. [ECF No. 84-1 ¶ 8]. Also in attendance at the meeting were BLinC's vice president, Brett Eikenberry, and two of BLinC's lawyers. [ECF No. 82-2 ¶ 193].

At the time of the meeting, BLinC was still an RSO. *See id.* ¶ 198. Baker informed Estell and Eikenberry that if BLinC understood the Human Rights Policy and was willing to comply with it going forward, BLinC could remain a registered organization in good standing. *Id.* Much of the

---

[4] Presently, Nelson is also the Associate Dean of Students. [ECF No. 84-1 ¶ 6].

meeting focused on what was permissible under the Human Rights Policy. This included discussion of the difference between discriminating based on "status" and choosing leaders based on "beliefs" and "conduct." *Id.* ¶ 207. As one example, Nelson and Baker explained that a group could require its leaders to abstain from sexual relationships outside of marriage—or abstain only from same-sex sexual relationships—if the requirement was "applicable to all." *Id.* ¶¶ 200–01. Nelson later testified that BLinC would not have violated the Human Rights Policy if it had denied Miller a leadership position based on his disagreement with their "religious philosophy," rather than his status as a gay man. [ECF No. 71-3 at 19]. This is consistent with other undisputed statements in the record showing that the Human Rights Policy only prohibited discrimination based on status, and not belief-based restrictions. *See, e.g.*, [ECF No. 82-2 ¶ 272].

The parties agree an RSO could require its leaders to embrace the mission of the organization, provided the group did not intend to pursue illegal activity. *See* [ECF Nos. 71-2 at 45; 82-2 ¶ 205]. Consistent with this, Estell and Eikenberry told Nelson and Baker that BLinC screened its leaders based on their beliefs and conduct, not their status, and that they intended to require BLinC's leaders to abide by the group's beliefs about sexual activity outside of marriage. [ECF Nos. 71-3 at 20; 82-2 ¶ 211]. Nelson inquired whether BLinC's beliefs were written down anywhere and suggested it would be better if students knew BLinC's beliefs before they joined. [ECF No. 82-2 ¶ 213]. Estell and Eikenberry agreed to detail BLinC's beliefs in its constitution, and Nelson indicated that such action would resolve his concerns about "any ongoing violation of the Human Rights Policy." *Id.* ¶¶ 215–16.

On September 13, 2017, Nelson sent BLinC a letter affirming that the group would be permitted "to function as [an RSO] in good standing" if it agreed to:

1.      commit to ongoing compliance with the Human Rights policy at all times in the future;

2.      submit a basic list of qualifications for leaders designed to prevent future disqualifications based on protected categories and to ensure that persons who identify as non-heterosexuals are not categorically eliminated from consideration; and

3.      submit an acceptable plan for ensuring that officers who interview candidates for executive positions will ask questions relevant to the group's beliefs that are not presumptive of candidates based upon sexual orientation.

*Id.* ¶ 221. In response, BLinC made various changes to its constitution. Relevant among them, it relabeled its "Vision Statement" as a "Statement of Faith" and added to it a new section titled "Doctrine of Personal Integrity." *Id.* ¶ 222. That section contained the following three sentences:

> We believe God's intention for a sexual relationship is to be between a husband and a wife in the lifelong covenant of marriage. Every other sexual relationship beyond this is outside of God's design and is not in keeping with God's original plan for humanity. We believe that every person should embrace, not reject, their God-given sex.

*Id.* BLinC also memorialized in its constitution an obligation that BLinC's leaders "accept and seek to live BLinC's religious beliefs." *Id.* ¶ 223. Additionally, BLinC formalized the process whereby all nominees for leadership positions had to be interviewed by the group's president and sign a copy of BLinC's Statement of Faith. *Id.* ¶ 224.

Nelson rejected the changes. In a letter to BLinC, Nelson said the revised constitution "does not satisfy the requirements" set out in his September 13, 2017 letter "for BLinC to remain as [an RSO] in good standing." *Id.* ¶ 227. He added that BLinC's "Statement of Faith, on its face, does not comply with the [Human Rights Policy] since its affirmation, as required by the Constitution for leadership positions, would have the effect of disqualifying certain individuals from leadership positions based on sexual orientation or gender identity, both of which are protected classifications." *Id.* The letter instructed BLinC that it could remain an RSO only if it revised its Statement of Faith to comply with the Human Rights Policy. *Id.* ¶ 228. Nelson testified

during his deposition that if BLinC would have removed from its Statement of Faith the three sentences excerpted above, he would have accepted the group's constitution.  *Id.* ¶ 365.

BLinC appealed to Defendant Dr. Lyn Redington, then-Assistant Vice-President and Dean of Students.  *Id.* ¶ 231.  She affirmed Nelson's decision and revoked the group's RSO status. *Id.* ¶ 232.  In doing so, Redington repeated Nelson's finding that the Statement of Faith failed to comply with the Human Rights Policy because the affirmation required for leadership positions "would have the effect" of disqualifying individuals from leadership positions based on sexual orientation or gender identity.  *Id.* ¶ 233.  It is notable that Defendants have since admitted that a student could identify as being gay and still hold a leadership position in BLinC, so long as he or she agreed with, and "agreed to live by" the group's Statement of Faith.  *Id.* ¶ 135.[5]

Beginning in January 2018, the University reviewed all RSO constitutions for compliance with the Human Rights Policy.  *Id.* ¶ 408.  This was meant to ensure the governing documents of RSOs contained "all required statements," including the Human Rights Clause and a required financial statement.  *Id.* ¶ 409.  Reviewers were also instructed to look for any language that might contradict the Human Rights Clause, including language that requires leaders or members to embrace certain "beliefs/purposes."  *Id.* ¶¶ 411, 414.  Reviewers were told that, although RSOs could have purposes or mission statements related to specific classes or characteristics of the Human Rights Clause, membership or leadership could not "be contingent on the agreement, disagreement, subscription to, etc., of the stated beliefs/purposes which are covered in the [Human

---

[5] Defendants qualify this by observing that the openly gay individual would have to regard his or her innate attraction to members of the same sex as "sinful" in order to participate as a member of BLinC's leadership team.  [ECF No. 82-2 ¶ 135].  Still, the admission shows Defendants do not view BLinC's restrictions on leadership as being based on status.

