# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1696
_____

Business Leaders In Christ, an unincorporated association

*Plaintiff - Appellant*

v.

The University of Iowa; Lyn Redington, in her official capacity as Dean of Students and in her individual capacity; Thomas R. Baker, in his official capacity as Assistant Dean of Students and in his individual capacity; William R. Nelson, in his official capacity as Executive Director, Iowa Memorial Union, and in his individual capacity

*Defendants - Appellees*

------------------------------

Foundation for Individual Rights in Education; 24:7; Chi Alpha; Christian Medical & Dental Associations; Jewish Coalition for Religious Liberty; Ratio Christi; Asma T. Uddin

*Amici on Behalf of Appellant(s)*
_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport
_____

Submitted: September 22, 2020
Filed: March 22, 2021
_____

Before SMITH, Chief Judge, BENTON and KOBES, Circuit Judges.

_____

SMITH, Chief Judge.

Business Leaders in Christ ("BLinC") filed suit against the University of Iowa ("University"); Lyn Redington; Thomas Baker; and William Nelson,[1] alleging that the University defendants violated its First Amendment rights through the application of the University's Policy on Human Rights ("Human Rights Policy"). On cross-motions for summary judgment, the district court held that the University defendants violated BLinC's First Amendment rights to free speech, expressive association, and free exercise of religion. As a result, the court granted BLinC permanent injunctive relief, thereby prohibiting the University defendants from enforcing the Human Rights Policy against BLinC under certain conditions. But the court granted qualified immunity to the individual defendants on BLinC's money-damages claims, concluding that the law on free speech, expressive association, and free exercise of religion was not clearly established.

BLinC appeals, arguing that the district court erred in granting qualified immunity to the individual defendants because its free speech, expressive association, and free exercise rights were clearly established. We hold that the district court erred in granting qualified immunity to the individual defendants on BLinC's free-speech and expressive-association claims; however, it correctly granted qualified immunity to the individual defendants on BLinC's free-exercise claim. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

_____

[1]We will refer to the University, Redington, Baker, and Nelson collectively as "University defendants." We will refer to Redington, Baker, and Nelson collectively as "individual defendants."

I. *Background*

A. *University's Policies*

As a state institution of higher education, the University permits students to form student organizations. A student organization is defined as "a voluntary special interest group organized for educational, social, recreational, and service purposes and comprised of its members." App. Volume I-B of Pl.'s Statement of Material Facts in Supp. of Mot. for Summ. J. at 114, *Bus. Leaders in Christ v. Univ. of Iowa*, No. 3:17-cv-00080-SMR-SBJ (S.D. Iowa 2018), ECF No. 71-3. These groups "are separate legal entities from the University" and may "exist [on campus] whether or not the University endorses them." *Id.*

The University registers student organizations under its "Registration of Student Organizations" policy. *Id.*[2] To become a registered student organization (RSO), the applying group must be 80 percent University students; obey local, state, and federal law; and have purposes consistent with the University's educational objectives. An RSO enjoys several benefits, including eligibility to apply for funds from mandatory Student Activity Fees, inclusion in University publications, utilization of the University's trademarks, and eligibility to use campus meeting facilities and outdoor spaces. A student organization interested in registering as an RSO must "write a constitution" and "hold a Pre-registration meeting with appropriate [University] staff." *Id.* at 115. Thereafter, University staff review the student organization's proposed constitution and application for RSO status and submit it to the University's Student Organization Review Committee for final review.

The RSO policy provides that every RSO must "adhere to the mission of this University, its supporting strategic plan, policies, and procedures." *Id.* at 114 (underline omitted). One of those policies is the University's Human Rights Policy. It states, in relevant part:

---

[2]The policy cited herein is the one that was in effect when BLinC first registered.

The University of Iowa brings together in common pursuit of its educational goals persons of many nations, races, and creeds. The University is guided by the precepts that in no aspect of its programs shall there be differences in the treatment of persons because of race, creed, color, religion, national origin, age, sex, pregnancy, disability, genetic information, status as a U.S. veteran, service in the U.S. military, sexual orientation, gender identity, associational preferences, or any other classification that deprives the person of consideration as an individual, and that equal opportunity and access to facilities shall be available to all. These principles are expected to be observed in the internal policies and practices of the University; specifically in the admission, housing, and education of students; in policies governing programs of extracurricular life and activities; and in the employment of faculty staff and personnel. Consistent with state and federal law, reasonable accommodations will be provided to persons with disabilities and to accommodate religious practices. The University shall work cooperatively with the community in furthering these principles.

Pl.'s Resp. to the Individual Defs.' Statement of Undisputed Material Fact at 4, *Bus. Leaders in Christ v. Univ. of Iowa*, No. 3:17-cv-00080-SMR-SBJ (S.D. Iowa 2018), ECF No. 84-1.

The University does not have an "all-comers policy." *See Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 668 (2010).[3] Instead, the University's RSO policy's membership clause provides:

It is the policy of the University that all registered student organizations be able to exercise free choice of members on the basis of their merits as individuals without restriction in accordance with the University Policy on Human Rights. The University acknowledges the interests of students to organize and associate with like-minded students, therefore

---

[3] An all-comers policy "mandate[s] acceptance of all comers." *Id.* at 671. This type of policy requires school-approved groups to "allow any student to participate, become a member, or seek leadership positions in the organization, regardless of [his or her] status or beliefs." *Id.* (quotation omitted).

-4-

> any individual who subscribes to the goals and beliefs of a student
> organization may participate in and become a member of the
> organization.

App. Volume I-B of Pl.'s Statement of Material Facts in Supp. of Mot. for Summ.
J. at 115. In addition, the RSO policy sets forth the following nondiscrimination
clause:

> Membership and participation in the organization must be open to all
> students without regard to race, creed, color, religion, national origin,
> age, sex, pregnancy, disability, genetic information, status as a U.S.
> veteran, service in the U.S. military, sexual orientation, gender identity,
> associational preferences, or any other classification that deprives the
> person of consideration as an individual. The organization will
> guarantee that equal opportunity and equal access to membership,
> programming, facilities, and benefits shall be open to all persons.

*Id.* The University requires all organizations to include this nondiscrimination clause
in their constitutions to earn RSO status.