Rights Clause]." *Id.* ¶ 415. Nelson testified this instruction was incorrect, and that the policy only prohibits status-based discrimination, not belief-based requirements. *Id.* ¶¶ 416.

Following the University's review, over thirty groups were deregistered, although many were either defunct or failed to timely resubmit their constitutions with a complete version of the Human Rights Policy included. *Id.* ¶ 439. Many of the deregistered groups were re-registered after they added the required language to their constitutions. *Id.* In the end, groups that limit membership or leadership based on characteristics protected by the Human Rights Policy remain registered. Among them are Hawkapellas, House of Lorde, and the Chinese Students and Scholars Association. *See id.* ¶ 24; [ECF No. 101-1 at 3, 5–6]. Love Works, which in many respects is the ideological inverse of BLinC, remains registered. *See* [ECF No. 101-1 at 8].[6] The University has suspended the registration of various religious student groups pending the outcome of this litigation. *See generally id.*[7]

BLinC filed its twenty-count Complaint on December 11, 2017. [ECF No. 1]. The Complaint asserted various counts against Defendants under 42 U.S.C. § 1983 for violations of BLinC's First Amendment rights to freedom of speech and expressive association, freedom of assembly, free exercise of religion, and, separately, the First Amendment's Religion Clauses. *See generally id.* ¶¶ 149–224, 284–89. BLinC also asserted claims for violations of the Fourteenth

---

[6] At the hearing on the instant motions, counsel for Defendants alleged the University has suspended Love Works' registered status pending the outcome of this litigation. That assertion is directly contradicted by evidence in the record. *See* [ECF No. 101-1 at 8]. Additionally, Defendants argued in their briefing about the differences between BLinC and Love Works, making no indication that Love Works had been de-registered. *See* [ECF No. 87 at 2].

[7] The University's approach to religious student groups following the 2018 review is the subject of a related lawsuit, *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 3:18-CV-00080-SMR-SBJ.

Amendment's Equal Protection Clause, the federal Higher Education Act, the Iowa Human Rights Act, and various provisions of the Iowa Constitution. *See id.* ¶¶ 225–83. BLinC subsequently filed a Motion for Preliminary Injunction, which the Court granted on January 23, 2018. [ECF No. 36]. In doing so, the Court ordered Defendants to restore BLinC's RSO status for a period of ninety days. *Id.* at 31. On June 28, 2018, the Court extended the injunction until the Court renders a judgment in this matter. *See* [ECF No. 55 at 3].

Following discovery, the parties filed the instant motions. BLinC seeks summary judgment as to its First Amendment free speech (Counts VII–VIII), expressive association (Count VI), free exercise (Counts III–IV), and Religion Clauses claims (Counts I–II).[8] BLinC seeks nominal damages and a permanent injunction "prohibiting enforcement of the University's Human Rights Policy against BLinC based on the content of BLinC's Statement of Faith and leadership selection policies." [ECF No. 71 at 3]. BLinC also seeks a declaration that the individual Defendants are personally liable for the constitutional violations at issue, and requests that the Court set a trial date for the determination of any further damages against them. *See id.* The individual Defendants have filed a Motion for Partial Summary Judgment in their favor on the grounds of qualified immunity. *See* [ECF No. 70 at 1].

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Paulino v. Chartis Claims, Inc.*, 774 F.3d 1161, 1163 (8th Cir. 2014). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict

---

[8] The First Amendment applies to the states through its incorporation into the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); *Wagner v. Jones*, 664 F.3d 259, 269 (8th Cir. 2011).

for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson*, 477 U.S. at 255. Even so, at the summary judgment stage, courts must view "the facts in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable inferences that can be drawn from the record." *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014)). To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). But "the nonmoving party [need not] produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Id.* at 324.

## III.  ANALYSIS

The Court will first analyze BLinC's claims and its entitlement to nominal damages and injunctive relief. The Court will conclude by considering the individual Defendants' qualified immunity defense.

### A.  *Free Speech, Expressive Association, and Free Exercise Claims*

As discussed below, Defendants are subject to strict scrutiny with respect to BLinC's free speech, expressive association, and free exercise claims. The Court will analyze the other elements of those claims before addressing Defendants' strict scrutiny burden.

1.   Free speech and expressive association claims

BLinC asserts three claims under the Free Speech Clause—"expressive association" (Count VI), "compelled speech" (Count VII) and "viewpoint discrimination" (Count VIII). BLinC argues the University created a limited public forum by granting recognition to student organizations.  Having done so, BLinC claims, Defendants violated its rights by denying it RSO status because of its leadership requirements.  BLinC adds that this action denied its members the ability to associate with "like-minded individuals . . . for the purpose of expressing commonly held views."  *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 309 (2012).  Relatedly, BLinC argues that applying the Human Rights Policy to the group would force it to allow leaders hostile to its beliefs, thus impacting the message it conveys to its members and the University at large. Defendants agree the University created a limited public forum, but they argue no evidence exists that the University intended to discriminate against or disadvantage BLinC because of its views.

When student groups in a limited public forum assert free speech and expressive association claims stemming from restrictions on their leadership criteria, "[w]ho speaks on [the group's] behalf . . . colors *what* concept is conveyed."  *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 680 (2010).  In such circumstances, the Supreme Court of the United States has held that its "limited-public-forum precedents supply the appropriate framework for assessing [the group's] speech and association rights."  *Id.* Accordingly, the Court will assess BLinC's speech and association claims together.