Although the RSO policy requires that an RSO "must be open to all students
without regard to" the protected traits set forth in the Human Rights Policy, including
race, creed, color, religion, sex, sexual orientation, and gender identity, *id.*, the
University has approved constitutions of at least six RSOs that expressly limit access
to leadership or membership based on race, creed, color, religion, sex, and other
characteristics that the Human Rights Policy protects. First, Love Works requires
leaders to sign a "gay-affirming statement of Christian faith." Defs.' Resps. to Pl.'s
Statement of Material Fact at 7, ¶ 17, *Bus. Leaders in Christ v. Univ. of Iowa*, No.
3:17-cv-00080-SMR-SBJ (S.D. Iowa 2018), ECF No. 82-2. Second, 24-7 requires
leaders to sign and affirm a statement of faith and live according to a code of conduct,
including abstaining from sexual conduct and relations outside of traditional
marriage. Third, House of Lorde holds membership "interview[s]" to maintain "a
space for Black Queer individuals and/or the support thereof." *Id.* at 11, ¶ 24
(alteration in original). Fourth, the Chinese Students and Scholars Association limits

membership to "enrolled Chinese Students and Scholars." *Id.* Fifth, the Hawkapellas, an "all-female a cappella group" requires a "vocal audition[]" for membership. *Id.* Sixth, the Iowa National Lawyers Guild requires all members to agree with the group's goal of bringing about "basic change in the structure of our political and economic system." *Id.* at 8, ¶18.[4]

## B. *BLinC*

In spring 2014, students from the University's Tippie College of Business formed BLinC. BLinC registered as an RSO that fall. "BLinC was founded as a religious organization to help 'seekers of Christ' learn 'how to continually keep Christ first in the fast-paced business world.'" *Id.* at 34, ¶ 99. BLinC members participate in weekly meetings, which include prayer, Bible discussion, and spiritual reflection. BLinC represents that it is a "Bible-based group that believes the Bible is the unerring Word of God." *Id.* at 40, ¶ 126. It believes that homosexual relationships are "outside of God's design" and "that every person should embrace, not reject, their God-given sex." *Id.* at 65, ¶ 222. "BLinC's beliefs are based on its sincere religious interpretation of the Bible, and are not something it can 'change' simply because the University disagrees with them." *Id.* at 67, ¶ 230.

BLinC's officers are responsible for leading its members in prayer, Bible discussion, and spiritual teaching. They must also implement and protect BLinC's religious mission and model BLinC's faith to the group and to the public. BLinC maintains that its leaders screen prospective officers "to ensure that they agree with and can represent the group's religious beliefs." *Id.* at 38, ¶ 116.

---

[4]Nelson admitted that when certain groups, such as the Iowa National Lawyer's Guild, exclude individuals because of their political views, they violate the Human Rights Policy by discriminating based on an individual's creed.

In March 2016, Marcus Miller, a BLinC member, approached BLinC's then-president Hannah Thompson to discuss his interest in becoming an officer for the next school year. In April 2016, Thompson met with Miller for approximately two hours to "find out if he was ready to provide spiritual leadership." App. Volume III-A of Pl.'s Statement of Material Facts in Supp. of Mot. for Summ. J. at 108, ¶ 16, *Bus. Leaders in Christ v. Univ. of Iowa*, No. 3:17-cv-00080-SMR-SBJ (S.D. Iowa 2018), ECF No. 71-6. According to Thompson, Miller disclosed to her that he was gay. She said that Miller was forthcoming about his desire to engage in same-sex relationships. In addition, Miller told Thompson that he had been struggling with the Bible's teachings on that topic.

Thompson discussed Miller's interest in becoming an officer with the other members of BLinC's executive board. According to Thompson, the board members expressed concern about Miller not sharing BLinC's views on the Bible's sexual-conduct teachings. They determined that Miller fundamentally disagreed with BLinC's faith and, as a result, could not lead BLinC's members "with sound doctrine and interpretation of Scripture." *Id.* at 109, ¶ 19.

Thompson met with Miller again. At that meeting, she restated BLinC's view on the Bible's authority and its teachings about sexual morality. She asked Miller whether he would be willing to forgo romantic same-sex relationships. Miller responded that he was not willing to do so. Thompson replied that Miller could be a part of BLinC but could not join BLinC's executive leadership.

On February 20, 2017, Miller filed a complaint with the University in which he stated that BLinC denied him a leadership position because he was "openly gay." *Id.* at 132. He demanded that the University "[e]ither force BLinC to comply with the non-discrimination policy (allow openly LGTBQ members to be leaders) or take away their status of being a student organization." *Id.*

The University initiated an investigation of Miller's complaint against BLinC. University Compliance Coordinator Constance Shriver Cervantes, from the

University's Office of Equal Opportunity and Diversity, was assigned to the investigation. Cervantes, along with then-Associate Dean of Students Thomas Baker, interviewed Thompson.[5] During the interview, Thompson maintained that BLinC denied Miller a leadership position because he "disagreed with, and would not agree to live by [BLinC's] religious beliefs." Pl.'s Reply to Defs.' Responses to Pl.'s Statement of Material Fact at 55, ¶ 168, *Bus. Leaders in Christ v. Univ. of Iowa*, No. 3:17-cv-00080-SMR-SBJ (S.D. Iowa 2018), ECF No. 91-1. Cervantes disagreed, concluding that BLinC denied Miller a leadership position because of his sexual orientation.

On September 1, 2017, Jacob Estell, BLinC's new president,[6] met with Dr. William Nelson, then-Executive Director of the Iowa Memorial Union,[7] and Dean Baker. At the time of the meeting, Dr. Nelson was responsible for registering student groups on campus. BLinC's vice president, Brett Eikenberry, and two of BLinC's lawyers also attended the meeting. BLinC was still an RSO at that time. Dean Baker began the meeting by noting the investigation's finding that BLinC had denied Miller a leadership position because he was gay and stating that BLinC's action violated the University's Human Rights Policy. Dean Baker informed Estell and Eikenberry that BLinC could remain a registered organization in good standing if it understood the Human Rights Policy and was willing to comply with it going forward.

The meeting primarily focused on what the Human Rights Policy permitted. This included discussion of the "difference between discriminating on the basis of 'status' and choosing leaders based on 'beliefs' and 'conduct.'" Defs.' Resps. to Pl.'s

---

[5]Both Cervantes and Baker are lawyers. Baker has held several titles during his employment with the University.

[6]Estell replaced Thompson as BLinC's president after Thompson graduated in May 2017.

[7]Dr. Nelson is currently the Associate Dean of Students.

Appellate Case: 19-1696   Page: 8   Date Filed: 03/22/2021 Entry ID: 5016811

Statement of Material Fact at 61, ¶ 207. Dr. Nelson and Dean Baker agreed that a student group could require its leaders to abstain from sexual relationships outside of marriage—or abstain only from same-sex sexual relationships—if the requirement "was applicable to all." *Id.* at 59, ¶ 201. Dr. Nelson later testified that BLinC would not have violated the Human Rights Policy if it had denied Miller a leadership position based on his disagreement with BLinC's "religious philosophy" instead of his status as a gay man. App. Volume I-B of Pl.'s Statement of Material Facts in Supp. of Mot. for Summ. J. at 19.

The University's policy was "that student groups could require their leaders to embrace the group's mission," provided the group did not "pursue illegal activity." App. Volume I-A of Pl.'s Statement of Material Facts in Supp. of Mot. for Summ. J. at 45, *Bus. Leaders in Christ v. Univ. of Iowa*, No. 3:17-cv-00080-SMR-SBJ (S.D. Iowa 2018), ECF No. 71-2. Consistent with this policy, Estell and Eikenberry told Dr. Nelson and Dean Baker that BLinC screened its leaders based on their beliefs and conduct, not their status, and that they intended to require BLinC's leaders to abide by the group's beliefs about sexual activity outside of marriage.