"If a state university creates a limited public forum for speech, it may not 'discriminate against speech on the basis of its viewpoint.'"  *Gerlich v. Leath*, 861 F.3d 697, 704–05 (8th Cir. 2017) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)).  Universities "establish limited public forums by opening property 'limited to use by

certain groups or dedicated solely to the discussion of certain subjects.'" *Martinez*, 561 U.S. at 679 n.11 (citation omitted).   A university program that grants student organizations official registration or recognition amounts to a limited public forum. *Id.* at 679. Universities may constitutionally restrict access to limited public forums so long as the access barriers are "reasonable and viewpoint neutral." *Id.*

The parties agree the University has created a limited public forum by granting recognition to student organizations.   In its Order granting BLinC's Motion for Preliminary Injunction, the Court determined: (1) the University's restrictions on access to the forum based on its Human Rights Policy are reasonable in light of the intended purposes of the forum; and (2) the Human Rights Policy is viewpoint neutral as written. *See* [ECF No. 36 at 22–23]. The Court sees no reason to revisit those determinations.   However, Defendants' actions are still subject to strict scrutiny if the Human Rights Policy is not viewpoint neutral as applied to BLinC. *See id.* at 23.

"Viewpoint discrimination is . . . an egregious form of content discrimination" that arises when "the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829; *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 108–09 (2001) (finding viewpoint discrimination where the limited public forum was available to groups to teach morals and character development to children, but access was denied to a group which sought to teach those issues from a religious viewpoint). Such discrimination "is presumed impermissible when directed against speech otherwise within the forum's limitations," *Rosenberger*, 515 U.S. at 830, and is subject to strict scrutiny, *see McCullen v. Coakley*, 134 S. Ct. 2518, 2530 (2014).

The Supreme Court has previously considered these principles as applied to religious student groups.   Notably, in *Rosenberger*, the court held that a public university could not withhold

-15-

student organization benefits from a group based on its religious perspective. 515 U.S. at 845–46. The officially recognized student group in that case sought reimbursement from a student activity fund for the costs of printing its newspaper, which espoused Christian views. *Id.* at 826–27. The university affirmed the student government's denial of funds to the group because the newspaper constituted a "religious activity," and a university regulation prohibited such an activity from receiving reimbursement. *Id.* at 825–26. The court determined that, by its terms, the prohibition did not "exclude religion as a subject matter but select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* at 831. Consequently, the prohibition, in its terms and application, amounted to viewpoint discrimination. *See id.* at 832, 837.

In contrast, the Supreme Court more recently upheld a public law school's decision to refuse to grant official recognition to a religious group that sought an exception to the university's nondiscrimination policy, which the parties stipulated was an "all-comers" policy. *Martinez*, 561 U.S. at 669. Under this policy, approved organizations had to "allow any student to participate, become a member, or seek leadership positions in the organization, regardless of . . . status or beliefs." *Id.* at 671. The law school granted official recognition to student groups through a "Registered Student Organization" program, and official recognition came with additional benefits. *Id.* at 669. Members of a formerly-approved student group decided to become a charter student chapter of the Christian Legal Society ("CLS"). *Id.* at 672. To become an affiliate chapter, the group had to adopt bylaws requiring members to sign a "Statement of Faith" and agree to live their lives by certain principles. *Id.* Among those principles was "the belief that sexual activity should not occur outside of marriage between a man and a woman; CLS thus interpret[ed] its bylaws to exclude from affiliation anyone who engage[d] in 'unrepentant homosexual conduct.'" *Id.* The school rejected CLS's application for registered status for noncompliance with

the nondiscrimination policy because CLS "barred students based on religion and sexual orientation." *Id.* at 672–73. CLS requested an exemption from the policy, which the school refused to grant. *Id.* at 673.

The Supreme Court applied the limited public forum analysis to the school's policy and concluded that it was both reasonable and viewpoint neutral. *Id.* at 688–89, 695–97. On viewpoint neutrality, the court found it "hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers." *Id.* at 694. Comparing the policy to those at issue in prior cases, including *Rosenberger*, the court determined that, whereas those "universities singled out organizations for disfavored treatment because of their points of view, Hastings' all-comers requirement draws no distinction between groups based on their message or perspective." *Id.* The court concluded that "[a]n all-comers condition on access to RSO status, in short, is textbook viewpoint neutral." *Id.* at 694–95.

BLinC attempts to distinguish the instant case from *Martinez* on the grounds that the University does not have an all-comers policy. *See* [ECF No. 82-2 ¶ 1]. This is a relevant distinction. *Martinez* is mostly notable for its determination that the all-comers policy at issue was a viewpoint-neutral regulation of speech. But because the University does not have an all-comers policy, *Martinez* does not resolve the viewpoint-neutrality question here.

BLinC argues the Human Rights Policy is not viewpoint neutral because the University does not apply it uniformly. Generally, the disparate application of a regulation governing speech can constitute viewpoint discrimination. "To sustain an as-applied challenge based on viewpoint discrimination, [a plaintiff] must establish a 'pattern of unlawful favoritism' by showing that she 'was prevented from speaking while someone espousing another viewpoint was permitted to do so.'" *Phelps-Roper v. Ricketts*, 867 F.3d 883, 897 (8th Cir. 2017) (citations omitted). Consistent

with this principle, the United States Court of Appeals for the Seventh Circuit has found that a university likely committed viewpoint discrimination when it unevenly applied its nondiscrimination policy to revoke official recognition from a student group. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 866 (7th Cir. 2006) (finding that a university likely engaged in viewpoint discrimination when the evidence showed that "[f]or whatever reason, [it] applied its antidiscrimination policy to [the plaintiff] alone, even though other student groups discriminate in their membership requirements on grounds that are prohibited by the policy").