Nelson inquired whether BLinC's beliefs were in writing and suggested that potential members know about BLinC's beliefs before joining. Estell and Eikenberry agreed to detail BLinC's beliefs in its constitution. "Dr. Nelson indicated that, once they did so, 'that would resolve [his] concerns about any ongoing violation of the Human Rights Policy.'" Defs.' Resps. To Pl.'s Statement of Material Fact at 63, ¶ 216 (alteration in original).

On September 13, 2017, BLinC received a letter from Dr. Nelson "affirm[ing] that BLinC would be permitted 'to function as a registered student organization in good standing' if it complied with" certain criteria. *Id.* at 64, ¶ 221. Specifically, BLinC had to

1. Commit to ongoing compliance with the University of Iowa Human Rights Policy at all times in the future;

2. Submit a basic list of qualifications for leaders of [its] organization designed to prevent future disqualifications based on protected categories and to ensure that persons who identify as non-heterosexuals are not categorically eliminated from consideration; and

3. Submit an acceptable plan for ensuring that group officers who interview leaders will ask questions relevant to the vision statement that are not presumptive of candidates based upon their sexual orientation.

*Id.* at 64–65, ¶ 221.

In response, BLinC revised its constitution. It "renam[ed] its 'Vision Statement' as a 'Statement of Faith.'" *Id.* at 65, ¶ 222. It also added a paragraph to its Statement of Faith under the heading "Doctrine of Personal Integrity," which provided:

> We believe God's intention for a sexual relationship is to be between a husband and a wife in the lifelong covenant of marriage. Every other sexual relationship beyond this is outside of God's design and is not in keeping with God's original plan for humanity. We believe that every person should embrace, not reject, their God-given sex.

*Id.* In addition, BLinC memorialized in its constitution an obligation that BLinC's leaders "accept and seek to live BLinC's religious beliefs." *Id.* at 65, ¶ 223. Additionally, BLinC included in the revised constitution a formalized process whereby all nominees for leadership positions had to be interviewed by its president and sign a copy of BLinC's Statement of Faith.

On October 19, 2017, Dr. Nelson rejected the changes via letter. Dr. Nelson advised BLinC that its revised constitution failed to satisfy the requirements set forth

Appellate Case: 19-1696   Page: 10   Date Filed: 03/22/2021 Entry ID: 5016811

in Dr. Nelson's earlier letter "for BLinC to remain as a registered student organization in good standing." *Id.* at 66, ¶ 227. He added that BLinC's Statement of Faith facially failed to "comply with the University's Human Right's policy since its affirmation, as required by the Constitution for leadership positions, would have the effect of disqualifying certain individuals from leadership positions based on sexual orientation or gender identity, both of which are protected classifications." *Id.* Dr. Nelson instructed BLinC that it could remain an RSO only if it revised its Statement of Faith to comply with the Human Rights Policy. Dr. Nelson testified that if BLinC would have removed from its Statement of Faith the three sentences excerpted above, he would have accepted BLinC's constitution.

BLinC appealed to Dr. Lyn Redington, then-Assistant Vice President and Dean of Students. On November 16, 2017, she affirmed Dr. Nelson's decision and revoked BLinC's RSO status. In affirming Dr. Nelson's decision, Redington repeated Dr. Nelson's finding that BLinC's Statement of Faith was facially invalid. Since that time, the University defendants have admitted that "a student could 'publicly acknowledge' or identify as being gay and still be [a] leader with BLinC so long as the student agreed with, and 'agreed to live by, BLinC's statement of faith.'" *Id.* at 43, ¶ 135. The University defendants qualified this admission by stating that "the 'openly gay' individual would have to regard his or her innate attraction to members of the same sex as 'sinful' in order to participate as a member of BLinC's leadership team." *Id.*

## C. *Procedural History*

BLinC filed its complaint against the University defendants on December 11, 2017. The complaint asserted various counts against the University defendants under 42 U.S.C. § 1983 for violations of BLinC's First Amendment rights to freedom of speech and expressive association, freedom of assembly, free exercise of religion, and, separately, the First Amendment's Religion Clauses. In addition, BLinC asserted claims for violations of the Fourteenth Amendment's Equal Protection Clause, the federal Higher Education Act, the Iowa Human Rights Act, and various provisions of the Iowa Constitution.

On December 13, 2017, BLinC moved for a preliminary injunction. The district court granted the motion on January 23, 2018. The court ordered the University defendants to restore BLinC's RSO status for a period of 90 days.

In response to the court's order, "the University adopted a 'Student Org Clean Up Proposal,' whereby it decided to review all student organization constitutions in late January and early February 2018 for compliance with the [Human Rights] Policy." *Id.* at 107, ¶ 408. This review was meant to make sure that RSOs' governing documents contained "all required statements," including the "'Human Rights Clause' and a required 'Financial Statement.'" *Id.* at 107, ¶ 409. Reviewers were instructed to look for any language that might contradict the Human Rights Clause, including language that requires leaders or members to embrace certain "beliefs/purposes." *Id.* at 108, ¶ 414. Reviewers were also told that, although RSOs could have purposes or mission statements related to specific classes or characteristics of the Human Rights Clause, membership or leadership could not "be contingent on the agreement, disagreement, subscription to, etc., of stated beliefs/purposes which are covered in the [Human Rights] Clause." *Id.* at 108, ¶ 415. "Dr. Nelson admitted that this guidance was inappropriate and inconsistent with the Policy itself, and that the review was based on a false premise, because the Policy only prohibits status-based discrimination, not belief-based requirements." *Id.* at 108–09, ¶ 416.

The University deregistered 30 groups as a result of its review. But many of those groups were either defunct or failed to timely resubmit their constitutions with a complete version of the Human Rights Policy. The University re-registered many of these groups after they added the required language to their constitutions. Ultimately, the University "approved the constitutions of dozens of organizations that explicitly restrict or control access to leadership or membership based on race, national origin, sex, sexual orientation, gender identity, status as a U.S. veteran, and/or military service." *Id.* at 11, ¶ 24. Among them are Hawkapellas, House of Lorde, and the Chinese Students and Scholars Association. And, as the district court noted, "Love Works, which in many respects is the ideological inverse of BLinC,

-12-

remains registered." *Bus. Leaders in Christ v. Univ. of Iowa*, 360 F. Supp. 3d 885, 894 (S.D. Iowa 2019). The University has suspended the registration of several religious student organizations pending this litigation's outcome.