The United States Court of Appeals for the Ninth Circuit has addressed this issue more recently. In *Alpha Delta Chi-Delta Chapter v. Reed*, San Diego State University declined to grant official registration to several Christian student groups because their membership requirements violated the university's nondiscrimination policy by requiring officers and members to profess to be Christians. 648 F.3d 790, 795–96 (9th Cir. 2011). The court determined that the nondiscrimination policy was reasonable in light of the purposes of the forum. *Id.* at 799. When evaluating whether the policy was viewpoint neutral, the court addressed the policy both as written and as applied. *Id.* at 800–04. In light of evidence that other student groups had membership requirements that appeared to violate the policy, the court reversed the district court's entry of summary judgment in favor of the defendants and remanded the case. *Id.* at 804. The court noted it was "possible that these groups were approved inadvertently because of administrative oversight, or that these groups have, despite the language in their applications, agreed to abide by the nondiscrimination policy." *Id.* However, the court found that "the record [did] not adequately explain why some official student groups at San Diego State appear[ed] to have membership requirements that violat[ed] the school's nondiscrimination policy." *Id.* The court thus remanded for consideration of whether "San Diego State has (1) exempted certain student groups from the

non-discrimination policy; and (2) declined to grant Plaintiffs such an exemption because of its religious viewpoint." *Id.*

Defendants argue that, like in *Reed*, there remain two triable issues of fact: (1) whether "the differences in application of the [Human Rights Policy] were a mixture of administrative oversight and justified exceptions to the policy"; and (2) whether the University discriminated against BLinC based on its viewpoint. [ECF No. 81-1 at 19]. The Court disagrees and finds that both issues on which the Ninth Circuit remanded *Reed* are established here.

First, Defendants admit the University allows some RSOs "exceptions" to the Human Rights Policy "for compelling reasons which support the educational and social purposes of the forum." [ECF No. 81-1 at 17]. There is no triable issue of fact as to that admission. Even if administrative oversight accounts for some groups' violations of the Human Rights Policy, it does not diminish the legal significance of the fact that the University deliberately exempted other groups from the policy. Also, the University reviewed all RSO constitutions in 2018, and there remain groups that limit membership or leadership based on characteristics protected under the policy. Although facially neutral, the Human Rights Policy is not neutrally applied.

Second, the undisputed evidence shows BLinC was prevented from expressing its viewpoints on protected characteristics while other student groups "espousing another viewpoint [were] permitted to do so." *Phelps-Roper*, 867 F.3d at 897. The University allows Love Works to limit leadership to individuals who share its religious beliefs on homosexuality. But BLinC may not. It allows groups, such as Hawkapellas and the Chinese Students and Scholars Association, to limit leadership based on protected traits in violation of the Human Rights Policy.

But BLinC may not. That is viewpoint discrimination.[9] The University allows groups to speak about religion, homosexuality, and other protected traits through their leadership criteria; but BLinC may not express its views on these subjects. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. That the University has determined some groups nevertheless further the University's educational mission is irrelevant. Defendants' justification for the University's disparate treatment of BLinC goes to the question of whether Defendants can withstand strict scrutiny, not whether their actions were viewpoint neutral.[10]

### 2. Free exercise claims

BLinC argues Defendants violated its rights under the First Amendment's Free Exercise Clause by targeting the group for its religious beliefs and, separately, singling out BLinC's religious practices for censure based on a policy that is not "generally applicable." Defendants disagree, arguing that the Human Rights Policy is a neutral law of general application permitted under the First Amendment.

---

[9] To the extent the University has in fact suspended Love Works' registered status pending the outcome of this litigation—a proposition that is not supported by the record—the Court finds the University's viewpoint discrimination is established where Defendants acknowledge other groups can impose leadership restrictions based on characteristics protected under the Human Rights Policy.

[10] Defendants argue that their reliance on student complaints for enforcing the Human Rights Policy should not be viewed as a selective application of the policy. *See, e.g.*, [ECF No. 81-1 at 19–21]. They cite no authority supporting this proposition, and there is authority indicating this is legally irrelevant. *See Walker*, 453 F.3d at 866–67 (finding it irrelevant whether other student groups would comply with a nondiscrimination policy if threatened with nonrecognition, reasoning that the policy "which [the university] insists applies to all student organizations, is a standing threat of nonrecognition"). In any event, the Court finds this argument is factually irrelevant given the University's 2018 review of RSO constitutions and Defendants' admission that the University allows exceptions to the Human Rights Policy. The latter especially evidences the University's selective application of the policy.

As a threshold matter, the Court finds BLinC's free exercise claims merge. BLinC contends the University targeted the group by enforcing the Human Rights Policy in a manner inconsistent with University policies and its approach to other RSOs. *See* [ECF No. 1 ¶¶ 169–72, 176]. BLinC's "not generally applicable" claim states this another way. In that claim, BLinC argues the University does not apply the Human Rights Policy to favored RSOs; thus, the University violated the Free Exercise Clause when it selectively applied the policy to BLinC. As discussed in more detail below, laws that burden religious activity, and that are not neutral or generally applicable, can violate the First Amendment because their discretionary application involves a negative judgment on religious activity. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537–38 (1993). This is ultimately BLinC's targeting claim: the University's actions—deregistering BLinC by selectively enforcing the Human Rights Policy—reflected "animus" (i.e., a negative judgment) toward BLinC's religious beliefs. Thus, the Court finds the "not generally applicable" precedents offer the appropriate framework for assessing both of BLinC's free exercise claims.[11]

Under the First Amendment's Free Exercise Clause, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The Free Exercise Clause clearly protects a citizen's right to his or her own religious beliefs. *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990) ("The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires.").

---

[11] In support of its targeting claim, BLinC quotes *Trinity Lutheran Church of Columbia, Inc. v. Comer*, for the proposition that "a law targeting religious beliefs as such is never permissible." 137 S. Ct. 2012, 2024 n.4 (2017) (citation omitted). The Human Rights Policy does not "target[] religious beliefs as such." Hence, it is more appropriate to determine whether Defendants took a negative view of BLinC's religious beliefs through its uneven application of the Human Rights Policy.

Under this clause, the "[g]overnment may neither compel affirmation of a repugnant belief . . . nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities." *Sherbert v. Verner*, 374 U.S. 398, 402 (1963) (citations omitted). However, the Free Exercise Clause does not shield every act that may be infected with religiosity from government regulation. *See Smith*, 494 U.S. at 878–79 ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate.").

To this end, the Supreme Court has refused to interpret the Free Exercise Clause "to require exemptions from a generally applicable criminal law." *Id.* Consequently, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879 (citation omitted). Laws that are not neutral and generally applicable require heightened scrutiny and "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531–32.