On March 23, 2018, the district court granted the parties' joint motion to extend the preliminary injunction through June 30, 2018. Then, in anticipation of the preliminary injunction's expiration date, BLinC filed a renewed motion for a preliminary injunction to enjoin the University defendants from interfering with BLinC's RSO status during the pendency of this litigation. On June 28, 2018, the district court granted the motion and ordered the University defendants "to maintain BLinC's registered student organization status until the [c]ourt renders a judgment in this litigation." *Bus. Leaders in Christ v. Univ. of Iowa*, No. 3:17-cv-00080-SMR-SBJ, 2018 WL 3688981, at *2 (S.D. Iowa June 28, 2018).

Following discovery, the parties filed cross-motions for summary judgment. BLinC sought summary judgment on its First Amendment free speech, expressive association, free exercise, and Religion Clauses claims. BLinC sought nominal damages and a permanent injunction "prohibiting enforcement of the University's Human Rights Policy against BLinC based on the content of BLinC's Statement of Faith and leadership selection policies." Pl.'s Mot. for Summ. J. at 3, *Bus. Leaders in Christ v. Univ. of Iowa*, No. 3:17-cv-00080-SMR-SBJ (S.D. Iowa 2018), ECF No. 71.

It also requested a declaration that the individual defendants were personally liable for the constitutional violations at issue and requested that the court set a trial date for the determination of any further damages against them. The individual defendants moved for partial summary judgment in their favor on the grounds of qualified immunity.

The district court granted BLinC's motion for summary judgment on its free-speech, free-association, and free-exercise claims, holding that the University defendants violated BLinC's constitutional rights. On BLinC's free-speech and

expressive-association claims, the court determined "that the University deliberately exempted [some] groups from [its Human Rights P]olicy." *Bus. Leaders in Christ*, 360 F. Supp. 3d at 899. According to the court, "the undisputed evidence show[ed] BLinC was prevented from expressing its viewpoints on protected characteristics while other student groups 'espousing another viewpoint [were] permitted to do so.'" *Id.* (alteration in original) (quoting *Phelps-Roper v. Ricketts*, 867 F.3d 883, 897 (8th Cir. 2017)). "That," the court held, "is viewpoint discrimination." *Id.*

The court also held that the University defendants infringed on BLinC's religious exercise for similar reasons. It noted that, "by Defendants' own admission, the University grants student groups secular exceptions to the Human Rights Policy" and that, "[i]n declining to grant BLinC an exception for its sincerely held religious beliefs, the University . . . made a value judgment that BLinC's beliefs do not support [the educational and social] purposes [of the forum]." *Id.* at 902.

The district court concluded that the University defendants' infringement of BLinC's rights to free speech, expressive association, and free exercise failed strict scrutiny. While the court concluded that the University had a legitimate interest in "allow[ing] students to engage with other students who have similar interests" without having to "fear rejection . . . because of their membership in a protected class," the court determined that there was "no appreciable difference in the potential harms caused by BLinC and those caused by the various RSOs that [were] permitted to limit leadership or membership based on protected characteristics." *Id.* at 903. Therefore, the court determined that the University's "interest given in justification of the restriction [was] not compelling." *Id.* (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 547 (1993)). Furthermore, the court was "not convinced that revoking BLinC's registration was narrowly tailored to promote the University's stated interests in its RSO program and [its] Human Rights Policy" because instead of "burden[ing] BLinC's constitutional rights, the University could, for example, [have] neutrally and consistently appl[ied] its Human Rights Policy." *Id.* Or, the court suggested, the University "could [have] adopt[ed] an 'all-comers'

-14-

policy, a change which would dramatically promote its goals of diversity and equal access to academic opportunity." *Id.*

The district court denied BLinC's motion for summary judgment on its claims that its selection of religious leaders was protected from governmental interference under the Religion Clauses. The court also granted the individual defendants' motion for summary judgment based on qualified immunity because it concluded that the law was not clearly established. However, the court characterized its conclusion as "a close call." *Id.* at 909. The district court's grant of qualified immunity to the individual defendants "only applie[d] to the extent [BLinC] s[ought] money damages. Qualified immunity d[id] not apply to [its] claims for injunctive relief." *Id.* BLinC appeals.[8]

## II. *Discussion*

We note at the outset what is *not* at issue in this appeal. The University defendants have not appealed the district court's holding that they violated BLinC's First Amendment rights to free speech, expressive association, and free exercise through their disparate application of the University's Human Rights Policy. Instead, the focus of this appeal is limited to whether, for purposes of qualified immunity, the law was clearly established that the individual defendants' conduct violated those rights.

On appeal, BLinC maintains that the individual defendants' "actions violated clearly established law" by "engag[ing] in a 'textbook violation' of BLinC's First Amendment rights." Appellant's Br. at 27. According to BLinC, "the controlling precedent of the Supreme Court and the Eighth Circuit has repeatedly confirmed that RSOs have a right to exercise their freedom of speech, association, and religion free from religious viewpoint discrimination." *Id.*

---

[8]Prior to this appeal, the district court granted BLinC's motion to dispose of the remaining claims following the court's order on the parties' cross-motions for summary judgment.

-15-

"Qualified immunity attaches when an official's conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (emphasis added) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). The clearly established inquiry focuses "on whether the offic[ial] had fair notice that her conduct was unlawful"; the reasonableness of the official's actions "is judged against the backdrop of the law at the time of the conduct." *Id*. (quotation omitted); *see also Gerlich v. Leath*, 861 F.3d 697, 704 (8th Cir. 2017). The Supreme "Court's caselaw does not require a case directly on point for a right to be clearly established"; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551).[9] The Supreme Court has admonished lower courts "not to define clearly established law at a high level of generality." *Id*. (quoting *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015)).[10] A court must not deny an official qualified immunity based on "constitutional guidelines [that] seem inapplicable or too remote." *Id.* at 1153.

To prove that the law was clearly established at the time that the individual defendants violated BLinC's constitutional rights of free speech, expressive association, and free exercise, BLinC must "point to existing circuit precedent that

---

[9]The Supreme Court has advised that "[s]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, [such as] excessive force, will apply to the factual situation the officer confronts." *Id.* (quotation omitted); *see also City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (noting that specificity as to a clearly established right "is particularly important in excessive force cases"). The present case, however, is not an excessive force case. But even in those cases, the Court "does not require a case directly on point for a right to be clearly established." *Kisela*, 138 S. Ct. at 1152.

[10]"Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers," but these "general rules . . . do not by themselves create clearly established law outside an obvious case." *Id.* at 1153 (quotations omitted).

involves sufficiently similar facts to squarely govern [the individual defendants']
conduct in the specific circumstances at issue, or, in the absence of binding
precedent, to present a robust consensus of persuasive authority constituting settled
law." *Graham v. Barnette*, 970 F.3d 1075, 1090 (8th Cir. 2020) (cleaned up).

We first address whether BLinC's free-speech and expressive-association
claims are undergirded by clearly established law.