In *Lukumi*, the Supreme Court considered the neutrality of several municipal ordinances regulating the slaughter of animals. One of the ordinances at issue prescribed punishments for "[w]hoever . . . unnecessarily . . . kills any animal." *Id.* at 537 (alteration in original). The court rejected the defendant's argument that the "ordinance is the epitome of a neutral prohibition." *Id.* In determining that the ordinance was not neutral, the court held:

> [B]ecause it requires an evaluation of the particular justification for the killing, this ordinance represents a system of "individualized governmental assessment of the reasons for the relevant conduct," . . . . As we noted in *Smith,* in circumstances in which individualized exemptions from a general requirement are available, the government "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." Respondent's application of the ordinance's test of necessity devalues religious

> reasons for killing by judging them to be of lesser import than
> nonreligious reasons. Thus, religious practice is being singled out
> for discriminatory treatment.

*Id.* at 537–38 (citations omitted).

Lower courts have used *Lukumi's* consideration of "individualized exemptions" as a basis to trigger heightened scrutiny when the government grants secular, but not religious, exemptions from an otherwise neutral and generally applicable rule. Notably, the United States Court of Appeals for the Third Circuit found a Free Exercise Clause violation in a case involving a police department's policy that prohibited officers from wearing beards. *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999). The purpose of the policy was to foster a uniform appearance. *See id.* at 366. The department denied two Sunni Muslims exemptions from the policy for their religious beliefs, even though medical exemptions were permitted under the policy. *See id.* at 360–61.

Relying on *Smith* and *Lukumi*, the Third Circuit held that "the Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny." *Id.* at 365. The court found that the medical exemption undermined the police department's stated interest in uniformity, and thus it "raises concern because it indicates that the Department has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." *Id.* at 366. The court concluded by stating, "when the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny." *Id.*

Within this circuit, the United States District Court for the District of Nebraska found that a university violated the Free Exercise Clause when it granted secular exemptions to a rule

requiring freshman to live on campus, but denied a similar exemption requested by a student wishing to live off campus in a religious group home. *Rader v. Johnston*, 924 F. Supp. 1540 (D. Neb. 1996). Relying on *Smith* and *Lukumi*, the court found that "[t]he defendants . . . have created a system of 'individualized government assessment' of the students' requests for exemptions, but have refused to extend exceptions to freshmen who wish to live [off campus] for religious reasons." *Id.* at 1552 (quoting *Smith*, 494 U.S. at 884). The court found the requirement was not generally applicable and subsequently applied strict scrutiny. *See id.* at 1552, 1555–56.

These precedents show that, whether viewed as a breach of neutrality or general application, strict scrutiny applies when: (1) the government declines to grant religious exemptions to facially neutral rules for which secular exemptions are permitted; and (2) the circumstances indicate the government did so based on its judgment of the religious values in question. Applying these principles, the University's decision to de-register BLinC is subject to strict scrutiny.

Here, by Defendants' own admission, the University grants student groups secular exceptions to the Human Rights Policy. Further, the University's purported reasons for doing so necessitate the type of value judgment that carries heightened scrutiny. Defendants assert that the University grants exceptions to the Human Rights Policy for reasons that "support the University's educational mission" or the "educational and social purposes of the forum." [ECF No. 81-1 at 17–18]. In declining to grant BLinC an exception for its sincerely held religious beliefs, the University has made a value judgment that BLinC's beliefs do not support those purposes. Moreover, the exceptions the University does grant undermine the purposes of the forum. Defendants cite many such purposes, including allowing students to associate based on shared beliefs and to organize with like-minded students; ensuring academic growth and access to educational opportunities; and ensuring a safe environment in which to do so. *See id.* at 23–24.

-24-

Allowing student groups to restrict leadership or membership based on gender, race, or any protected characteristic does nothing to ensure access to educational opportunities and erodes the safety of the environment for students whose status or views are rejected. This is not to say that the University has violated BLinC's free exercise rights *per se*, but to pass constitutional muster, the University's actions must withstand strict scrutiny.[12]

### 3.   Strict scrutiny

To withstand BLinC's viewpoint discrimination, expressive association, and free exercise claims, Defendants must show that the University's decision to revoke BLinC's RSO status "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar v. Vincent*, 454 U.S. 263, 270 (1981); *see also Lukumi*, 508 U.S. at 531–32.

Defendants never present in their briefs a position on strict scrutiny. However, in the context of BLinC's free speech claims, they argue the Human Rights Policy is reasonable in light of the purposes of the forum. These are different issues, but Defendants' discussion of the relevant policies and their motivations can nevertheless aid the Court in its strict scrutiny analysis.

Defendants assert that student organizations at the University "play an important role in developing student leadership and providing a quality campus environment."   [ECF

---

[12] In addition to free speech challenges, both the *Martinez* and *Reed* courts considered free exercise challenges to the defendants' nondiscrimination policies. In *Martinez*, the Supreme Court rejected this argument in a footnote. 561 U.S. at 697 n. 27. The court reasoned, "the Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct." *Id.* (citation omitted). The court found that, by seeking an exemption from the university's neutral all-comers policy, CLS sought "preferential, not equal, treatment" to which they were not entitled under the Free Exercise Clause. *Id.* In *Reed*, much like its analysis of the plaintiff's free speech claims, the court observed that the nondiscrimination policy was neutral on its face, but because evidence suggested the university granted other groups exemptions to the policy, there remained a factual dispute as to whether the plaintiff was denied an exemption because of its religious beliefs. *See* 648 F.3d at 804–05. Because the record here shows the University unevenly applied the Human Rights Policy, *Martinez* and *Reed* do not contradict the Court's findings as to BLinC's free exercise claims.

No. 81-1 at 23]. As discussed above, Defendants also claim that student groups "[e]nsur[e] academic growth . . . access to educational opportunities, and a safe environment in which to do so." *Id.* at 24. More broadly, through the Human Rights Policy itself, the University "strives to promote diversity and to ensure that all students are granted equal access to educational opportunities within the forum." *Id.* As the Court previously observed:

> These statements show that the intended purpose of the student organization registration program is to allow students to engage with other students who have similar interests and in doing so, students should only fear rejection on the basis of their own merits, not because of their membership in a protected class.