### A. *Free Speech and Expressive Association*

In its complaint, BLinC alleged that the University defendants violated its
right to free speech and right to expressive association. "[I]ts expressive-association
and free-speech [claims] merge: *Who* speaks on its behalf . . . colors *what* concept is
conveyed." *Martinez*, 561 U.S. at 680. Based on the facts of this case, we look to
"limited-public-forum precedents" in determining whether BLinC's "speech and
association rights" were clearly established. *See id.*

The State, "like the private owner of property, may legally preserve the
property under its control for the use to which it is dedicated." *Rosenberger v. Rector
& Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (quoting *Lamb's Chapel v. Ctr.
Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390 (1993)). "The necessities of
confining a forum to the limited and legitimate purposes for which it was created
may justify the State in reserving it for certain groups or for the discussion of certain
topics." *Id.* The State "establish[es] [a] limited public forum[] by opening property
limited to use by certain groups or dedicated solely to the discussion of certain
subjects." *Martinez*, 561 U.S. at 679 n.11 (quotation omitted). But when the State
creates a limited public forum, it is nonetheless prohibited from "exercis[ing]
viewpoint discrimination." *Rosenberger*, 515 U.S. at 829. "Once it has opened a
limited [public] forum . . . the State must respect the lawful boundaries it has itself
set. The State may not . . . discriminate against speech on the basis of its viewpoint."
*Id.* "[V]iewpoint discrimination . . . is presumed impermissible when directed
against speech otherwise within the forum's limitations." *Id.* at 830.

-17-

### 1. *Supreme Court Precedent*

The Supreme Court has previously "considered clashes between public universities and student groups seeking official recognition or its attendant benefits." *Martinez*, 561 U.S. at 683 (citing *Healy v. James*, 408 U.S. 169 (1972); *Widmar v. Vincent*, 454 U.S. 263 (1972); *Rosenberger*, 515 U.S. at 819). In *Healy*, *Widmar*, and *Rosenberger*, the Court "ruled that student groups had been *unconstitutionally singled out* because of their points of view." *Id.* at 685 (emphasis added). First, in *Healy*, the Supreme Court held that a public college's unjustified denial of official recognition to a student group desiring to form a local chapter of Students for a Democratic Society (SDS) violated the First Amendment. 408 U.S. at 194. In that case, a state college had created a limited public forum for student groups. *Id.* at 172–76. To receive official recognition, student groups had to "affirm in advance its willingness to adhere to reasonable campus law." *Id.* at 193. The benefits of official recognition included the right to place announcements in the student newspaper and on campus bulletin boards and the right to hold meetings in "campus facilities." *Id.* at 176. When a group of students requested official recognition for a chapter of the SDS, the college's president denied that request because "[h]e found that the organization's philosophy was antithetical to the school's policies." *Id.* at 174–75. Specifically, the SDS "'openly repudiate[d]' the College's dedication to academic freedom." *Id.* at 176. The college president associated the SDS chapter with other SDS chapters known for "disruptive and violent campus activity" and "considered that affiliation itself [a] sufficient justification for denying recognition." *Id.* at 185.

The Supreme Court acknowledged that "[a] college administration may impose a requirement . . . that a group seeking official recognition affirm in advance its willingness to adhere to reasonable campus law," which includes "reasonable standards respecting conduct." *Id.* at 193. But the Court rejected the college's reasons for denying recognition, holding that a public college "may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." *Id.* at 187–88. It reasoned that "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.* at 180 (cleaned up). "The college classroom with its surrounding

-18-

environs," the Court explained, "is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom." *Id.* at 180–81.

Second, the Court "later relied on *Healy* in *Widmar*." *Martinez*, 561 U.S. at 684. *Widmar* held that a public university engaged in impermissible viewpoint discrimination by excluding a Christian student organization from the forum "based on [the student organization's] desire to use a generally open forum to engage in religious worship and discussion," which "are forms of speech and association protected by the First Amendment." *Widmar*, 454 U.S. at 269. The "public university, in an effort to avoid state support for religion, had closed its facilities to a registered student group that sought to use university space for religious worship and discussion." *Martinez*, 561 U.S. at 684 (citing *Widmar*, 454 U.S. at 264–65). The public university did so pursuant to a "regulation . . . prohibit[ing] the use of University buildings or grounds 'for purposes of religious worship or religious teaching.'" *Widmar*, 454 U.S. at 265.

While the Court acknowledged that "a university[] [has the] authority to impose reasonable regulations compatible with [the university's educational] mission upon the use of its campus and facilities," *id*. at 267 n.5, the Court applied strict scrutiny to the university's regulation because it "singled out religious organizations for disadvantageous treatment." *Martinez*, 561 U.S. at 684–85 (citing *Widmar*, 454 U.S. at 269–70). The Court was "unable to recognize the State's interest" "in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution" "as sufficiently 'compelling' to justify content-based discrimination against [the Christian student organization's] religious speech." *Widmar*, 454 U.S. at 277–78.

Third, "in *Rosenberger*, [the Court] reiterated that a university generally may not withhold benefits from student groups because of their religious outlook. The officially recognized student group in *Rosenberger* was denied student-activity-fee funding to distribute a newspaper because the publication discussed issues from a

Appellate Case: 19-1696   Page: 19   Date Filed: 03/22/2021 Entry ID: 5016811

Christian perspective." *Martinez*, 561 U.S. at 685 (citing *Rosenberger*, 515 U.S. at 825–27). In that case, the student group requested that the student activities fund pay for the costs of printing its newspaper. *Rosenberger*, 515 U.S. at 827. But the student council denied the request, determining that the student group "was a 'religious activity' within the meaning of the Guidelines, *i.e.*, that the newspaper 'promote[d] or manifest[ed] a particular belie[f] in or about a deity or ultimate reality.'" *Id.* (alterations in original). The student council based its decision on its examination of the first published issue of the student group's newspaper that discussed newsworthy matters from a Christian perspective. *Id.* The university sustained the denial of funding. *Id.*

The Court determined that "[b]y the very terms of the [student association funding] prohibition, the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* at 831. The Court held that the university had engaged in "viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 830.

Fourth, and most recently, the Supreme Court, in *Martinez*, held that a public law school's all-comers policy—a policy "mandat[ing] acceptance of all comers"— constituted "a reasonable, viewpoint-neutral condition on access to the student-organization forum." 561 U.S. at 671, 669. The Christian Legal Society (CLS) applied for RSO status and submitted a "set of bylaws mandated by CLS-National." *Id.* at 672. The bylaws "require[d] members and officers to sign a 'Statement of Faith' and to conduct their lives in accord with prescribed principles." *Id.* Those principles included "the belief that sexual activity should not occur outside of marriage between a man and a woman" and "exclude[d] from affiliation anyone who engages in 'unrepentant homosexual conduct.'" *Id.* CLS also excluded students with religious beliefs different from those set forth in the Statement of Faith. *Id.* The law school rejected CLS's application because its bylaws failed to comply with the all-comers policy by barring students based on their sexual orientation and religion.

-20-

*Id.* CLS subsequently requested an exemption from the all-comers policy, which the law school denied. *Id.* at 673.