[ECF No. 36 at 21].

These are compelling interests that the University is entitled to pursue. However, "[w]here the government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling." *Lukumi*, 508 U.S. at 546–47. The Court sees no appreciable difference in the potential harms caused by BLinC and those caused by the various RSOs that are permitted to limit leadership or membership based on protected characteristics. Those other groups also hinder diversity and equal access to educational opportunities. The University asserts that some such groups promote other goals, such as providing "safe spaces for minorities which have historically been the victims of discrimination." [ECF No. 81-1 at 18]. Although this goal is important to the University's educational mission, *Lukumi* trains the Court's focus on the comparative harms, not benefits, caused by BLinC and student groups that violate the Human Rights Policy.

The Court is also not convinced that revoking BLinC's registration was narrowly tailored to promote the University's stated interests in its RSO program and Human Rights Policy. Rather

than burden BLinC's constitutional rights, the University could, for example, neutrally and consistently apply its Human Rights Policy. Similarly, it could adopt an "all-comers" policy, a change which would dramatically promote its goals of diversity and equal access to academic opportunity.

Defendants have failed to satisfy their strict scrutiny burden. Accordingly, Defendants have violated BLinC's First Amendment rights to free speech, expressive association, and free exercise of religion. The Court therefore GRANTS BLinC's Motion for Summary Judgment as to Counts III–IV, and Counts VI–VIII.

### B.  Religion Clauses Claims

In Counts I and II, BLinC asserts additional claims against Defendants for violating their rights under the First Amendment's Religion Clauses. These claims are titled "Ministerial Exception" and "Internal Autonomy," respectively. [ECF No. 1 at ¶¶ 149–65]. Despite the differing labels, both claims allege Defendants interfered with the group's selection of its leaders by threatening to revoke its RSO status unless it revised its Statement of Faith. *See id.* ¶¶ 155, 164. In its brief, BLinC does not distinguish between the two claims, arguing only that the alleged interference violates the group's rights under the First Amendment's "ministerial exception." *See* [ECF No. 74 at 45–48]. The Court will thus consider both claims together for the purpose BLinC's motion.

BLinC argues the First Amendment's Religion Clauses prevent government interference with a religious organization's leadership selection. In support of this proposition, BLinC relies on *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), and other cases involving internal disputes within religious organizations.

In *Hosanna-Tabor*, a minister/teacher at a religious school was terminated from her employment after she was diagnosed with narcolepsy. *See id.* at 178–79. The minister filed a claim with the EEOC alleging a violation of the Americans with Disabilities Act. *Id.* at 179. The EEOC subsequently sued the church. *Id.* at 180. On appeal, the Supreme Court adopted the "ministerial exception" to employment discrimination statutes and determined that "the existence of a 'ministerial exception,' grounded in the First Amendment . . . precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers." *Id.* at 188. The court further stated:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Cause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* at 188–89. However, the Supreme Court limited the effect of its ruling:

> The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers.

*Id.* at 196.

BLinC's claim is distinguishable from the minister/teacher's claim in *Hosanna-Tabor* because it does not arise from a live internal dispute within the group. By the time the University issued its ultimatum regarding BLinC's Statement of Faith, the parties had moved on from Miller's complaint to BLinC's future compliance with the Human Rights Policy. *See* [ECF

No. 82-2 ¶ 198]. In other words, BLinC does not ask the Court to resolve a dispute between the group and Miller; it asks the Court to resolve a dispute between the group and the University. Additionally, *Hosanna-Tabor* did not involve conditions on receiving public benefits, nor did it involve a limited public forum. More fundamentally, the ministerial exception has traditionally been used as a defense to claims asserted against a religious organization, not as its own cause of action. *See, e.g., Hosanna-Tabor*, 565 U.S. at 177–79; *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 361 (8th Cir. 1991); *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 117–18 (3d Cir. 2018); *Penn v. N.Y. Methodist Hospital*, 884 F.3d 416, 418 (2d Cir. 2018). This is not surprising. The ministerial exception is concerned with disentangling the government from a religious organization's internal governance disputes; when the government burdens a religious organization's free exercise rights outside of this context, *Lukumi* and similar cases provide the appropriate framework to determine if the government has violated the First Amendment.

BLinC does not cite any cases that apply the ministerial exception in the manner it seeks here. Given the Supreme Court's efforts in *Hosanna-Tabor* to constrain the reach of its holding, the Court declines to extend it to the University's actions in this matter. The Court therefore DENIES BLinC's Motion for Summary Judgment as to Counts I and II.

### C. Permanent Injunction and Nominal Damages

BLinC seeks nominal damages and a permanent injunction "prohibiting enforcement of the University's Human Rights Policy against BLinC based on the content of BLinC's Statement of Faith and leadership selection policies." [ECF No. 71 at 3]. Having established a free speech violation, BLinC is entitled to nominal damages as a matter of law. *See Lowry ex rel. Crow v.*

*Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) ("[N]ominal damages must be awarded when a plaintiff establishes a violation of the right to free speech.").

Turning to BLinC's request for a permanent injunction, "[c]onsideration of a permanent injunction involves essentially the same factors as for a preliminary injunction." *Gerlich v. Leath*, 152 F. Supp. 3d 1152, 1181 (S.D. Iowa 2016). The Court thus considers: (1) whether BLinC has shown success on the merits of its claims; (2) the threat of irreparable harm to BLinC in the absence of an injunction; (3) the balance of harms between BLinC and Defendants; and (4) whether the injunction will serve the public interest. *See id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc)).