The Supreme Court found it "hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers." *Id.* at 694. It distinguished "*Healy*, *Widmar*, and *Rosenberger*, in which universities singled out organizations for disfavored treatment because of their points of view" from the law school's "all-comers requirement[, which] draws no distinction between groups based on their message or perspective. An all-comers condition on access to RSO status . . . is textbook viewpoint neutral." *Id.* at 694–95. The Court determined that the law school's "requirement that student groups accept all comers" did not "reference . . . content or viewpoint of the regulated speech." *Id.* at 696 (cleaned up). The all-comers policy focused on "the *act* of rejecting would-be group members without reference to the reasons motivating that behavior." *Id.* It was "CLS's conduct—not its Christian perspective," the Court explained, that "st[ood] between the group and RSO status." *Id.* As a result, the Court held that the law school's "open-access condition on RSO status [was] reasonable and viewpoint neutral" and therefore "reject[ed] CLS's free-speech and expressive-association claims." *Id.* at 697.

## 2. *Eighth Circuit Precedent*

Like the Supreme Court, this court has also applied the limited-public-forum analysis to universities' treatment of student speech. For instance, in *Gay & Lesbian Students Ass'n v. Gohn*, we held that a university engaged in viewpoint discrimination by making funding available to student groups but thereafter denying that funding to a group advocating for gay and lesbian rights. 850 F.2d 361, 362–65 (8th Cir. 1988). We explained "that a public body that chooses to fund speech or expression must do so even-handedly, without discriminating among recipients on the basis of their ideology." *Id.* at 362. To support our holding, we cited the following: "the fact that the university followed an unusual funding procedure that was specific to the gay and lesbian group, some of the decisions makers 'freely admitted that they voted against the group because of its views,' and '[u]niversity

officials were feeling pressure from state legislatures not to fund' the group."
*Gerlich*, 861 F.3d at 707 (alteration in original) (quoting *Gohn*, 850 F.2d at 367).
The "record le[ft] no reasonable doubt that funds were denied because of
disagreement with the [student group's] speech." *Gohn*, 850 F.2d at 368.

More recently, we held that a university engaged in viewpoint discrimination
by denying the use of the university's trademarks to a student group that advocated
for the reform of marijuana laws. *Gerlich*, 861 F.3d at 707. In that case, the
university "grant[ed] student organizations permission to use its trademarks if
certain conditions [were] met. The [university's] student chapter of the National
Organization for the Reform of Marijuana Laws . . . had several of its trademark
licensing requests denied because its designs included a cannabis leaf." *Id.* at 700.
The student group asserted that the university and its officials violated its First
Amendment rights by engaging in viewpoint discrimination. *Id.* at 704. The district
court permanently enjoined the university defendants "from enforcing trademark
licensing policies against Plaintiffs in a viewpoint discriminatory manner and from
further prohibiting Plaintiffs from producing licensed apparel on the basis that their
designs include the image of a . . . cannabis leaf." *Id.* at 703 (alteration in original).
It also denied the university officials qualified immunity. *Id.*

On appeal, we first held that the university's rejection of the student group's
"designs discriminated against that group on the basis of the group's viewpoint." *Id.*
at 705. We then addressed whether such "rights were clearly established." *Id.* at 708.
We framed the inquiry as "whether plaintiffs' right not to be subject to viewpoint
discrimination *when speaking in a university's limited public forum* was clearly
established." *Id.* (emphasis added). Based on *Martinez* and *Rosenberger*, we
concluded that the "plaintiffs' right not to be subjected to viewpoint discrimination
while speaking in a university's limited public forum was . . . clearly established at
the times in question." *Id.* at 709. "Because defendants violated plaintiffs' clearly
established First Amendment rights," we held that "the district court did not err by
denying qualified immunity to defendants and granting plaintiffs summary judgment
on their First Amendment claims." *Id.*

-22-

### 3. *Persuasive Precedent*

Cases from our sister circuits concerning a university's selective enforcement of its nondiscrimination policy to student speech also provide guidance as to the law at the time the individual defendants acted in the present case. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006); *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790 (9th Cir. 2011).

The Seventh Circuit, four years before *Martinez*, reversed a district court's denial of a preliminary injunction, holding that CLS showed a likelihood of success on its claims that the public law school violated CLS's free speech and expressive association rights by revoking its official status based solely on the ground that CLS's requirement that its voting members and officers sign a statement of faith abjuring homosexual conduct violated the university's nondiscrimination policy. *Walker*, 453 F.3d at 867. Addressing CLS's free speech claim, the court observed that while the nondiscrimination policy was "viewpoint neutral on its face," "strong evidence [existed] that the policy ha[d] not been applied in a viewpoint neutral way." *Id.* at 866. The court concluded that the law school had "applied its antidiscrimination policy to CLS alone, even though other student groups discriminate[d] in their membership requirements on grounds that [were] prohibited by the policy." *Id.*

Additionally, in *Reed*, decided one year after *Martinez*, the Ninth Circuit held that "a narrower nondiscrimination policy that, instead of prohibiting all membership restrictions, prohibited membership restrictions only on certain specified bases, for example, race, gender, religion, and sexual orientation" "is constitutional." 648 F.3d at 795. However, it held that "a triable issue of fact [existed] as to whether the narrower policy was selectively enforced in this particular case, thereby violating [the student groups'] rights under the First and Fourteenth Amendments." *Id.*

-23-

4. *Analysis*

An important task in determining whether the law was clearly established at the time the individual defendants acted is to avoid defining the law at a "high level of generality." *See Kisela*, 138 S. Ct. at 1152. In the present case, the appropriate inquiry is "whether [BLinC's] right not to be subject to viewpoint discrimination when speaking in a university's limited public forum was clearly established." *Gerlich*, 861 F.3d at 708. This inquiry takes into account the undisputed facts of the present case: the University's creation of a limited public forum for student speech and subsequent viewpoint discrimination against BLinC, a student organization, within that forum.

First, "it was clearly established at the time of these events" that the University's recognition of RSOs constituted a limited public forum. *Id.* "As the Supreme Court has repeatedly pointed out, a university 'establish[es] limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects.'" *Id.* (alteration in original) (quoting *Martinez*, 561 U.S. at 679 n.11). Second, "it was clearly established that a university may not discriminate on the basis of viewpoint in a limited public forum." *Id.* at 709. *Martinez*, *Rosenberger*, *Widmar*, *Healy*, and *Gerlich* all place "beyond debate," *id.* at 708 (quotation omitted), that BLinC had a "right not to be subjected to viewpoint discrimination while speaking in [the] [U]niversity's limited public forum." *Id.* at 709. As the district court recognized, "the individual [d]efendants *should have been aware* that their actions implicated BLinC's First Amendment rights; and, indeed, the record shows that they were." *Bus. Leaders in Christ*, 360 F. Supp. 3d at 908 (emphasis added).