As set out above, BLinC has demonstrated success on the merits of its claims. As to the second *Dataphase* factor, the United States Court of Appeals for the Eighth Circuit has held that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably construes irreparable injury." *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, the second factor also weighs in favor of granting a permanent injunction. The Court also finds that the third factor, the balance of harms, favors BLinC. Whereas BLinC's injury is irreparable, any injury the injunction causes the University would be less severe, given that the University allows other RSOs to operate in violation of the Human Rights Policy. Finally, "it is axiomatic that protection of First Amendment rights serves the public interest." *Gerlich*, 152 F. Supp. 3d at 1181. Thus, the fourth factor also favors granting an injunction.

Because all four *Dataphase* factors weigh in BLinC's favor, the Court finds BLinC is entitled to a permanent injunction. The Court will prohibit Defendants from enforcing the Human Rights Policy against BLinC based on the content of BLinC's Statement of Faith and leadership

selection policies, provided: (1) BLinC does not materially alter its Statement of Faith or leadership selection policies from those submitted to the University in response to Nelson's September 13, 2017 letter; (2) the University continues to allow other RSOs exceptions to the Human Rights Policy for their membership or leadership criteria; and (3) BLinC otherwise maintains its eligibility for RSO status.[13]   The injunction is appropriate, in part, because Defendants have admitted that BLinC's Statement of Faith and leadership selection policies do not discriminate based on status.  *See* [ECF No. 82-2 ¶ 135].  Thus, they do not, on their own, violate the Human Rights Policy.   Additionally, the Court stresses the importance of the second qualification—the injunction does not grant BLinC a special exemption if the University applies the Human Rights Policy in a manner permitted by the Constitution.

### D.  Qualified Immunity

Individual Defendants Redington, Baker, and Nelson seek summary judgment under the doctrine of qualified immunity.[14]   "The doctrine . . . protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).  Thus, the Court must determine: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Foster v. Mo. Dep't of Health & Sr. Servs.*, 736 F.3d 759, 762 (8th Cir. 2013).

---

[13] Of course, the University may not discriminate against BLinC by deviating from its normal procedures for enforcing its eligibility requirements.

[14] BLinC argues the individual Defendants seek summary judgment on only BLinC's free speech and expressive association claims.  *See* [ECF No. 84 at 16 n.1].  The Court disagrees.  The individual Defendants ask the Court to "dismiss them in their individual capacities," implying that they seek summary judgment on all of BLinC's claims.  [ECF No. 70-1 at 2].

The Court has found BLinC cannot establish a constitutional violation under its Religion

Clauses claims.   However, Defendants have violated Plaintiff's constitutional rights to free speech,

expressive association, and free exercise of religion.   Thus, as to those claims, the Court focuses

on the second qualified immunity factor—whether the constitutional rights were "clearly

established."   The Supreme Court recently summarized:

> Qualified immunity attaches when an official's conduct "'does not
> violate clearly established statutory or constitutional rights of which
> a reasonable person would have known.'"   While this Court's case
> law "'do[es] not require a case directly on point'" for a right to be
> clearly established, "'existing precedent must have placed the
> statutory or constitutional question beyond debate.'"   In other
> words, immunity protects "'all but the plainly incompetent or those
> who knowingly violate the law.'"

*White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alteration in original) (citations omitted).

"[Q]ualified immunity is important to society as a whole."   *Id.* at 551 (internal quotation

marks omitted).   The "social costs" of claims against public officials "include the expenses of

litigation, the diversion of official energy from pressing public issues, and the deterrence of able

citizens from acceptance of public office."   *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).   The

Supreme Court has cautioned of the "danger that fear of being sued will 'dampen the ardor of all

but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of

their duties.'"   *Id.* (alteration in original) (citation omitted).

Consequently, the "'clearly established law' should not be defined 'at a high level of

generality'" and "must be 'particularized' to the facts of the case."   *White*, 137 S. Ct. at 552

(citations omitted).   "Otherwise, '[p]laintiffs would be able to convert the rule of qualified

immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely

abstract rights.'"   *Id.* (alteration in original) (citations omitted).   Thus, in *White*, the Supreme Court

overturned the denial of qualified immunity when the circuit court "failed to identify a case where

an officer acting under similar circumstances as [the defendant]" was found to have violated the Constitution, relying instead on cases laying out the relevant legal principles "at only a general level." *Id.*

Defendants correctly recognize that the viability of their qualified immunity claim depends on how the constitutional issue is framed. They offer the following:

> The question before the court is whether clearly established law exists which sets forth the course a University official should take in protecting the First Amendment and civil rights of protected groups when those rights come into direct conflict with one another, such that the official could be said to be reasonably apprised of the law at the time of the alleged violations. More specifically: does a university's requirement that a student group adhere to its nondiscrimination and equal opportunity policies in order to receive state funding, recognition, and other peripheral benefits, violate that group's First Amendment Rights when that group's sincerely held religious beliefs are in direct conflict with state and federal civil rights law?

[ECF No. 70-1 at 4]. The Court agrees with this, in part. In offering benefits to RSOs, the University created a limited public forum. The law is clear that a state actor may impose conditions on the use of a limited public forum, provided those restrictions are reasonably related to the purposes of the forum and are viewpoint neutral. *Martinez*, 561 U.S. at 685. As applied to the official recognition of student groups by a university, numerous courts have found that nondiscrimination policies are reasonable in light of the purposes of the forum. *See id.* at 690; *Reed*, 648 F.3d at 799. There are no authorities of which the Court is aware that clearly establish the illegality of applying a viewpoint-neutral nondiscrimination policy to restrict the leadership selection of a religious student group.

But the University does not apply the Human Rights Policy in a viewpoint-neutral manner. It applies the policy selectively, and it allows exceptions to the policy for groups that further the University's educational mission and the purposes of the forum. Thus, the key issue is whether it

was clearly established that such disparate application of a nondiscrimination policy violates a student group's free speech and free exercise rights.  That the selective application of a rule or policy can violate the First Amendment has been established for some time.  *See Lukumi*, 508 U.S. at 537–38; *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional. . . .").  However, the Court must consider the law with regards to the particular facts of this case, namely the nature of the policy at issue and the university setting.