Nonetheless, the individual defendants argue that there is no clearly established law "definitively decid[ing] the issue of the *uneven enforcement of a nondiscrimination policy* against registered student organizations on a university campus." Appellee's Br. at 60 (emphasis added). But *Walker* and *Reed* both recognized the legal principle that a nondiscrimination policy neutral on its face violates a student group's rights to free speech and expressive association if not

-24-

applied in a viewpoint-neutral manner. *See Walker*, 453 F.3d at 866; *Reed*, 648 F.3d at 803.

To be sure, *Walker* and *Reed* contemplated further proceedings to conclusively determine whether the schools selectively enforced their nondiscrimination policies against the student groups. But *Walker* and *Reed* express a clear legal tenet: "The neutral enforcement of a legitimate school curriculum generally will satisfy [the] requirement" that schools "may limit student speech in school-sponsored expressive activities so long as their actions are reasonably related to pedagogical concerns"; however, "the *selective enforcement* of such a curriculum or the singling out of one student . . . based on hostility to her speech will not." *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (emphasis added) (quotation omitted). Indeed, *Walker*'s and *Reed*'s recognition that a school's selective enforcement of a nondiscrimination policy violates the student group's free speech is supported by Supreme Court precedent. *See Martinez*, 561 U.S. at 685 ("In [*Healy*, *Widmar*, and *Rosenberger*], we ruled that student groups had been unconstitutionally *singled out* because of their points of view." (emphasis added)).[11]

In summary, we are satisfied that Supreme Court precedent, existing Eighth Circuit precedent, and "a robust consensus of cases of persuasive authority," "squarely govern[ed] [the individual defendants'] conduct in the specific circumstances at issue." *Graham*, 970 F.3d at 1090 (cleaned up). As a result, we hold that the district court erroneously granted the individual defendants' motion for summary judgment based on qualified immunity on BLinC's free-speech and expressive-association claims.

---

[11]*Martinez* does not detract from the clearly established law that a school is prohibited from selecting enforcing its nondiscrimination policy against a student group. In that case, "[n]either the District Court nor the Ninth Circuit addressed an argument that [the university] selectively enforce[d] its all-comers policy." *Martinez*, 561 U.S. at 697. The Supreme Court determined that it was "not the proper forum to air the issue in the first instance" and instructed that the Ninth Circuit could, on remand, "consider [the petitioner's] pretext argument if, and to the extent, it is preserved." *Id.* at 697–98.

B. *Free Exercise*

BLinC also maintains that its free-exercise rights were clearly established. Three Supreme Court cases concerning student speech in a university's limited public forum are instructive in determining whether it was clearly established that the individual defendants' selective enforcement of its nondiscrimination policy against BLinC violated BLinC's free-exercise rights. *See Martinez*, 561 U.S. at 697 n.27; *Rosenberger*, 515 U.S. at 841–42; *Widmar*, 454 U.S. at 273 n.13.

First, in *Widmar*, the Christian student organization brought suit against the public university for violations of its "rights to free exercise of religion . . . and freedom of speech" after the university "informed the group that it could no longer meet in University buildings" because a regulation "prohibit[ed] the use of University buildings or grounds 'for purposes of religious worship or religious teaching.'" 454 U.S. at 266, 265. The Supreme Court declined to address the free-exercise claim, stating:

> This case is different from the cases in which religious groups claim that the denial of facilities *not* available to other groups deprives them of their rights under the Free Exercise Clause. Here, the University's forum is already available to other groups, and respondents' claim to use that forum does not rest solely on rights claimed under the Free Exercise Clause. Respondents' claim also implicates First Amendment rights of speech and association, and it is on the bases of speech and association rights that we decide the case. Accordingly, we need not inquire into the extent, if any, to which free exercise interests are infringed by the challenged University regulation. Neither do we reach the questions that would arise if state accommodation of free exercise and free speech rights should, in a particular case, conflict with the prohibitions of the Establishment Clause.

*Id.* at 273 n.13.

Second, in *Rosenberger*, the student group brought suit against the university for its withholding of authorization for payments to a printer for its Christian-

-26-

perspective newspaper, alleging "that refusal to authorize payment of the printing costs of the publication, solely on the basis of its religious editorial viewpoint, violated their rights to freedom of speech and press, to the free exercise of religion, and to equal protection of the law." 515 U.S. at 827. Despite the student group bringing free-speech *and* free-exercise claims, the Court focused almost exclusively on the free-speech claim and did not separately analyze the free-exercise claim. *See id.* at 828–37.[12]

Finally, in *Martinez*, in addition to bringing a free-speech claim, CLS also asserted that the school's "all-comers condition violates the Free Exercise Clause." 561 U.S. at 697 n.27. But, in a footnote, the Court determined that a prior decision "foreclose[d] that argument." *Id.* (citing *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 878–882 (1990) (holding that the Free Exercise Clause does not prohibit the enforcement of an otherwise valid regulation of general applicability that incidentally burdens religious conduct)). According to the Court, CLS's request for "an exemption from [the school's] across-the-board all-comers policy" was a request for "preferential, not equal treatment; it therefore [could not] moor its request for accommodation to the Free Exercise Clause." *Id.*

None of these cases make clear that BLinC would have a free-exercise claim—as opposed to a free-speech claim—against the University defendants for selectively enforcing its nondiscrimination policy against BLinC in a limited public forum. In fact, *Widmar* expressly declined to "inquire into the extent, if any, to which

---

[12]The Court mentioned the Free Exercise Clause one time when it addressed the university's argument that funding the student group would violate the Establishment Clause. *See id.* at 841–42 ("Government neutrality is apparent in the State's overall scheme in a further meaningful respect. The program respects the critical difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. In this case, the government has not fostered or encouraged any mistaken impression that the student newspapers speak for the University." (cleaned up)).

free exercise interests are infringed by the challenged University regulation." 454 U.S. at 273 n.13.

BLinC cites several other cases in support of its argument that the law clearly established that the individual defendants' conduct violated BLinC's free-exercise rights, but none of them involve student speech in a limited public forum.[13] We may

_____

[13]*See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020) (holding that the ministerial exception, grounded in the First Amendment's Religion Clauses, applies to laws governing the employment relationship between a religious institution and certain employees and barred claims brought by teachers at two Catholic elementary schools against their school employers because, even though neither teacher held the title of minister, both performed vital religious duties, including educating and forming students in the Catholic faith, praying with and attending Mass with their students, and preparing students for their participation in other religious activities, and both schools viewed the teachers as playing a crucial part in carrying out the church's mission); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017) (holding that the denial by the Missouri Department of Natural Resources of application by the church, which operated a preschool and daycare center, for a grant to purchase rubber playground surfaces, which denial was based on Department's policy of denying grants to religiously affiliated applicants, was denial of the church's free-exercise rights; "Missouri's policy preference for skating as far as possible from religious establishment concerns" was not a compelling interest); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) (holding that the ministerial exception under the Religion Clauses barred the employment discrimination claim brought by an elementary teacher against a religious school where she taught); *Lukumi*, 508 U.S. at 546 (striking down an ordinance designed to ban religious practice involving alleged animal cruelty and explaining that a law "target[ing] religious conduct for distinctive treatment or advanc[ing] legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases"); *Rader v. Johnston*, 924 F. Supp. 1540 (D. Neb. 1996) (holding that although interests advanced by a state university to support its parietal rule generally requiring full-time freshmen students to live on campus were legitimate, they did not rise to the level of compelling state interests for purposes of withstanding a Free Exercise Clause challenge by a student wishing to reside off-campus for religious reasons, as university's own implementation of the rule, allowing exceptions to over a third of the students affected by it, undercut any contention that the interest was compelling,

-28-

not "define clearly established law at a high level of generality," *Kisela*, 138 S. Ct. at 1152 (quotations omitted), and to apply the general principles derived from those cases to the present case would contravene the Supreme Court's directive.

Because the law was not clearly established at the time that the individual defendants' conduct violated BLinC's free-exercise rights, we hold that the district court did not err in granting qualified immunity to them on BLinC's free-exercise claim.

## III. *Conclusion*

Accordingly, we reverse the district court's grant of qualified immunity to the individual defendants on BLinC's free-speech and expressive-association claims but affirm its grant of qualified immunity to the individual defendants on BLinC's free-exercise claim. We remand for further proceedings consistent with this opinion.

KOBES, Circuit Judge, concurring in part and dissenting in part.

Administrators at the University of Iowa discriminated against religious student groups. The University and individual defendants do not appeal that finding. I join the well-written majority opinion in denying qualified immunity on BLinC's free speech and association claims, but I write separately because I think the law is clearly established on its free exercise claim, too.

To satisfy the Free Exercise Clause of the First Amendment, a law or policy must be both neutral and generally applicable. *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879–82 (1990). A policy is not generally applicable if it is underinclusive—in other words, if exemptions are made for secular but not religious reasons. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542–46 (1993).

---

and other campuses in the university system did not enforce any such residency requirement).

The majority says *Widmar*, *Rosenberger*, and *Martinez* do not clearly establish a free exercise violation under the specific facts of this case. I think these cases are mostly beside the point. In both *Widmar* and *Rosenberger*, the Court found violations of the religious groups' right to free speech without comment on the free exercise claims. *See Widmar v. Vincent*, 454 U.S. 263, 266–67 (1981); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 827–28 (1995). And in *Martinez*, the Court found that the "all-comers" policy did not violate the group's right to free speech or right to free exercise because the policy was both reasonable and viewpoint neutral. *Christian Legal Soc'y of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 669 (2010). Just because these cases have some facts similar to this case does not mean they tell us what is clearly established here. Instead, I look to cases that *do* rest on free exercise grounds.

What the individual defendants did to BLinC has been done before. In *Lukumi*, the Supreme Court struck down a city ordinance regulating the killing of animals because it targeted the Santeria religion and its ritual of sacrificial animal slaughter. *Lukumi*, 508 U.S. at 542–46. The ordinance specifically punished the "unnecessary" killing of animals, supposedly to protect public health and prevent animal cruelty. *Id.* at 527–28; 543. The Court held that the underinclusive ordinance violated the Free Exercise Clause because it specifically exempted slaughtering animals for secular and some religious reasons—commercial operations and kosher food preparation—but not for the Santerians. *Id.* at 545. The Court concluded that a law is not generally applicable and violates the Free Exercise Clause "when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* at 542–43. Here, the individual defendants' choice to deny BLinC an exemption from the Human Rights Policy—while allowing exemptions for other secular and religious groups (that they approve of)—shows that they sought to advance their interests *only* against specific religious conduct. A policy cannot be generally applicable when it is deliberately enforced unequally. What the city council could not do in *Lukumi*, the individual defendants cannot do to BLinC.

-30-

In *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, then-Judge Alito, writing for a unanimous panel, reiterated that granting secular but not religious exemptions from a neutral policy violates the Free Exercise Clause. 170 F.3d 359, 365 (3d Cir. 1999). That policy required male police officers to shave their beards and granted exemptions for medical but not religious reasons. *Id.* at 360–61. The problem was the police department "made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not." *Id.* at 366. Reaffirming the holdings from *Smith* and *Lukumi*, Judge Alito found that the State's value judgment against religious conduct was a "clear" violation of the Free Exercise Clause. *Id.* at 365.

The same thing happened here. The individual defendants decided that student groups with leadership qualifications based on race, gender, or political ideology were not subject to the Human Rights Policy, but BLinC was. That kind of "value judgment in favor of secular motivations, but not religious motivations . . . must survive strict scrutiny." *Id.* at 366. The individual defendants do not—and cannot—explain how what they did meets strict scrutiny.

The rule from *Lukumi* and *Fraternal Order* clearly establishes that granting secular but not religious exemptions from a neutral policy violates the Free Exercise Clause. But if those cases were not enough, the Supreme Court's decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer* puts the question beyond debate. 137 S. Ct. 2012 (2017). Missouri offered grants to qualifying organizations to resurface playgrounds. *Id.* at 2017. Trinity Lutheran operated a religious preschool and applied for a grant but was turned away because the Missouri Constitution prohibited the state from giving money to religious institutions.[14] *Id.* at 2017–18. The Court held that when the State denies an otherwise generally available benefit "solely on

---

[14]Other than being a religious institution, Trinity Lutheran met all the criteria to qualify for the grant. *Trinity Lutheran*, 137 S. Ct. at 2017–18. It ranked fifth out of 44 applicants to receive the grant and was denied solely because it "was deemed categorically ineligible to receive a grant" due to its religious character. *Id.* at 2018.

-31-

account of religious identity" without satisfying strict scrutiny, it violates the Free Exercise Clause. *Id.* at 2019.

BLinC was entitled to all the benefits that came with being a registered student organization. Secular groups that required their leaders to affirm certain beliefs or have a specific characteristic (like race, gender, or political ideology) were exempted from the Human Rights Policy. BLinC was not. Like Trinity Lutheran, BLinC "assert[ed] a right to participate in a government benefit program without having to disavow its religious character." *Id.* at 2022. Denying BLinC that right while allowing secular groups—and other religious groups like Love Works—to access that benefit "inevitably deters or discourages the exercise of First Amendment rights." *Id.* (cleaned up).

The purpose of qualified immunity is to shield good-faith actors who make mistaken judgments about unresolved issues of law, and it protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted). But we do not need the benefit of hindsight to know that the individual defendants' choices were prohibited by the Constitution. They had more than "fair warning" that their conduct was unconstitutional. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted). In fact, they *knew* it was. *See* Maj. Op. 24.

The law is clear: state organizations may not target religious groups for differential treatment or withhold an otherwise available benefit solely because they are religious. That is what happened here. The individual defendants may pick their poison: they are either plainly incompetent or they knowingly violated the Constitution. Either way, they should not get qualified immunity.

––––––––––––––––––––––––––––––

Appellate Case: 19-1696   Page: 32   Date Filed: 03/22/2021 Entry ID: 5016811