There are elements of nondiscrimination laws and the university setting that could be viewed as complicating this case.  For example, nondiscrimination laws "plainly serve[] compelling state interests of the highest order." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). Such laws generally do not violate the First Amendment because they target discrimination rather than protected speech.  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 571–72 (1995).  Additionally, in a university setting, "First Amendment rights . . . must be analyzed in light of the special characteristics of the school environment." *Martinez*, 561 U.S. at 685–86 (citation omitted).  "A college's commission—and its concomitant license to choose among pedagogical approaches—is not confined to the classroom, for extracurricular programs are, today, essential parts of the educational process." *Id.* at 686. Thus, schools "enjoy 'a significant measure of authority over the type of officially recognized activities in which their students participate.'" *Id.* at 686–87 (citation omitted).

However, the First Amendment's restrictions on viewpoint discrimination apply to a limited public forum established by a university.  *See Gerlich*, 861 F.3d at 709. This is true even when the viewpoint implicates a nondiscrimination policy—"[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better

reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579. It is also clear that a university may not illegally burden a student's free exercise rights. *See Rader*, 924 F. Supp. at 1558.

But these authorities still only set out the general legal principles applicable to this case. At the same time, the cases that are factually most like this matter fail to offer clear conclusions as to the selective application of a nondiscrimination policy. *Martinez* found no liability against the university or its officers. The court emphasized the importance of the policy's neutrality but did not specifically address how a more selective application of the policy would impact its decision. *See Martinez*, 561 U.S. at 694–95. *Reed* is certainly relevant, but on remand, the parties voluntarily dismissed the case and never reached the issue of why certain groups appeared to be exempted from the university's nondiscrimination policy. *See* Joint Mot. to Dismiss, *Alpha Delta Chi-Delta Chapter v. Reed*, 3:05-CV-02186-LAB-WMC (S.D. Cal. March 19, 2013), ECF No. 143. The Seventh Circuit likely sent the strongest message on this issue in *Walker*, but the court was only considering the district court's denial of a preliminary injunction. *See* 453 F.3d at 858–59. Given the lack of factual record in that case, it is difficult to view *Walker* as clearly establishing the constitutional issues here. Each of these cases also involved free exercise claims, but they were either rejected or left unresolved. *See Martinez*, 561 U.S. at 697 n.27 (rejecting free exercise claim); *Reed*, 648 F.3d at 805–06 (finding factual issue remained as to whether school discriminated against student group based on religious views); *Walker*, 453 F.3d at 860 n.1 (declining to address the plaintiff's free exercise claim).

Defendants could be forgiven for focusing on *Martinez*, *Reed*, and *Walker*, given their factual similarities to this dispute. Further, despite indications on the issue, those cases left

unresolved how a selective application of the policies in question would impact the respective plaintiffs' constitutional rights (both free speech and free exercise).  After all, for example, the Court reached its decision on BLinC's free speech and expressive association claims by applying broader First Amendment principles to fill in the gaps left by *Martinez*, *Reed*, and *Walker*.

In these circumstances, the Court cannot say the constitutional issues were established "beyond debate."  Certainly, the individual Defendants should have been aware that their actions implicated BLinC's First Amendment rights; and, indeed, the record shows that they were. *See, e.g.*, [ECF No. 71-4 at 131] (Redington indicating that she had discussions with University counsel over BLinC's revised Statement of Faith); [ECF No. 71-3 at 53–54] (Nelson indicating that he had discussions with Redington and others over whether they were correctly applying the Human Rights Policy).  But the law was not so clear that only a state official who was "plainly incompetent" or "knowingly violate[d] the law" could commit the constitutional violations at issue here. *White*, 137 S. Ct. at 551 (citation omitted).

This is a close call.  The Court is also mindful that the parties have described this case as "unusual" and "difficult."  [ECF Nos. 74 at 8; 81-1 at 5].  The Supreme Court's recent holdings on qualified immunity signal that the defense should only be denied in the absence of such uncertainty.  Accordingly, the Court GRANTS the individual Defendants' Motion for Partial Summary Judgment as to BLinC's free speech, expressive association, free exercise, and Religion Clauses claims (Counts I–IV, VI–VIII).  However, this only applies to the extent Plaintiffs seek money damages.  Qualified immunity does not apply to claims for injunctive relief. *Mead v. Palmer*, 794 F.3d 932, 937 (8th Cir. 2015).  Additionally, Defendants have offered no argument as to BLinC's remaining claims.  Thus, to the extent the individual Defendants seek qualified immunity as to those claims, the motion is DENIED.

## IV.  CONCLUSION

The Court suspects that some observers will portray this case as a fundamental conflict between nondiscrimination laws and religious liberty.  Appealing as that may be, it overinflates the issues before the Court.  The Human Rights Policy promotes valuable goals for both the University and society at large.  There is no fault to be found with the policy itself.  But the Constitution does not tolerate the way Defendants chose to enforce the Human Rights Policy.  Particularly when free speech is involved, the uneven application of any policy risks the most exacting standard of judicial scrutiny, which Defendants have failed to withstand.

* * *

For the reasons set out in this Order:

(1)     The individual Defendants' Motion for Partial Summary Judgment, [ECF No. 70], is GRANTED as to Counts I–IV and Counts VI–VIII.  It is DENIED as to all other counts.

(2)     BLinC's Motion for Summary Judgment, [ECF No. 71], is GRANTED as to Counts III–IV and Counts VI–VIII.  It is DENIED as to Counts I and II.

(3)     The University must pay BLinC nominal damages in the amount of $1.

(4)     As discussed *supra*, Defendants are prohibited from enforcing the Human Rights Policy against BLinC based on the content of BLinC's Statement of Faith and leadership selection policies, provided: (1) BLinC does not materially alter its Statement of Faith or leadership selection policies from those submitted to the University in response to Nelson's September 13, 2017 letter; (2) the University continues to allow other RSO exceptions to the Human Rights Policy for their membership or leadership criteria; and (3) BLinC otherwise maintains its eligibility for RSO status.

The Court will confer with the parties as to BLinC's remaining claims.

IT IS SO ORDERED.

Dated this 6th day of February, 2019.

STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT